1          UNITED STATES OF AMERICA
           UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
           WESTERN DIVISION
3
                    - - -
4          HONORABLE ANDRE BIROTTE, JR.
           UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6

   CLEVELAND CONSTANTINE BROWNE,      )
7                                     )
              PLAINTIFF,              )
8                                     )
   VS.                                )     CASE NO.:
9                                     )     CV 21-2840-AB
   RODYNEY SEBASTIAN CLARK            )
10  DONALDS, ET AL.,                  )
                                      )
11            DEFENDANT.              )
   _____)
12

13

14
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
              FRIDAY, OCTOBER 20, 2023
16
              LOS ANGELES, CALIFORNIA
17

18

19

20

21

22

23
              LAURA MILLER ELIAS, CSR 10019
24            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, ROOM 4455
25            LOS ANGELES, CALIFORNIA 90012
              PH:  (213) 894-0374


              UNITED STATES DISTRICT COURT

```
1       APPEARANCES OF COUNSEL:
2       ON BEHALF OF PLAINTIFFS:
3
                DONIGER BURROUGHS
4               BY:  SCOTT BURROUGHS, ESQ.
                     BENJAMIN TOOKEY, ESQ.
5                    FRANK TRECHSEL, ESQ.
                603 ROSE AVENUE
6               VENICE, CA 90291

7
        ON BEHALF OF THE PRYOR CASHMAN DEFENDANTS:
8
                PRYOR CASHMAN LLP
9               BY:  DONALD ZAKARIN, ESQ.
                     SHAMAR JASTIN TOMS-ANTHONY, ESQ.
10              1801 CENTURY PARK EAST
                24TH FLOOR
11              LOS ANGELES, CA 90067

12
        ON BEHALF OF DEFENDANTS RIMAS AND BAD BUNNY:
13
                FREUNDLICH LAW
14              BY:  KENNETH FREUNDLICH, ESQ.
                16133 VENTURA BOULEVARD
15              SUITE 645
                ENCINO, CA 91436
16

17      ON BEHALF OF DEFENDANT AUBREY DRAKE GRAHAM:

18              MITCHELL SILBERBERG AND KNUPP LLP
                BY:  MARK CRAWFORD HUMPHREY, ESQ.
19              2049 CENTURY PARK EAST
                18TH FLOOR
20              LOS ANGELES, CA 90067-3120

21      ON BEHALF OF DEFENDANTS VLADIMIR FELIX AND
        CAMILO ECHEVERRIE:
22
                FERRAIUOLI, LLC
23              BY:  JEAN VIDAL FONT, ESQ.
                221 PONCE DE LEON AVENUE
24              5TH FLOOR
                SAN JUAN, PR 00917
25
```

```
1
    APPEARANCES OF COUNSEL:
2   (CONTINUED)

3
    ON BEHALF OF DEFENDANT RICH MUSIC, INC.:
4
                JOHNSON AND JOHNSON LLP
5               BY:  DANIEL LIFSCHITZ, ESQ.
                439 NORTH CANON DRIVE
6               SUITE 200
                BEVERLY HILLS, CA 90210
7

8
    ON BEHALF OF DEFENDANT WILLIAM SAMI ETIENNE GRIGAHCINE:
9
                PHILLIPS ERLEWINE GIVEN AND CARLIN LLP
10              BY:  ROBERT CARROLL, ESQ.
                39 MESA STREET
11              SUITE 201
                SAN FRANCISCO, CA 94129
12

13
    ON BEHALF OF THE CINQ MUSIC DEFENDANTS:
14
                BEVERLY HILLS LAW CORPORATION, PC
15              BY:  SAGAR PARIKH, ESQ.
                433 NORTH CAMDEN DRIVE
16              6TH FLOOR
                BEVERLY HILLS, CA 90210
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

                              INDEX
2

3        PROCEEDINGS                              PAGE

4
         MOTIONS TO DISMISS                       4
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    LOS ANGELES, CALIFORNIA; FRIDAY, OCTOBER 20, 2023; 11:41 A.M.

 2                          - - -

 3              THE CLERK:  Calling Civil Case 21-2840.

 4              Cleveland Constantine Browne versus Rodney

 5    Sebastian Clark Donalds, et al.

 6              Counsel, please state your appearances.

 7              MR. BURROUGHS:  Good morning, Your Honor.  Scott

 8    Burroughs from Donovan Burroughs for the plaintiff.  I

 9    believe the plaintiff is joining or attempting join via Zoom

10    from Jamaica as well.

11              THE COURT:  Um, okay.  Who?

12              MR. BURROUGHS:  Apologies, Your Honor.  Plaintiff

13    Cleveland Browne.

14              THE COURT:  Okay.  Let's just make sure.  It's

15    almost 3 o'clock there.  Let's see if he's on.

16              Okay.  I think he's on and on the call.

17              Mr. Tookey?

18              MR. TOOKEY:  Yes, Ben Tookey appearing on behalf of

19    the plaintiffs.  Good morning, Your Honor.

20              THE COURT:  Good morning.

21              MR. TRECHSEL:  Frank Trechsel also on behalf of the

22    plaintiffs.

23              THE COURT:  All right.  So let's go through the NBA

24    list, I guess, on the defense side.  Who wants to start?

25              MR. ZAKARIN:  Your Honor, Don Zakarin from Pryor
```

1   Cashman.  I would call them the Pryor Cashman defendants.  We

2   have about 90 of them.

3            THE COURT:  Okay.  Good morning.

4            MR. TOMS-ANTHONY:  Good morning, Your Honor.

5   Shamar Toms-Anthony also on behalf of the Pryor Cashman

6   defendants.

7            THE COURT:  All right.  Good morning.

8            MR. FREUNDLICH:  Good morning, Your Honor.  Kenneth

9   Freundlich on behalf of Rimas and Benito Antonio Martinez

10  Ocasio who is better known as Bad Bunny.

11           MR. HUMPHREY:  Mark Humphrey from Mitchell

12  Silberberg & Knupp for defendants Aubrey Drake Graham and

13  Sound of 1.0 Catalog, LP which was incorrectly sued as OVO

14  Sound, LLC.

15           THE COURT:  Okay.  Who else do we have for the

16  defense?  Mr. Font?

17           MR. FONT:  Good morning, Your Honor.  Mr. Vidal

18  Font, good morning, Your Honor, on behalf of Vladimir Felix

19  and Camilo Echevarrie.

20           THE COURT:  Okay.  Good morning or good afternoon

21  where you are?

22           MR. FONT:  Good afternoon, yes.

23           THE COURT:  Mr. Lifschitz.

24           MR. LIFSCHITZ:  Good morning, Your Honor.  Daniel

25  Lifschitz from Johnson and Johnson on behalf of defendant

1    Rich Music, Inc.

2              THE COURT:  Okay.  Good morning.

3              Mr. Carroll.

4              MR. CARROLL:  Good morning, Your Honor.  Robert

5    Carroll from Phillips Erlewine Given & Carlin on behalf of

6    defendants Empire Distribution, Incorporated and William Sami

7    Etienne Grigahcine.

8              THE COURT:  Okay.  And then I think do we have

9    Mr. Parikh on the call?

10             MR. PARIKH:  Yes, good morning, Your Honor.  Sagar

11   Parikh for the Cinq defendants, Cinq Music Group and Cinq

12   Publishing.

13             THE COURT:  Okay.  Is there any other counsel that

14   we have not or has not made their appearances yet on this

15   case?

16             MR. HUMPHREY:  Your Honor, Mr. Wolfe, counsel to

17   about 12 defendants, he's, um, on a jury trial.  Got called

18   in Orlando and he just told me -- he's sharing -- joining the

19   arguments, but he told me to let Your Honor know he may be

20   able to get on if he gets a break in the jury trial.

21             THE COURT:  Okay.  So if you find out that he does

22   because there are number of people on the zoom call so we

23   won't necessarily -- it may be a challenge to know if he

24   wants to join.  Because, um, if he gets on the call and needs

25   to be heard, he'll just be a zoom participant unless you tell

UNITED STATES DISTRICT COURT

1    us so we can promote him to the call.

2              MR. HUMPHREY:  Your Honor, I'm going to be using my

3    phone.

4              THE COURT:  You can do so.  I get it.

5              Anyone else?

6              Okay.  So let's talk about this case here.  Sorry,

7    I just want to pull up the notes I have for here.  As you all

8    can imagine, a big file so it takes a while to load up when I

9    switch from case to case.

10             Let's talk music for a little bit.  All right.  So

11   let me ask, and I don't know if it's Mr. Burroughs or

12   Mr. Tookey or Mr. Trechsel has drawn the short straw, I just

13   want to figure out your clients they have registered

14   copyrights with Dembow, Pounder Riddim, and Pounder Dub

15   Mix II; is that correct?

16             MR. BURROUGHS:  Almost, Your Honor.  And we lay

17   this out in our papers and it's also something that we've

18   created a mix to illustrate for the Court how the

19   registrations work for the -- the, um, different compositions

20   and sound recordings.

21             THE COURT:  You say you created a mix meaning what?

22             MR. BURROUGHS:  An audio mix that we lodged with

23   the Court and we can get to that, but to answer your question

24   directly, we have the composition and the sound recording

25   copyright for Fish Market.

1                THE COURT:  Fish Market.

2                MR. BURROUGHS:  Those are registered.  We have the

3      Dembow, uh, composition and that's registered.  And then we

4      have the Pounder sound recording and that's registered.

5                THE COURT:  So is Pounder sound recording different

6      than Pounder Dub Mix II?

7                MR. BURROUGHS:  We refer to it as -- it's the same,

8      Your Honor.

9                THE COURT:  And what about Pounder Riddim?

10               MR. BURROUGHS:  The same.  All of these songs are

11     essentially the same.  They're all recordings of Fish Market

12     so the sound recording of Fish Market and the sound recording

13     of Pounder Dub Mix II, it's the same composition recorded

14     with different recordings and they have different

15     registrations.

16               THE COURT:  Okay.

17               MR. BURROUGHS:  That's something that I want to

18     make sure that we keep it sort of clear on the record is that

19     a song unlike a book or a film, it'll have two copyrights.

20     You have the copyright for the composition and the copyright

21     for the sound recording.  And every sound recording in this

22     case is going to embody the composition of Fish Market.

23               So it does get, you know, the parties address this

24     in different ways in the papers, but to the extent that we're

25     claiming a sound recording copyright for Pounder Dub Mix, for

```
 1   example, that's the Fish Market composition played and
 2   recorded.
 3           THE COURT:  And so your view is Pounder Riddim and
 4   Pounder Dub Mix II, they're not separate works.  They're one
 5   in the same?
 6           MR. BURROUGHS:  Pounder Dub Mix is the sound
 7   recording that's at issue in the case.
 8           THE COURT:  Okay.  All right.
 9           MR. BURROUGHS:  To clear one other thing just so
10   we're all on the same page, riddim as it's used in the
11   industry it's not the same as rhythm.  It's how we refer to
12   an instrumental.
13           THE COURT:  No, well, well, I know that.
14           MR. BURROUGHS:  Okay.  It's in the papers.  From
15   the defense side, there's some I think some lack of clarity
16   on that.  We're not making any sort of allegation as to just
17   a rhythm.  We're making these allegations as to the
18   instrumental composition and, of course, the sound
19   recordings.  And then for Dembow we have lyrics and the --
20   the clarification that needs to be made there is the vocal
21   music that's added, this was raised in the papers so we might
22   as well get it out of the way now, when we initially
23   submitted the copyright registration for the Dembow
24   composition to the Copyright Office, we included everything.
25   The Copyright Office took the step of amending it and
```

1    removing everything but the lyrics.

2              THE COURT:  Right.

3              MR. BURROUGHS:  We then went back to the Copyright

4    Office and said you shouldn't have done that.  They said

5    okay, you're right and they added back everything.  And what

6    that is cause it's a little bit hard even when I grapple with

7    it, it's sort of difficult, but it's the composition and the

8    vocal performance that's the inflection, the cadence, the

9    flow that's all encompassed in that registration.

10             THE COURT:  Okay.  Can you walk me through, I just

11   want to make sure I understand it.  Look, I just want to make

12   sure, walk me through your infringement theory, if you could.

13             MR. BURROUGHS:  Okay.  And I can play for Your

14   Honor the audio recording of the four songs to show you the

15   evolution of it.

16             THE COURT:  Okay.  Do you I need to bring up my

17   controller or something?

18             MR. BURROUGHS:  We did an audio test before Your

19   Honor took the bench so we'd have everything cued up.

20             THE COURT:  I'm sorry.  It looks like --

21             MR. ZAKARIN:  Your Honor, if I can?

22             THE COURT:  Mr. Zakarin.  Okay.

23             MR. ZAKARIN:  If I can on this, the audio recording

24   was lodged three days ago.  It's not part of the complaint.

25   It is, I'm not sure what it is relevant to motions to

1    dismiss.  I have no objection to Your Honor hearing it.

2    They've put it together.  It's snippets of whatever they say

3    it is.  It's not authenticated.  They've said we have it, we

4    know what it is.  That's not so.  We got it when Your Honor

5    got it three days ago.

6         THE COURT:  Well, and I appreciate you raising it

7    cause I was gonna ask the question because when I was reading

8    this weeks ago, I'm like where is the recording and I thought

9    quite frankly because of COVID, you know, filings, um, if you

10   attach something, things are getting lost.  I thought we had

11   missed it and then it was confirmed that it had not been

12   filed.

13        I think for purposes of today, we can debate

14   whether or not I should consider it as it relates to the

15   motion, but I do think it would be beneficial to the Court to

16   understand because I have some questions about things.

17        MR. ZAKARIN:  Certainly, I would not deprive

18   Your Honor of or even deign to do that.  You have the right

19   to hear whatever you want to hear.  I was just observing that

20   it's really not part of the motion.  It wasn't lodged with

21   it.  I think that Mr. Freundlich may have lodged some audio

22   tapes in connection with his motion to dismiss.

23        THE COURT:  Right, I did listen to those.

24        MR. ZAKARIN:  I'll sit down and be quiet.

25        THE COURT:  Mr. Burroughs.


UNITED STATES DISTRICT COURT

1          MR. BURROUGHS:  And just for the record, Your

2    Honor, each of these, um, compositions and sound recordings

3    is plainly referenced in the complaint.

4          THE COURT:  I know it is referenced, but what

5    you're about to play is a compilation.  It's not

6    specifically, um, it's not exhibit song, exhibit song.  It's

7    a compilation of all of the songs that are referenced in the

8    complaint; correct?

9          MR. BURROUGHS:  Um, yes, Your Honor.  Snippets so

10   they're not altered in any way.  So it's the snippets of each

11   song just put together to illustrate for the Court the

12   evolution and I think it goes to the question.  So what

13   you'll hear is the first 21 seconds are the Fish Market

14   composition as captured in the Fish Market sound recording

15   and we have registrations for both of those.  At 21 seconds

16   you'll hear the Dembow composition played.

17         THE COURT:  Okay.  Can you play it and then stop at

18   21 seconds, and then tell me what we're gonna hear next?

19         MR. BURROUGHS:  Absolutely.

20         And then finally, Your Honor, you'll hear at

21   36 seconds, the Fish Market composition as captured in the

22   Pounder Dub Mix II sound recording which as I mentioned

23   before, we do have registered.

24         THE COURT:  Okay.

25         MR. BURROUGHS:  So here's the Fish Market

1    composition.

2                        (Audio Played.)

3            MR. BURROUGHS:  And now I'm going to play a

4    recording of Dembow composition.

5                        (Audio Played.)

6            MR. BURROUGHS:  Okay.  And now finally, I'm going

7    to play the Pounder II Dub Mix recording.

8                        (Audio Played.)

9            MR. BURROUGHS:  So you can hear that the Fish

10   Market composition is played throughout all three of those

11   songs.  It's just replayed.

12           THE COURT:  That's your position.

13           MR. BURROUGHS:  That's plaintiff's position, yes,

14   Your Honor.

15           THE COURT:  Well, go ahead.  So walk me through

16   your infringement theory, if you could.

17           MR. BURROUGHS:  So Your Honor, it's -- I mean this

18   really is a case that it's sua generous.  There's never been

19   a case I think like this before.

20           THE COURT:  Well, one that's been filed.  Look, is

21   this any different than Bob James and all the other artists,

22   The Foundation, Impeach the President, all those songs that

23   were arguably the foundation for virtually every hip-hop

24   record from the 80s on.  Look, I'm an 80s baby.  I was a D.J.

25   in college.  I mean so -- I mean, I get you may be the first

```
 1    to file the suit in this form, but is this any different than
 2    those other kinds of cases?
 3         MR. BURROUGHS:  Yes, it's entirely different and
 4    the reason why it's unique, we have overwhelming evidence of
 5    actual copying.  Never before has there been a copyright case
 6    where the defendants are on record saying we copied the
 7    plaintiff's work.  We have another audio recording with some
 8    of those interview snippets where one of the producers for
 9    over 200 songs at issue in this case admits I copied this.
10         And one of the other defendants, Ivy Queen had a --
11    and she had a pod cast on the history of reggaeton that's now
12    been taken off line where she goes on and says these songs
13    are copied from Dembow.
14         THE COURT:  Well, again, is that part of the
15    record?  And now look, I'm just gonna be candid with you.  I
16    know that pod cast.  Like I said, I'm a music guy.  Okay?
17    Wrong or right.  Um, does she say she copied it or she says
18    that's the foundation?  I can't remember because I've heard
19    that pod cast probably over a year ago, um, and I think
20    virtually every reggaeton artist says it comes from the
21    Dembow sort of foundation if you will.
22         MR. BURROUGHS:  Exactly.
23         And what she says Your Honor verbatim is we're
24    going to hear about that beat that came to define the scene.
25    You know what I'm talking about Dembow.  That beat will
```

UNITED STATES DISTRICT COURT

1    dominate almost every song of reggaeton that you hear today.

2         She goes on to say that Sleepy Wonder and Bobo

3    General did a song on the beat called Pounder which we

4    referenced earlier.  This record has an instrumental version

5    of the new beat on B side that's Pounder Dub Mix II and that

6    instrumental is the one that end up getting sampled over and

7    over again and becoming the Dembow beat we all know and love.

8         DJs in Puerto Rico started literally flying to

9    New York and going to the Jamaican record store and buying up

10   every copy of Sleepy Wonder's record that they could find.

11        So the papers address more of a traditional

12   copyright infringement case, and this is important because of

13   the ruling notice requirement.  But this is more similar to

14   what we had in the Newton v. Diamond case where it's an

15   actual copying case.  And if we're talking about actual

16   copying, we're not worried as much about substantial

17   similarity or access.

18        We're worried about qualitative and quantitative

19   importance, which reading between the lines, I think that's

20   really the defendant's position.  Yes, we copied, but it's

21   not important or it was okay that we did it because so many

22   other people did.

23        THE COURT:  And to that point, I mean, when

24   Evie Queen talks about it, she says this is the thing that

25   will dominate.  Right?  Your view is dominate means copy

1    or -- or could there be an argument that dominate means these

2    are the beats that we use?  This is the foundational beats

3    that we use to create this style of music.

4            MR. BURROUGHS:  It could be, Your Honor, and that's

5    more of a Rule 56 summary judgment standard.  And I will

6    eventually get to this I think, but today we're talking about

7    Rule 8 and reasonable notice.  And to the extent the

8    defendants spend a lot of time, they spill a lot of ink

9    saying we don't know what we copied.  They need to tell us

10   who did what with whom in the studio.

11           Those positions they don't hold water because they

12   know exactly what they copied and how they did it.  In fact

13   they know more than we can possibly know about who came in

14   with what sample.  Who said oh, let's put this up in the mix.

15   Who said oh, let's pitch shift this.  They argue that we

16   didn't give them enough details about what happened in

17   studio, but we don't have access to that.

18           And we cite the Friedman case.  Even on summary

19   judgment, we would still be able to beat that standard.

20   Here's it's the 12 B(6).  It's the outset of the case and

21   what we have that's publically available to us, we've

22   provided to them.  And really we're here today, this is a

23   situation of the defendants' own making.

24           If you recall, we filed these cases discretely,

25   broken down and we mention in Paragraph 193 of the complaint,

1    there was 59 discrete cases.  We filed the first one.  We

2    were actually in discovery.  We filed the additional ones.

3    We filed one in New York to address some jurisdictional

4    concerns and then the defendants came to us.

5         And the defendants said look, we need to

6    consolidate these.  We need to bring these all together.

7    It'll be more efficient.  That's the way we should handle it.

8    And we said I don't think so.  It's gonna be a little bit

9    unwieldily.  There's a lot of songs.  So they moved

10   Your Honor for relief.  They said look, Your Honor, we need

11   to consolidate these.  That's the best way to move these

12   cases forward.

13        And after that happened, now they're coming to the

14   Court and saying these cases are too unwieldily.  Basically

15   everything we were saying in opposition to the motion to

16   consolidate.  And in Paragraph 193, we break down the 59

17   cases.  And then throughout the complaint and you see it,

18   it's a voluminous complaint, we give them notice of what our

19   song is.  We break down the tracks.  We break down the

20   elements.

21        We did a highly granular description of each

22   percussive and harmonic element.  Everything is in the

23   papers.  We provided transcriptions that set forth all seven

24   tracks in detail.  And then we provide to them a written

25   description of how those elements were copied, and for 33 of

1    the works, we provide those transcriptions.  The

2    transcriptions that would have been in all 59 cases had we

3    not consolidated.

4         Rule 8 says that in cases like this where the

5    infringement is going to be manifest, it's gonna be obvious

6    to the defendant, you don't need to lay out every single song

7    and every single transcription.  That goes against the whole

8    notion of Rule 8 which is a concise statement that puts them

9    on notice.  And here that's exactly what we've done.

10         This is not a literary case or a film case like

11    much of the precedence cited by the defendants.  In those

12    cases, of course, you may need to have a side-by-side saying

13    in the opening scene so-and-so had this dialogue and said it

14    to this person or this character has these components.  This

15    is a music case where copying is for the most part or at

16    least referenced for the most part is conceded.

17         They're all aware of our music.  The whole genre is

18    named after one of our songs so they can't come into court

19    and say Your Honor, we're unaware of what they're claiming.

20    Here, the best way to put them on notice is what we've done.

21    We've provided them with that granular breakdown of our

22    elements and we've provided them with our theory as to how it

23    was copied.

24         Now, the vast majority of the songs are copied with

25    mathematical precision, mathematical precision.  Not only was

UNITED STATES DISTRICT COURT

 1    that the intent of a lot of the copying, it was the whole

 2    point.  They were trying to make a copy of our song to fit

 3    within this genre, this established genre.  And to the extent

 4    that they take issue with the fact that we don't provide more

 5    detail about what each one actually did when they were

 6    privately recording, it's beyond our -- the purview of what

 7    is available to us at this point, Your Honor.

 8            And so this, I don't want to call it sophistry, I

 9    don't want to say anything that's -- that's disparaging, but

10    the fact that certain of the defendants in this case say

11    we're unaware of what you're claiming we're infringing, but

12    other ones go right through it and say, yeah, we know what

13    you're claiming we're infringing.  It's not protectable or

14    it's a basic building block.  It's evident to every single

15    defendant what they copied.

16            We cite the Perfect Ten case, we cite Paramount, we

17    cite these cases that say look, you need to put them on

18    notice by identifying your work and identifying the

19    infringing work.  And if those two works are long and complex

20    and multiple elements like I mentioned dialogue in a film,

21    yes, you should break down the dialogue and show how it's

22    similar.  Here a good pair of ears is worth a thousand pages

23    of pleading.

24            You know they wanted us to file a complaint that

25    would have been 10,000 pages long, but that would have been

1    more difficult for them to parse and come to a conclusion as

2    to what our claims are than us identifying the song,

3    providing the transcriptions which can be extrapolated to

4    cover every song in the case.  Sure, some of the defendants

5    modified it, they slowed it down, they removed elements, but

6    that copying that's alleged in those 33 transcriptions to a

7    degree is embodied in every single song.

8            THE COURT:  I suspect you'll say that this is

9    perhaps not the appropriate time for this discussion, but

10   what about the foundational blocks we heard in defense

11   papers?  I mean, what's your response to that?  I mean, I

12   read the papers, I just want to hear it from the horse's

13   mouth.

14           MR. BURROUGHS:  We understood that would be their

15   argument, Your Honor, and that's where we go through at

16   length, and I can refer Your Honor to, I believe it's

17   Paragraph 648 of the complaint, um, and it's really -- it's

18   throughout, um, where we walk through everything about our

19   work that's original and protectable.

20           And this is, you know, I'm familiar with

21   Your Honor's rulings and I understand, you know, some of the

22   positions that you've reached in the past, but we spent a lot

23   of time describing not only the creative elements, but how

24   they're arranged.  And, again, we're looking at -- I think

25   I'm going to, um, now address what Your Honor thought I was

1    going to address which is we're at the pleading stage.

2         We're going to have experts.  We have experts who

3    are going to testify or provide opinion that at the time this

4    work was created, there was nothing like it.  And, again,

5    there's thousands and thousands and thousands riddims; right?

6    Now, I'm using the r-i-d-d-i-m.  Thousands of those.  And the

7    defendants in this case could have copied from any of them.

8    They all copied from our clients.

9         So really this argument that it shouldn't be

10   protectable because it's been copied so much, it proves too

11   much.  It's appealing and it's creative enough for all these

12   folks to have copied it and then released these extremely

13   popular songs.  Right?  And to the extent that the, you know,

14   the argument is that because there's a lot songs now in the

15   marketplace that incorporate this is somehow probative, it's

16   completely spurious.  There's -- there's nothing to it.

17        As the 9th Circuit said in the Alfred case which is

18   the Pirates of the Caribbean case, you look at the

19   marketplace at the time the song was released to make these

20   decisions about building blocks and tropes.  And in doing

21   that, you should consider, you should consider the effect of

22   the song of the plaintiff's work in establishing those

23   tropes.  So, you know, in '89 and '90 when this song was

24   released, everybody agrees -- well, I don't want to say

25   everyone agrees.  I think everyone agrees, but I haven't seen

1    any evidence to the contrary, this was an original work.

2    There was nothing like it.  There were thousands and

3    thousands of other works with these elements.  And to be

4    clear, we're not claiming, you know, quarter note, we're not

5    claiming these basic things.  We're claiming the combination

6    of them which is absolutely creative.

7              THE COURT:  So your -- your view is before this,

8    nothing like it existed.  The -- the -- I mean, it's not

9    gonna be the boom back, boom back sort of rhythm.  You think

10   there was nothing like this before it.

11             MR. BURROUGHS:  With the seven discrete elements

12   that we have mentioned in the papers, absolutely not.

13   Certainly not in the -- and it's certainly not evident from

14   the face of the complaint, but even the evidence that we've

15   obtained or that's publically available from experts in these

16   fields, they say the same thing.  And, again, this why this

17   is really probably a trial issue.

18             You know, I'm sure they're going to have

19   someone who's -- and I probably know who it's going to be

20   actually.  It's generally the same expert that the defense

21   uses in these cases.  But it's going to be someone who's

22   gonna say oh, everybody was using this and they're not

23   similar.  And we're gonna have experts and even concessions

24   from a lot of the defendants that it was original and it was

25   appealing.

1           And at summary judgment maybe Your Honor can make

2     that decision.  Probably, I think that's probably for the

3     trial -- the Court to -- I'm sorry, the trial to determine

4     through jury, but at the 12 B(6) stage, it's just completely

5     outside of the purview.  I understand that in general I

6     wouldn't be introducing these arguments, but I feel like I

7     have to because the defendants have raised them and

8     Your Honor has questioned me on them, but it's highly

9     disputed.

10           I think I can leave it at that whether or not these

11     materials were around at the time, these elements, however

12     you want to categorize them, but there's certainly nothing in

13     the complaint to that.  And there's certainly nothing in the

14     defendants' papers that's admissible.  We have a lot of

15     evidence, there's reference to some sound recordings

16     submitted by the defendants.

17           It's outside of the four corners of the papers,

18     Your Honor, and it's not referenced in a way that makes it

19     admissible for this type of hearing.

20           THE COURT:  And I guess, well, I'll just continue

21     to ask these questions cause, I guess, all these issues come

22     up when you're looking at the complaint and -- and the

23     motion.  How would you distinguish this, if at all, from sort

24     of the traditional dance hall riddims that are used, well,

25     that have been used since I was a kid, uh, in reggae?  I

 1    mean, you go to the streets of Jamaica, all the Caribbean,

 2    you drive down, big speakers, same beat, everyone's getting

 3    up toasting.  So is there a difference or. . .

 4              MR. BURROUGHS:  Absolutely.  We have a report

 5    already that's gonna go through the fact that there are

 6    thousands, tens of thousands of what Your Honor's describing,

 7    but this particular -- and again, we're not claiming

 8    copyright in all of those.

 9              THE COURT:  Let me stop you there.  I mean, I -- I

10    heard you say tens of thousands of these riddims, but there

11    are probably a core group that are used over and over and

12    over again.  I mean, again, I guess for what's it worth, I

13    was a college deejay, not a radio deejay, like a party music

14    deejay.

15         I've got hundreds -- or I had I mean probably

16    hopefully it's beyond the statute of limitations, but

17    hundreds of CDs, you know, that I bought in the streets of

18    New York and New Jersey with literally the same riddim

19    running for 45 minutes with and you fill in the blank, Beenie

20    Man, Bounty Killer, toasting over those.

21         And so I'm trying to understand if there is a

22    distinction because it seems like based on the 20, you know,

23    a minute or so of what you played that basically artists have

24    used that and have, uh, made variations to make, you know,

25    arguably some of the biggest hits that people hear on the

1    radio today or on streaming or what have you.

2         MR. BURROUGHS:  And that's why the Alfred decision

3    is so important.  We have to look at it at the time my

4    clients created the work.  And at the time, you're right,

5    there were thousands of them and some of them were more

6    popular than others, but when you're looking at

7    protectability, you're looking at the spectrum.  How many

8    ways can this be expressed, this particular musical idea?

9         The fact that some were very popular and some that

10   weren't, it doesn't make it so that there are only a few ways

11   to do the music.  And we're not taking any sort of or we're

12   not making any claim to any sort of genre or anything other

13   than this particular combination which the evidence will show

14   was absolutely original in 1989 when it was released.

15        Now, yes, we have recordings that we can play for

16   Your Honor that really this whole argument goes against the

17   position they've taken in defense which is we don't know what

18   you've claimed we've copied.  It's so manifest and it's so

19   obvious how this has been copied; right?  What we're talking

20   about today, I mean, the motion should just be denied

21   outright.  There's no possible way they can claim they

22   don't -- they're not on notice of what was copied.

23        But in terms of what's protected, you know, in the

24   spectrum of protectability even if ours is less baroque or

25   less complex than others, we still have a copyright in it.

```
1    They can that maybe, you know, the substantial similarity
2    standard should be different, but that isn't even probably
3    for most of the songs isn't even applicable here and that's
4    because of this actual copying versus the, um, what we call
5    indirect copying.
6              This was set forth back in the Three Voice case
7    where the court said look, you can either prove actual
8    copying, you can show the defense copied from you or you can
9    indirectly prove it by access and substantial similarity.
10   Here we have actual copying.  Absolutely for the 700 songs
11   that include samples, there's no doubt about that, but also
12   for all of these defendants who copied with mathematical
13   precision that -- going back to the start of my presentation,
14   Your Honor, that's what really sets this apart.
15             Other cases they try to change it or they try to
16   work around it.  Here they tried to recreate it as closely as
17   they could.  And even if our copyright is not the most
18   robust, and I don't concede that, but even if that's true,
19   even if this work because it has some minimalist elements has
20   a thinner copyright, these are mathematically precise copies
21   so it's virtually identical; right?  It hits that, uh, that
22   sweet spot for a copyright that's not even robust.
23             THE COURT:  So let me ask you if I could, um, just
24   in the interest of time and I -- I don't -- well, I'll just
25   ask.  So what's the end game?  Well, (A) what's the end game
```

1    and (B), related to that does this lawsuit run the risk of

2    arguably stifling the creativity of, I mean, you name almost

3    every genre.  Look at how much, assuming the allegations in

4    the complaint are true, look at the ripple effect that this

5    style has had.

6            First, you know, going to the heart of Reggae,

7    Reggaeton, um, Latin music, Hip-Hop, you name it, does this

8    stifle the creativity of all of those genres, EDM, Amapiano,

9    you name -- I mean does it -- is that what, I mean would --

10   would this lawsuit have that effect?

11           MR. BURROUGHS:  Absolutely not, Your Honor.

12           All my client is looking for in this case is what

13   the defendants have done with every other sample that they've

14   used in all of these songs.  As you'll see when we get into

15   discovery, most of these songs have multiple samples and

16   multiple people credited.  But for whatever reason, they

17   reached out to these other folks and got samples, but when it

18   came to my client's work and remember my client's work is the

19   heart of these songs.  It's the heart of the entire genre.

20   They decided they didn't need a sample.  Maybe --

21           THE COURT:  So it in some ways it is the Bob James

22   sort of theory.  Like basically get, you know, uh, to put in

23   the words of these youngsters, put some respect on my name in

24   other words.

25           MR. BURROUGHS:  Precisely, Your Honor.


                    UNITED STATES DISTRICT COURT

```
1            We don't want to be in court.  We would have liked
2       to have a conversation with them and negotiated settlements
3       and licenses.  The fact that they went to everybody else
4       involved in these songs and obtained licenses shows that it's
5       possible.  It raised this question of well, why not us?
6            And some of the samples as you'll see in discovery
7       are quite small.  Much, much less important to the song than
8       our client's sample which, we could play the audio, it
9       drives -- it runs throughout these entire songs.  Why on
10      earth would they have gone to everyone else and got samples,
11      but not come to us.  Why do they feel like they can take our
12      work with impunity when they went to all these other people
13      and collected samples and paid for those samples, paid
14      royalties, paid license fees.
15           It's really when you hear this argument about
16      stifling creativity, it's completely belied by the fact that
17      they've obtained licenses for all these other samples, all
18      these other works.  So for them to get up here and say oh,
19      we're not gonna be able to do these songs, the entire --
20      Hip-Hop was based on samples and guess what, people cleared
21      samples.  I get calls --
22           THE COURT:  Well, not originally.
23           MR. BURROUGHS:  Well, not originally, but now.
24      Right?  So maybe we do need a case like this because and
25      our -- we have an expert who's gonna speak about the history
```

1    of Reggae and the history of intellectual property rights and

2    the lack of respect for Jamaican artists' intellectual

3    property rights.

4          And so we'll get into that in discovery, but maybe

5    we do need a reckoning as to why these folks on the defense

6    side cleared all these other licenses with all these other

7    artists who are oftentimes on big labels like they are, but

8    they left my client out in the cold while making millions,

9    tens of millions, hundreds of millions of dollars from music

10    that's really -- it's built on the -- on the back of that

11    music.

12          THE COURT:  Can a distinction be drawn with, again,

13    I'm not -- well, I am getting in the weeds somewhat, but I

14    don't have examples of every sample that you're talking about

15    that has been cleared, but I suspect in a lot of those, there

16    are distinct parts where you can say we know that came from

17    this song or that song.

18          What you're talking about is the -- is the

19    foundational beat that drives the song through and through.

20    Some of which have been stretched, uh, compressed, uh,

21    twisted, um, and -- and could the argument be made that as

22    such it is a foundational beat and does not -- it's not

23    protectable.

24          MR. BURROUGHS:  No, Your Honor, for two reasons.

25          First, what you just described, I think it's a

1    point for us, it favors us.  If something is a small sample,

2    a couple of horn blasts from an old jazz song, why should

3    that person get a license and share in the profits while my

4    client's work which drives the entire song is not licensed?

5    I think that's really a favorite -- and this is gonna take us

6    back to the quantitative and qualitative analysis.

7         I raised this issue of actual copying and how we

8    look at qualitative and quantitative elements to see whether

9    or not there's infringement.  Here, qualitatively, right,

10   whether or not this is the heart of the song, we win on that.

11   Our client's music is the foundation for the lion's share of

12   the defendant's song.  As Your Honor's mentioned, some of

13   them are changed, but most of them are copied with

14   mathematical precision or sampled outright or both.  Okay.

15        The second answer to your question is I think what

16   we've done is we're looking at it post facto when we should

17   be looking at it at time of creation.  We cite a number of

18   cases for this.  It's the law cause it makes sense; right?

19   Why should a client be punished because so many people have

20   copied him or her and made money off their -- off their

21   music.

22        You know in '89, '90, and, again, this all goes to

23   expert testimony and illustrates why we shouldn't be here on

24   this motion, but it's going to show that this was an original

25   work and it's gonna show that it's not the only way to

UNITED STATES DISTRICT COURT

1    express this idea.  It's going to show there's thousands of

2    others, but folks copied this one.  They liked it.  They

3    found something about it that they believed would be

4    appealing and guess what, they were right.

5         But that shouldn't be to the detriment of my client

6    that should be to the benefit.  If anything that's proof

7    positive that this is a creative work.  If it wasn't, why

8    would it be so popular not with just the defendants, but with

9    the public at large.

10        We're talking about the other side of the coin of

11   the Newton analysis, the quantitative analysis that goes to

12   how much of the defendant's song incorporates the material.

13   Here it's the driving force throughout the entire work in

14   most cases.

15        THE COURT:  Okay.

16        MR. BURROUGHS:  So both of those elements really

17   favor us.  And I understand Your Honor's position, look, it's

18   in a lot of songs now, but nowhere in either the actual

19   copying, quantitative and qualitative analysis or the

20   substantial similarity test does this arise.

21        Um, and I hasten to get into weeds on this, but we

22   are just to bring on a law review article about the effect of

23   prior art in copyright cases.  I understand Your Honor in the

24   Danny Boy case did find, you know, something about prior art.

25   But respectfully, there's no prior art doctrine in copyright.

1    There's a number of cases going back decades that say that

2    prior art in copyright is only relevant if the infringer can

3    prove that either the plaintiff copied from it or the

4    defendant copied from it.

5         Here, again, it's almost -- I'm not going to say

6    it's conceded, but there's a lot of evidence that they copied

7    directly from us.  So to the extent there is prior art, it's

8    completely irrelevant unless they can show we copied from the

9    prior art.  There's no evidence of that.  And just to put a

10   pin on that whole thing, prior art is a patent concept

11   because in patent you need novelty.  In copyright there is no

12   novelty requirement.  There's only an originality

13   requirement.

14        So Judge Learned Hand who seems to have written a

15   lot of these sort of great turns of phrase, he once said

16   look, if two people sit down and write Keats Ode To A Grecian

17   Urn and they're identical, both of them get a copyright cause

18   there's no novelty requirement.  Of course in patent with

19   prior art that wouldn't work.  Who's first?  But there is no

20   prior art doctrine in copyright law, Your Honor.

21             THE COURT:  Okay.

22             MR. BURROUGHS:  So for those reasons, I don't

23   believe that these issues even if they were properly before

24   the Court on a 12 B(6) motion should carry the day.

25             THE COURT:  Okay.  Thank you.  I appreciate it.

```
 1              Um, who's drawn the short straw for the defense,
 2    Mr. Zakarin?
 3              So Mr. Zakarin, I guess, look, I've asked a lot of
 4    questions.  Admittedly, you know, some of them may be beyond
 5    sort of your traditional 12 B(6), but at the end of the day,
 6    this is a motion to dismiss.  And it's hard for me to -- to
 7    grasp the notion that you and your clients don't know what
 8    the allegations are.  I mean, and maybe because I'm closer to
 9    it, but like we know the songs at issue.  We know the beats
10    at issue.  Um, I don't think there's a dispute.
11              Now, whether it carries the day long term is a
12    different thing.  I don't think there's a dispute.  Like
13    Mr. Burroughs said, artists acknowledge the foundation of
14    these genre of music.  And so can you really say you don't
15    know who, what, you know, for purposes of a 12 B(6).
16              MR. ZAKARIN:  Yes, Your Honor, for a Rule 8 motion
17    and for a 12 B(6), yes, we can.  First of all, we're
18    getting -- the first time I've ever heard them talking about
19    a combination was during Mr. Burroughs's argument cause they
20    haven't articulated a selection and arrangement claim in
21    their complaint.  It sounds like in response to Your Honor's
22    questions about this being basic building block drum beats,
23    foundational that they're moving to a combination of
24    different drum beats.
25              And in terms of each individual work, just dealing
```

 1    with -- starting with their 33 works for which they have

 2    transcriptions, the Fish Market transcriptions if Your Honor

 3    looks at them and I have the handy selection that I've

 4    pulled, the Fish Market transcriptions are the same.  But if

 5    you look at each of the individual defendant transcriptions,

 6    those 33, they're all different.  They're different from one

 7    another.  They don't use the same instruments.  Some don't

 8    have tambourines, some don't have timbales.

 9            THE COURT:  But -- but I guess is that the issue?

10    Are you saying -- I think the plaintiff is saying it may not

11    have tambourines or timbales, but the boom back, you know, I

12    don't want to kill anyone's ears, but that rhythm pattern all

13    comes, at least from the plaintiff's side, all comes from

14    Fish Market.

15            MR. ZAKARIN:  If the rhythm -- if the rhythm

16    pattern, rhythm itself is not protectable under the copyright

17    law.  That is clear enough, and drum beats typically are not.

18            THE COURT:  Typically; right?

19            MR. ZAKARIN:  Are not.  And so the answer to your

20    question is if it's a combination claim, yes, it matters very

21    much because one or two or three elements, the drum beat, the

22    tom, the -- the snare, whatever it may be which ones are

23    copied?  Which ones appear?  Which ones did they originate?

24    Because prior art does matter when we're talking about

25    combination or selection and arrangement claims because it

1    goes into the new or novel standard in this circuit.

2            Is it new?  Is it novel?  Was that new or novel?

3    And the one way you look at that was what existed?  Well, it

4    was revival music.  As it happens, the plaintiffs, and

5    they're on record, they heard this in streets in Jamaica.

6    They heard it at revival.  They heard these beats.  They

7    borrowed it.  So what?  They borrowed this piece, that piece,

8    the other piece.  So that means that it's not new or novel

9    even as to them.

10           There's -- there's so many issues.  We heard also

11   about 700 samples.  Well, a sample, if I'm understanding it

12   correctly, is a duplication of a particular recording in a

13   defendant's recording.  They don't allege that.  There's no

14   place where they specifically allege what recording has

15   taken --

16           THE COURT:  Specific sample.

17           MR. ZAKARIN:  What recording, which of defendants'

18   recordings has taken which sample, duplicate something from a

19   plaintiff's recording?  And let us remember, there's only one

20   recording that they had registered in 2020, 30 years after

21   the fact, only one recording they had registered before this

22   case was brought.  They didn't -- they registered Fish Market

23   recording.  They never registered Dembow.  They don't own

24   that recording.

25           What's the other recording that they claim to own?

1    Not Pounder Riddim.  They don't own Pounder Riddim.  They

2    don't have an interest in Pounder Riddim.  Pounder Riddim is

3    a Dennis Halliburton song and recording.  He's not a

4    plaintiff, he's not a defendant, he's not a copyright

5    applicant, he's not anything.  Pounder Riddim is not theirs.

6    They cite Pounder Riddim because as they springboard to try

7    to get to a claim on Dub Mix, Pounder Dub Mix II.

8         Pounder Dub Mix II was registered in March of this

9    year six, seven months after this complaint was brought.

10   They can't even pursue this claim here, but they haven't

11   identified either what supposed samples are drawn from

12   Pounder Dub Mix II even if it were properly registered which

13   it was not.  They didn't -- they couldn't have registered it.

14   That's a point, by the way, Your Honor, in our motion.

15        They're making -- aside from the fact that under

16   Fourth Estate, they can't bring the claim on Dub Mix, the

17   truth is their registration's improper any way.  They found

18   an heir of a producer and themselves to register in March of

19   2023 the recording of Dub Mix.  But Dub Mix was a recording

20   of Dennis Halliburton.  He's the author.  He's not a

21   registrant.  He has to be a registrant or the registration's

22   invalid.  I don't know how they even got it registered.

23        The only other people who can register are the

24   owners of exclusive rights.  None of them are the owner of

25   exclusive rights or any rights in Dub Mix so they're

1    asserting infringement claims on a sound recording where they

2    don't identify what's been duplicated in what works of the

3    defendant.  They don't identify.

4          THE COURT:  And tell me why, I think I know the

5    answer, that sounds like more of a summary judgment argument

6    versus a motion to dismiss argument.

7          MR. ZAKARIN:  No, it's a pleading argument.  They

8    haven't plead it.

9          THE COURT:  Okay.

10          MR. ZAKARIN:  How do we answer or respond or

11    address a complaint that does not identify what is infringing

12    and what has been infringed in each work?  They don't do

13    that.  They have to do that.

14          THE COURT:  So you're ready for the 10,000 page

15    complaint then.

16          MR. ZAKARIN:  Well, let me -- let me try to deal

17    with that in two ways.  One, that's their choice.  I didn't

18    tell them to sue 1800.  We said --

19          THE COURT:  But you did want it consolidated.

20          MR. ZAKARIN:  Because I think it makes appropriate

21    sense to pursue the claims you have in one proceeding rather

22    than in 59 different proceedings with the potential for 59

23    different adjudications and determinations.  But they chose

24    to move from 10 works to 40 works to in one fell swoop, 1800

25    composition works.  Potentially, potentially 3,000 works if

1    they're talking about sound recordings.  And, again, I don't

2    know what they're talking about.  They haven't plead it.

3        I do want to talk for a second cause I've talked

4    about the recordings, a little bit about the compositions.

5    In terms of the compositions, again, if it's a combination,

6    then we know what the standards are.  They have to be

7    original.  In the 9th Circuit, it has to be new and novel.

8    We're talking about unprotectable elements, a combination of

9    unprotectable elements or building blocks and, and the

10   alleged infringing works have to be virtually identical.

11       Well, even on the face of this complaint from the

12   33, and Mr. Freundlich is gonna deal with you the substance,

13   I'm dealing with the pleading deficiencies.  Even on the face

14   of it, the 33 transcriptions show differences not merely from

15   the Fish Market, whether it's recording or composition, they

16   show differences that exist in every work that they've listed

17   from Fish Market so they're not virtually identical, but

18   number two, they're different from each other.

19       So what are the elements?  For a composition if

20   it's a combination claim, they've got to allege and specify

21   what is allegedly protectable in their work and what is it in

22   our work that copies those protectable elements.  That's not

23   done anywhere.  I can show you the complaint.  I -- I tagged

24   a paragraph.  Paragraph 466, they're making a claim against

25   J Balvin and they list in Paragraph 466 about 50 songs.  They

1    don't tell us whether it's a sound recording or a

2    composition, but they list let's say 40 to 50 works.

3            And in 467 they just say these were released at

4    different times subsequent to Fish Market.  And then here's

5    the claim.  Each of the J Balvin works incorporates an

6    unauthorized sample of the Fish Market recording and a

7    verbatim copy of the Fish Market composition as the primary

8    Riddim.  That's all that they're saying.  They don't tell you

9    what part, what's protectable.  They don't tell you anything.

10            THE COURT:  But could one interpret that to be

11    what -- a Luddite's version -- interpretation is basically,

12    it's Fish Market with J Balvin's voice on it.

13            MR. ZAKARIN:  Well, they may be saying it, but

14    they're not giving us any facts.  They're telling us --

15            THE COURT:  But -- but they say it's unauthorized

16    sample of Fish Market.  Now, I know samples can be broad or

17    well, I guess I'm more -- I'm used to samples being more

18    narrow, a finite section of the song.  But it sounds like

19    what Mr. Burroughs is saying is that it's Fish Market in its

20    entirety with J Balvin's voice on it.

21            MR. ZAKARIN:  If that's so, if they're saying it

22    duplicates the Fish Market recording, that's one thing, but

23    it doesn't say that and I don't think they mean that.  I

24    think what they're saying is that it somehow copies this

25    basic beat.  They're saying that for about 50 works of

 1    J Balvin, just took that as example, 50 works.  But they're

 2    not breaking it down.  They're not telling you what it is,

 3    where it appears, what it is that's taken from theirs and

 4    that's something that we are entitled to know.

 5          Why?  Because it frames this case.  We're entitled

 6    to know what each work is.  And by the way, each of those

 7    works may be owned by different publishers.  We're entitled

 8    to know each of those works.  What they say is infringing.

 9    What they say has been taken.  They're not doing that.

10    They're giving us a conclusion, a sweeping conclusion.  And

11    just -- just by way of example that instance, they're doing

12    it in gross for 50 different works.

13          Now, I will confess I didn't count them.  It may be

14    45, but the point's the same.  So that's an important point.

15    Our motion is not a substantive motion as is

16    Mr. Freundlich's.  Our motion is we're entitled under the

17    Federal Rules on a song-by-song basis to know what -- and a

18    defendant-by-defendant basis what's your claim?  What do you

19    say is protectable in your work?  What do you say was taken

20    in our work?

21          And is it a sound recording?  Meaning is it a

22    sample that is duplicated or recording you own or is it a

23    composition claim?  And they say and/or, and/or throughout.

24    They say sound recording and/or composition.  Well, those are

25    very, very different copyrights with very, very different

```
1    restrictions.  A sound recording copyright as Your Honor

2    knows only protects against the precise duplication of that

3    sound recording.  Compositional copyright is a substantial

4    similarity and access claim.

5           Um, we have a number of other arguments that are

6    laid out in our brief.  I don't want to take more of

7    Your Honor's time.  Their registrations are invalid.  They

8    violate Fourth Estate.  Um, their Exhibit A, Your Honor,

9    tells us nothing.  It doesn't tell us what is infringing.

10          What their Exhibit A to the complaint does is

11   identifies the work, the defendants supposedly involved with

12   the work, and then it will say composition and/or something

13   else, but it doesn't tell you what in the work is

14   protectable.  What of your work allegedly infringes.  And as

15   I say with a combination claim, which I heard for the first

16   time today and they haven't pleaded a combination claim.

17          I think they've retreated to that for this argument

18   which doesn't actually -- it's not even on a substantive

19   issue, but if they're pleading a combination claim, the

20   standards are different.  They're more rigorous because

21   you're not -- and Your Honor has hit on it precisely, you're

22   not gonna accord protection to unprotectable elements under

23   copyright law because that infringes on the rights of future

24   authors, future creators because you're taking building

25   blocks that are basic away from their use.
```

```
 1          So that's why the standards of the 9th Circuit are

 2   very strict:  New, novel, original and virtual identity.  And

 3   they have to be -- if they can't show what they have is new

 4   or novel or it's not virtually identical because changes have

 5   been made, variations have been made, all of that's

 6   important.

 7          Um, the secondary liability claim, Your Honor, just

 8   very quickly jumping to it, they don't plead it.  Don't come

 9   close to pleading it.  The people who were charged with

10   vicarious and contributory infringement are the same ones

11   they're claiming are direct infringers.  You can't have that.

12   And they don't go through the facts.  They don't tell you

13   what you've done.  This is a pleading that is inadequate.

14          Now, they've chosen to bring in 160 defendants.

15   They've chosen to have 1800 to 3,000 works.  That's their

16   choice.  They could have sued 50 and then --

17          THE COURT:  But in fairness, though, look, this

18   lawsuit at least from what I read, and I don't want to put

19   words in the plaintiff's mouth, but it strikes me that this

20   lawsuit is about acknowledgment of the foundation.  They

21   believe merits -- is a copyright violation that merits

22   compensation.  It goes to the foundation of -- of significant

23   genres of music so picking one or two songs probably doesn't

24   cut it; right?

25          MR. ZAKARIN:  I wasn't gonna suggest that, but I
```

1    was suggesting there's room between two songs and 1800 or

2    3,000.

3          THE COURT:  Well, I mean, but in fairness is there

4    really?  If you take the plaintiff's allegation as true, you

5    are talking about a genre of music.  And -- and I could

6    envision defense saying you're suing Evie Queen, Fonzi, why

7    not Bad Bunny?  Why not Drake?  Because, I mean, the ripple

8    effect is pretty significant.

9          MR. ZAKARIN:  Well, Your Honor is actually bringing

10   up another issue that we've raised in our motion which is

11   let's remember they created, whether it's original or not,

12   Fish Market in 1989.  They never registered it until 2020

13   just before they sued.  It was never registered.  Dennis

14   Halliburton in 1989 or '90 did Pounder Riddim.  They never

15   made a claim that it was infringing.  They never claimed it

16   was a derivative work.  They never did anything and maybe

17   people followed on the heels of Dennis Halliburton.  You know

18   Dub Mix II was done in that same period of time and people

19   loved it and it spread around.  And yes, an entire genre of

20   music Reggaeton grew up over 30 years.  Did they sue?  Did

21   they bring a claim?  Did they do anything?  No.  You're

22   actually raising the issue, which is an important issue in

23   this case, and one of the few cases that will raise it if we

24   ever get there, equitable estoppel.  Should they be able to

25   pursue those kinds of claims when their own actions

```
 1    encouraged, allowed, permitted that kind genre to grow.

 2            THE COURT:  It is a really interesting legal

 3    question, but I mean, look, when Bob James did Take Me to the

 4    Mardi Gras, he didn't know that it would be sampled over and

 5    over again.  Impeach the President, James Brown, I mean, you

 6    know, um, all of those artists arguably, you know, sat on

 7    their heels while this industry blew up.  Um, and, I mean, is

 8    this any different?

 9            MR. ZAKARIN:  Maybe.  Maybe it is, maybe it's not.

10    I mean I wasn't defending those cases so I can't speak to it.

11            THE COURT:  Right, right.  Fair enough, fair

12    enough.

13            MR. ZAKARIN:  I might very well have made that

14    argument and the Supreme Court has certainly said that

15    argument exists in /PA*T it still exists, but that's only if

16    we get there.  My -- our point of this motion really is

17    focused on the lack of pleading, the inadequacy of the

18    pleading and if it takes, you know, instead of 286 pages, if

19    it takes a thousand pages, every defendant just because

20    they're suing 1800 works or 160 defendants doesn't mean that

21    the defendants aren't entitled to full notice of what it is

22    that is in their work whether it's a recording or a

23    composition that they claim is taken from their work.  And is

24    their claim a selection and arrangement of unprotectable

25    elements and if that's so, then they've got to plead that out
```

```
 1   and they haven't.  These defendants are entitled to know so
 2   that they can fairly conduct discovery, defend against
 3   claims.  It's not just having a label attached to the
 4   complaint.  It's not just saying it's copyright infringement
 5   and I've done enough by pleading or putting in 33
 6   transcriptions which as I've said they're all different from
 7   one another and they're different from Fish Market as well.
 8              THE COURT:  All right.  No, I appreciate the
 9   conversation.  Mr. Freundlich, you wanted to heard?
10              MR. BURROUGHS:  Your Honor, may I address the
11   positions in order because I feel that --
12              THE COURT:  Let me only cause I got another case, I
13   just want to make sure I hear from the defense, please.
14              MR. FREUNDLICH:  Your Honor, let me first say that
15   we are also moving on exactly the same grounds as
16   Mr. Zakarin.  I -- I concur with everything that he said, but
17   I'm not gonna repeat it.
18              The fundamental problem that I see in this is the
19   distinction being blurred between the samples, the Bob James,
20   the Bridgeports, all that and the musical compositions.  What
21   my motion focuses on are the musical compositions.  I'm not
22   even here to say you should dismiss whole case, but a fairly
23   large percentage, a large percentage of this case seems to be
24   based on a faulty premise that merely a rhythm that goes
25   (sound) should be --
```

UNITED STATES DISTRICT COURT

```
 1                THE COURT:  Is the court reporter gonna get that?
 2                MR. FREUNDLICH:  Just say boom chick, boom chick
 3     played.
 4                THE COURT:  Impressive, though, but go ahead.
 5                MR. FREUNDLICH:  I'm working on my skill.
 6                The point is that's what they're claiming and that
 7     is different from the recordings that we discussed and I just
 8     want to make that really clear.  Your Honor's correct as a
 9     deejay, you've got all these recordings and you play.  And
10     what you said is exactly one of the points I want to make
11     because I've watched deejays and I've been in bands and I
12     know what it's like to have one rhythm, in my case I'm a '70s
13     more than '80s, but disco.  I won't do that one, but you know
14     what I'm talking about with the --
15                THE COURT:  I'm -- I'm with you.
16                MR. FREUNDLICH:  With the high hat that opens and
17     closes.  You're not gonna tell me that Mr. Burroughs is gonna
18     go and find the -- the drummer who came up with the high hat
19     that became disco and sue every disco song.
20                THE COURT:  But -- but in fairness, um, this --
21     what -- what the plaintiff seems to be talking about is a
22     distinct rhythm.  Where disco has a whole wide breadth of
23     genres whether it's Georgia Moroter or, uh, just trying to
24     think.  I mean the different styles sort of, you know, the
25     140 BPM versus the 80 BPM.  Where it seems like plaintiff is
```

 1    focused on one specific pattern that you just demonstrated

 2    that doesn't change.  And so look, I mean this is a difficult

 3    question and I see arguments on both sides.  And so I'm

 4    not -- I'm not saying that you're wrong, but -- but I do see

 5    some differences here.

 6            MR. FREUNDLICH:  Your Honor, there are other

 7    verticals.  I'll get into it a little bit later.  I want to

 8    just start off by saying Rimas and Bad Bunny are two of the

 9    defendants.  Um, there are I believe 38 tracks that implicate

10    Bad Bunny.

11            And the reason, by the way, that we lodged all

12    those recordings, I appreciate that Your Honor listened to

13    them, but we found a rule that seemed to make it seem as if

14    we were required to do so.  You don't need to listen those

15    recordings.  This case -- this motion is a pleading-based

16    motion and that's all it is.

17            Um, copyrightability in the 9th Circuit is an issue

18    of law.  The Court gets to decide it.  In fact the Court has

19    an important gatekeeping function as the 9th Circuit told us

20    in the Gray case which was the sort of crowning, uh,

21    achievement, if you will, of a line of cases that began from

22    Blurred Lines went to Led Zeppelin ended up at Katy Perry,

23    and the appellate decision there and Judge Snyder's district

24    court decision really laid it out.  And -- and -- and kinda

25    of, uh, I think that's the case that the Court here should be

1    the most, uh, cognizant of in trying to make this ruling.

2            It's plaintiff's burden to put forth facts that

3    demonstrate plausibly protectable compositional elements that

4    have appropriated.  Again, on the compositional side not

5    talking about the sound recordings.  The pleading is what we

6    have.  That's what sets out their case.  The pleading talks

7    about a drum pattern, a programmed kick snare and high hat

8    playing a one bar pattern, and then, of course, talks about

9    the fact that it is the foundation for the entire genre of

10   Reggaeton.

11           So in this circuit you have the extrinsic test.

12   Again, Gray II quoting Skidmore.  Um, you can look at my

13   reply brief on page 9 line 15 to line 10.  Um, you filter out

14   all the elements that are not legally cognizable elements for

15   a composition sound recording.  That gets rid of the

16   instruments, that gets rid of the sounds, it gets rid of the

17   tambour.  That's it.

18           You'll see at the reply on page 7 line 21 and also

19   the reply on page 10 at line 13 and Newton v Diamond also

20   supports that.  You're left with a simple rhythm which I

21   played before.  I'm not gonna make the court reporter try to

22   figure out how to report it again, but that's the rhythm,

23   that's what we're left with.

24           THE COURT:  And that's not protectable in your

25   mind.

1          MR. FREUNDLICH:  Not protectable.

2          The funny thing is in the opposition, I think

3     Mr. Burroughs gets this, um, because not only is he now sort

4     of slipping over to a selection and arrangement theory, but

5     he also said that a baseline which was an ostinato on one

6     note is a harmony.  And he talked before about harmonic

7     elements and percussive elements.

8          There are no harmonic elements whatsoever in the

9     plaintiff's claim.  None.  There's no melody, there's no

10    lyrics, there's no harmony.  So -- so this all about the

11    rhythm.  And courts have never found rhythm alone to be

12    copyrightable.  Now, again, that's on the music composition

13    side.

14         On the sounding recording side, if somebody takes

15    my sound recording, and I think of it as a physical act.  You

16    took my record.  You put it on the other guy's record.  It

17    might be theft.  Now, there may be defenses to that,

18    di minimus.  I don't want to say that we're not gonna defend

19    strongly against the sound recording claims, but it's

20    different.

21         It's a completely different quantum when someone

22    takes someone's sound recording and samples it.  This is

23    different.  The compositional side all we got is the rhythm.

24    And you can't get a selection and arrangement on that

25    composition even if they do try and plead that because all

```
1    the individual components are not copyrightable.  Neither is
2    the selection and arrangement.  Done.  So the beat is all
3    we've got here.
4              Um, and, um, what -- what I'm saying is that the
5    disco beat, I understand what your point was.  What I was
6    referring to was simply the -- the high hat arrangement, you
7    know, the way that was played.  I can give you other -- other
8    genres, and I could see a list of vertical cases for each
9    genre.  This guy came up with the jazz swing beat (sound).
10   This guy came up with four on the floor rock and roll.  Oh,
11   let's bring that guy in.
12             This guy came up with reggae.  He was the first guy
13   to do the reggae beat.  Let's sue on a musical composition.
14   Different if someone took Bob Marley's reggae song and
15   sampled it and put in some other song.  That's a different
16   case.  We're talking about the rhythm.  And so --
17             THE COURT:  Even -- even if, let's say assuming
18   what the plaintiff says is true, they can show that rhythm
19   didn't exist prior to '79 or '80?
20             MR. FREUNDLICH:  Yes, exactly because rhythm is not
21   copyrightable.  And just on that for a minute, I don't how
22   many here are classical music fans, but if you listen to the
23   Habanera from Carmen (sound) that's the same rhythm.
24             THE COURT:  You're killing our court reporter here.
25             MR. FREUNDLICH:  It comes from all the way back
```

UNITED STATES DISTRICT COURT

1    there and many, many, many things since.  But that's not

2    relevant either to the motion to dismiss.  That's all like

3    stuff that might come up later on.

4          What I want to see happen here is I not only want

5    to see the case amended as Mr. Zakarin spoke, but I want this

6    thing to be cut down by 70, 75 percent.  The musical

7    compositions outta here.  And quite frankly, I don't even

8    think they're gonna have any claims against Bad Bunny left

9    cause there's not a sample in there and defy them to find it.

10   Now, maybe I'm wrong, but we -- we listened to all of them.

11   There are no samples.  So maybe Bad Bunny is gone.  You do

12   that and maybe you won't see me here again.

13         THE COURT:  So I won't get to see any more air

14   drumming or air guitar?

15         MR. FREUNDLICH:  Well, maybe Mr. Zakarin will

16   invite me in for the performance.

17         So basically, um, and then the other thing, there's

18   also a scenes of faire point.  I don't want to just leave

19   that out, but, um, there is law also that says that the sort

20   of rhythm that I described to you is simply scenes a faire

21   and it can also be dismissed on that point.

22         Um, let me just make sure I'm not leaving anything

23   out.  Yeah, what I want to remind the Court is that my

24   colleague Richard Wolfe, um, is probably maybe trying to get

25   in, maybe not, but he also made a similar argument.  He

```
 1    wanted me to remind the Judge that he seconds, uh, everything

 2    that I just said.  Um, I don't think I have much more.

 3              THE COURT:  Okay.  And I think Mr. Wolfe is now in

 4    the building.  Mr. Wolfe, can you hear us?

 5              MR. WOLFE:  Yes, Your Honor.

 6              THE COURT:  Hope all is well in Orlando.

 7              MR. WOLFE:  Yes, I'm on Day 5 of a three-week

 8    trial.

 9              THE COURT:  Civil or criminal?

10              MR. WOLFE:  Civil.

11              THE COURT:  Enjoy.

12              MR. WOLFE:  I'm having loads of fun.

13              THE COURT:  All right.  In the interest of time and

14    because I know you're in trial so is there anything you

15    wanted to share with the Court before we wrap things up here?

16    Again, I'm just trying to be mindful of your time.

17              MR. WOLFE:  No, Your Honor.  I don't think I need

18    to repeat the arguments that have been made.

19              THE COURT:  Okay.  Well, thank you both.

20    Mr. Freundlich, I appreciate the comments.

21              Mr. Burroughs, I know you wanted to address some

22    points.  And, I guess, one thing I'd -- I'd like you to

23    address, you know, you've heard the defense say look, they

24    looked at your exhibit and we might appreciate, you know, the

25    effort that was made to kind of go through all these songs,
```

UNITED STATES DISTRICT COURT

1    but, you know, you look at things such as sampled and copies,

2    composition and copied composition.

3         What part of it?  Um, copied composition.  Again,

4    are you saying it's the whole song or is it portions of it?

5    And I'm getting in the weeds, but, you know, from my prior,

6    you know, novice experience, there's a difference between a

7    sample, you know, a snippet that you can put in the

8    controller or mixer and hit versus what I think your argument

9    is the actual composition.

10        And so does the defense have a point that that

11    could be, that spreadsheet if you will, could be, um, more

12    specific so that the defendants know and understand what

13    they're being accused of in this case?

14        MR. BURROUGHS:  First, Your Honor, before I start,

15    if Your Honor allows, I would like to address the Pryor

16    Cashman arguments.  Then my colleague is going addressed the

17    arguments advanced by Mr. Freundlich.

18        THE COURT:  That's fine.

19        MR. BURROUGHS:  So in response to the question,

20    Your Honor, we can look at the documents themselves.  I

21    believe that it was the argument of Pryor Cashman that the J

22    Balvin material was not adequately alleged.  If Your Honor

23    takes a look at Document 305-1, you'll see each of his songs

24    as well as the collaborators as well as whether or not it

25    copied the composition or included a sample.

UNITED STATES DISTRICT COURT

        1          Now, it's true that sometimes we're unable to

        2   determine whether it's a sample of our Fish Market recording,

        3   our Pounder recording or if it's a mathematical replay.  And

        4   I don't want to get into the weeds here, Your Honor, but

        5   sampling can happen in a number of different ways as

        6   Your Honor's probably aware.  They can take the individual

        7   tracks or stems and combine them, they can play some of the

        8   tracks and combine them.  Again, we simply don't know what

        9   happened in the studio.

       10          What we did was we identified granularly, and,

       11   again, there's a lot of back-and-forth about what we claim is

       12   protected.  It's not about -- we're not delineating a single

       13   note or selection or arrangement.  We're claiming copyright

       14   in our songs, in our compositions and sound recordings.  So

       15   there was a lot of colloquy about oh, they're retreating.

       16   We're claiming a copyright in what we've created which is the

       17   compositions and the songs that's embodied in the sound

       18   recordings.

       19          Now, if 305-1 is not enough to put defense counsel

       20   on notice of what we're claiming, we also go into detail, and

       21   you can look for example at Paragraph 180 to 189 where we

       22   describe the copying.  But really all of this, we're sort of

       23   talking around the -- the issue which is they know.  The best

       24   way for them to figure out is what they copied is not for a

       25   lawyer to write in a legal document, it's to look at the

                          UNITED STATES DISTRICT COURT

```
 1   paper.

 2          THE COURT:  But is that -- is that fair?  I mean

 3   like in the example of Bad Bunny, he's saying look, if you go

 4   through the songs, this part I'm adding, at best all you're

 5   gonna have is the rhythm.  You're not gonna have anything

 6   else.  There's not gonna be a direct -- you're gonna have a

 7   rhythm boom ba bop, boom ba bop.  That's it.

 8          If that's it, their argument is they should be out

 9   of the case because a rhythm is not protectable.  And so I'm

10   just trying find it.  You said Paragraph 188 or 189?  I just

11   want to get to it.

12          MR. BURROUGHS:  If you start at 180, Your Honor,

13   and walk through those allegations.

14          THE COURT:  Okay.

15          MR. BURROUGHS:  You'll see even though I don't

16   think it's necessary, we get into the weeds.  We've plead

17   what I believe to be much more than we need to put them on

18   notice of what they've copied because, again, that

19   information is solely within their possession.

20          THE COURT:  Right.  So 180 you talk about the

21   programmed kicks, snare, high hat.

22          MR. BURROUGHS:  What they've copied.  Right.  And

23   they've copied all that from us.  They may argue oh, no we

24   only copied some elements which it sounds like they're

25   arguing and not others so there's no similarity, but that's
```

1    gonna be something that they're gonna have an expert that's

2    gonna say it's not copied and we're gonna have evidence and

3    an expert that's going to say it is.

4        I've looked at the allegations and I've tried to

5    figure out a way to put them more on notice than we already

6    have, and the only way would be to provide these

7    transcriptions which they already have half of them any ways.

8    They already have our client's transcription.  They know what

9    we're claiming to be copyrighted.

10        And even if it is just what they contextualize as

11    the rhythm, Your Honor, and this is just a point of law I

12    wanted to correct because I believe that, um, one of my

13    colleagues here on the other side indicated that drums for

14    whatever reason can't be protectable or a drum sequence or a

15    drum work that's absolutely not the truth.  I can cite you to

16    Vargas versus Pzifer, Inc.  418 FSupp. 369 which says that,

17    you know, a high hat and snare drum elements can be

18    protectable.

19        THE COURT:  Well, high hat and snare drum, I mean,

20    just hearing it, I haven't read the case, is that -- it

21    sounds like that could be distinguished from a rhythm.

22        MR. BURROUGHS:  Well, distinguished as being even

23    less.  Right?  As even having less components.  That's what

24    I'm saying.  Even courts have regularly found much less than

25    what we're claiming here to be protectable.  I think a case

UNITED STATES DISTRICT COURT

1    that really addresses the standard, Your Honor, and even

2    deals with Jamaican music is May versus Sony Entertainment.

3    It's a case out of the Southern District of New York at

4    399 FSupp. 3D 169.

5          And it talks about a number of things we've been

6    talking about today including whether or not we should be

7    having this conversation about what's original and what

8    isn't, but to the extent that the other side has argued that

9    a drum pattern or a drum sequence is not protectable that's

10   simply not true.

11         Nor is it true that novelty is required.  I heard,

12   and this was more in the Pryor Cashman presentation, I heard

13   over and over again, we need to tell them what's novel, we

14   need to tell them what's new.  That is absolutely not the

15   law.  The law was set forth in a number of cases, but I can

16   quote verbatim from law within the circuit where the court

17   says novelty is not required.

18         I can start with. . . I'm just trying to make sure

19   the quote is correct here, Your Honor, but I'll start with

20   Roth Greeting Cards versus United Card Company.  This is at

21   429 F2d at page 1109.  And what it says is quote, "The

22   originality necessary to support a copyright merely calls for

23   independent creation not novelty."  And that's binding

24   9th Circuit law.  It's been the case forever.

25         In another seminal case, uh, Croft versus

 1    McDonald's which is at 562 F2d 1163.  Again quote, "A work

 2    offered for registration need not be new, but only original,

 3    i.e. the product of the registrant."  So, you know, when

 4    Pryor Cashman made the presentation, they said over and over

 5    again that novelty is required, that newness is required,

 6    that our claims fail because we're not alleging novelty.

 7         That is not the law.  There's no doubt about it.

 8    It's settled in this circuit that novelty is not a

 9    requirement.  So to the extent they took that position

10    repeatedly, it's simply not the law.

11         And there was also some discussion about the sound

12    recording for Pounder, and they allege that we don't have

13    rights in it.  Undisputed we have ownership in it by

14    transfer.  We registered it.  It's before the Court.  They

15    make an argument that under Fourth Estate, there's an issue

16    with that.  But what Fourth Estate says is a plaintiff cannot

17    cure a lack of registration by registering during the case.

18    That's not what happened here.

19         We didn't allege that Pounder sound recording in

20    the original complaint.  We alleged it in the amended

21    complaint.  And also as the cases we cite in our papers

22    indicate, when you add a new plaintiff, and I believe this is

23    the Licorice case, adding a new plaintiff in a new work is

24    also okay.  It's acceptable under Fourth Estate because

25    you're not trying to cure anything.

```
 1          I cannot come to court, Your Honor, file a case
 2   without a registration and then register and amend.  That's
 3   what the cases they cite say, but that is not what happened
 4   here.  When we filed the case, we had registrations.  We
 5   added a plaintiff and we added a sound recording to try to
 6   bring everything under the purview of this case.  And when we
 7   did and the obtained registration and amended, that's
 8   sufficient under Licorice.
 9          And to hold otherwise, would lead to inefficiencies
10   and absurdities, again, because we would have to file a
11   separate case over the sound recording, consolidate it with
12   this one and it would be completely unwieldy.
13          And there's this argument about Patrella which
14   again only supports us.  What Patrella says is that in a
15   situation like this one where a plaintiff may not have the
16   millions of dollars necessary to go after some of the biggest
17   musicians in the world, they're not required to.  They can
18   wait and I believe what Justice Ginsberg writes is they can
19   wait until the game is worth the gamble.  Here our clients,
20   you know, including Mr. Brown who's joined it, he's in
21   Jamaica.  He doesn't have a large legal team.
22          This case, you know, as is evident from us being
23   here today and how long it's taken us to get here today, this
24   case was a monumental undertaking.  The fact that he waited
25   until he had the right attorneys, until he was in the right
```

1    situation to bring the case is absolutely not grounds for

2    equitable estoppel.  In Patrella the Supreme Court said

3    laches is not going to be a defense in copyright infringement

4    cases.

5           THE COURT:  To be fair that's much later down the

6    road; right?

7           MR. BURROUGHS:  I agree.  It was just raised and

8    it's such a misstatement of the law, I wanted to correct it

9    because equitable estoppel it's more difficult to prove than

10   laches.

11          THE COURT:  If we get to that point, you'll raise

12   that then.  We'll fight about that for another hour or so.

13          MR. BURROUGHS:  And beyond that, Your Honor, the

14   allegations that for whatever reason listening to the songs

15   is not enough, in combination with this massive complaint, in

16   combination with the exhibit that sets forth whether or not

17   it's a composition or sound recording is not enough to put

18   them on notice is a difficult argument for them to make with

19   a straight face.

20          THE COURT:  But is it, though?  Again, I focus on

21   Mr. Freundlich's point.  He's got to represent his client and

22   go to his client and say we stole this.  Okay?  Or we

23   infringed on this.  To which if the client says how?  What's

24   his answer?  And just indulge me for a second.  In the

25   Bad Bunny is it we took the whole song and just sang on it

1  for all those songs or is it we just took parts of it?  What

2  is it?

3          MR. BURROUGHS:  Very simple, Your Honor.  You would

4  say, confer with his client and say here's what they claim.

5  Here's their transcription of their elements.  Here's their

6  description of what they claim you copied.  Here it is

7  embodied in two sound recordings.  Here is your song and

8  let's compare the two.  That's takes five minutes.

9          THE COURT:  But I don't think you answered the

10  question.  Bad Bunny says what is it that they say I copied?

11  What is it that they say I sampled?  What's the answer to

12  that question?

13          MR. BURROUGHS:  What's in the transcription that's

14  in the complaint.

15          THE COURT:  Okay, show me.

16          MR. BURROUGHS:  Any of them, Your Honor.

17          THE COURT:  I'm focusing on Bad Bunny so show me

18  where it is.  I'm just trying to find it.  Is it in the chart

19  or is it in the complaint itself?

20          MR. BURROUGHS:  So I'm looking at one of them on

21  page 120.

22          THE COURT:  Of the complaint.

23          MR. BURROUGHS:  Of the, yeah, amended complaint.

24          THE COURT:  Hold.  Let me just get to it if I

25  could.  Page 120 in the amended complaint.  What paragraph?

UNITED STATES DISTRICT COURT

          1              MR. BURROUGHS:  I'm looking at the transcription,

          2     Your Honor.

          3              THE COURT:  Of Fish Market versus Un Ratito.

          4              MR. BURROUGHS:  Yes, Your Honor.  We could also get

          5     329 to 367.

          6              THE COURT:  Paragraph 329?

          7              MR. BURROUGHS:  367, yes.  There's multiple

          8     indicators in here as to what they copied.

          9              MR. FREUNDLICH:  Can I just make a comment about

         10     that?

         11              THE COURT:  Okay.  Stand up.

         12              MR. FREUNDLICH:  They do have some of those in

         13     there, but there's not one of those for every song.

         14              THE COURT:  That's really what I was trying to

         15     understand.  Do you -- is it your view you don't have to do

         16     it for every song?

         17              MR. BURROUGHS:  That's what Perfect Ten says,

         18     Your Honor.  For the defendant we put them on notice what the

         19     claim is, we walked through a lot of these songs.  We could

         20     have done it for every one, but it's not necessary.  They

         21     know exactly what they copied and how.  You can do it just

         22     with the Fish Market transcription.  Here's what the

         23     plaintiff's claim that you copied.  What did you copy out of

         24     these seven elements or in combination.  It's --

         25              THE COURT:  So you're saying it's not required for

1    every song.  That's your position.

2         MR. BURROUGHS:  That's what Perfect Ten says and

3    it's not a requirement in these cases.  And when you combine

4    those two things, Your Honor, with the sound recording and

5    again, I'm gonna play with Your Honor's permission --

6         THE COURT:  No, I don't need to hear it.  I know

7    these songs.  I know these songs.

8         MR. BURROUGHS:  As part of, uh, if you want to go

9    back and listen later, you know, Track 5 on Audio Recording 1

10   is La Dificil by Bad Bunny.  And you listen to that song and

11   it's manifest that's what's been copied.  And it's just

12   there's no basis to the argument that they're not on notice.

13        The fact that we're here in this unwieldily posture

14   is because of the consolidation and we would request that the

15   motion be denied entirely.  I'm going to cede the floor to my

16   colleague here.

17        MR. ZAKARIN:  Since that was addressed, may I just

18   have two points to make?

19        THE COURT:  Well, look, in fairness I made

20   Mr. Burroughs wait.  You'll have a chance to the upset of all

21   these other lawyers that are waiting for their case to be

22   heard.

23        MR. ZAKARIN:  Your Honor, I'll do it afterwards and

24   I can do it one minute or less.

25        THE COURT:  Okay.  Well, I may hold you to that,

UNITED STATES DISTRICT COURT

1    but okay.

2          Go ahead, counsel.

3          MR. TOOKEY:  Your Honor, just to briefly address

4    some of the points made in connection with Bad Bunny's

5    opposition and starting with the scenes a faire argument, uh,

6    it was somewhat page short shrift in oral argument and in the

7    papers, but all of these things go to sufficiency of

8    evidence.  These are summary judgment arguments not whether

9    the pleading meets or satisfies the Rule 8 requirement.

10          But just to address the point, there's nothing in

11    the record or in the operative pleading that would give rise

12    to adjudicating scenes a faire right now.  As an initial

13    matter, as Your Honor may have pointed out earlier in this

14    hearing, Fish Market, Dembow these are dancehall songs.  None

15    of the allegedly infringing songs at issue are dancehall

16    works.  They're Reggaeton songs.  They're not in the same

17    relevant field of music.

18          THE COURT:  Well, is that -- they're not in the

19    relevant field of music?  I mean. . .

20          MR. TOOKEY:  Yes, Your Honor.  This goes back to

21    the Alfred case which we've cited previously at this hearing

22    that -- and the Swirsky case which is cited in our papers.

23    Relevant fields of music, genre-to-genre comparisons are

24    required to adjudicate --

25          THE COURT REPORTER:  Counsel, you're going to have

UNITED STATES DISTRICT COURT

1    to slow down.  I'm sorry.

2                MR. TOOKEY:  My apologies.

3                THE COURT:  I'm sorry, I'm interrupting you now.

4    It's interesting you say it's not in the same genre of music

5    in sense we're talking about Reggae versus Reggaeton.  I mean

6    some could argue that's the same genre of music.

7                MR. TOOKEY:  We're actually talking about dancehall

8    versus Reggaeton.

9                THE COURT:  Right, and I guess one could make the

10    argument those are all sort of under -- I mean, look, well,

11    maybe this is outside the record, but Evie Queen talks about

12    the fact that they heard this music in Jamaica and adapted it

13    to it create basically a Latin version of it.  I mean maybe

14    that's a side point, but go ahead.

15                MR. TOOKEY:  It's not necessarily a side point, but

16    what it is is a point for later down the road once the

17    factual record complete with expert testimony on quantitative

18    and qualitative significance is, uh, established and more

19    developed for this Court to then consider if the defendants

20    chose to renew the defense whether or not scenes a faire

21    would apply here.

22                At this point there's nothing in the operative

23    pleading that would give rise to that.  There's nothing in

24    the complaint.  There's no pre-existing purportedly identical

25    dancehall works.  Um, there's -- there's nothing in the

UNITED STATES DISTRICT COURT

```
1    pleading that says these things would follow unavoidably or

2    inevitably or necessarily from the use of the dancehall

3    genre.

4          The only suggestion is that the number of allegedly

5    infringing songs named and the number of defendants would

6    give rise to getting rid of this case right now, there's just

7    no basis for that and I want to quickly address that.

8          On the unpredictability point --

9          MR. WOLFE:  Your Honor, one second.  I'm getting

10   called back into the trial.

11         THE COURT:  Good luck in the trial.

12         MR. TOOKE:  To be clear at Paragraphs 180 to 189

13   and 648 in the complaint, we lay out transcriptions and

14   narrative descriptions of the instrumental of the riddim

15   r-i-d-d-i-m that we're claiming has been infringed here and

16   there's seven elements.  It's much more than some

17   characterizations that have been flown about boom chick, boom

18   chick so I just wanted to clarify that.  What's exactly in

19   the pleading.

20         The idea of rhythm and expressions of rhythmic

21   elements are two different things.  We're not claiming

22   ownership of a time signature or a tempo or even the duration

23   of a note.  We're claiming ownership and infringement of this

24   pattern, this instrumental, that has been widely copied since

25   its creation.
```

UNITED STATES DISTRICT COURT

1          It's -- the Vargas case which my colleague cited,

2     New Old Music Group, these are cases cited in our opposition

3     where even drum groups which is not all of what's going on

4     here and with even fewer elements, where courts have said as

5     a matter of law, I cannot say that this is unoriginal just a

6     high hat and snare or just high hat, snare and kick.  There's

7     a lot more going on here so I wanted to make that

8     distinction.

9          We're not -- the characterization of rhythm is

10    just -- defies what is actually plead in the operative

11    pleading.  And in any event, the parties will inevitably get

12    into this in discovery and we'll have dueling expert reports

13    hashing this out.  Um, which brings me to the next point

14    about what is considered part of the composition or not.

15    Again, there's nothing in this pleading that would allow this

16    Court to even try to entertain that inquiry at this point.

17         And I'll point the Court to its prior opinion in

18    Yohan Songs Publishing versus Loveland, the Danny Boy case

19    from three years ago.  That was on summary judgment.  This

20    Court considered expert reports from both sides once the

21    record had been developed, and then came to its conclusion

22    which was then affirmed by the 9th Circuit.  This Court

23    citing Swirsky said, "A variety of compositional elements may

24    be considered including melody, harmony, rhythm, tambour,

25    structure, instrumentation, meter, tempo and lyrics."

1          This Court also said, the extrinsic test which my

2    colleague mentioned earlier, often requires expert testimony.

3    That's because music, I understand Your Honor is personally

4    familiar with it --

5          THE COURT:  I'm no expert.  I want to be clear.  I

6    am no expert.  I'm just a fan.

7          MR. TOOKEY:  Suffice it to say this is a subject

8    matter that's not readily understandable by ordinary people.

9    This requires specialized knowledge to understand terms like

10   harmony.  And to that point, a harmonic element which

11   provides tonality to the pattern that we're asserting here is

12   not the same as harmony in the sense of a chord progression.

13         That distinction is important and even the fact

14   we're arguing about this shows that these are issues to be

15   adjudicated later on down the road once we flesh these out

16   with dueling expert reports.

17         And what I wanted to leave on is that the citation

18   to this Court's gatekeeping function in the cases cited in

19   Bad Bunny's reply go to the Court's role in making sure that

20   expert testimony is relevant and helpful.  It doesn't go to

21   whether or not an operative pleading satisfies the Rule 8

22   requirements or is sufficient as alleged to state a claim.

23         The fact is Bad Bunny doesn't dispute that Fish

24   Market was independently created in 1989.  There are no

25   pre-existing works cited in the complaint and that it's been

1    widely copied.  You know, at bottom that suffices to state a

2    claim.

3              THE COURT:  All right.  Thank you.

4              Mr. Zakarin, two minutes.

5              MR. ZAKARIN:  I can do it in one I can promise you.

6              THE COURT:  58, 57.  Just kidding.

7              MR. ZAKARIN:  It's harder when you're doing that,

8    Your Honor.  Not impossible, but harder.  Harder for the

9    court reporter.

10             First of all, um, Mr. Burroughs pointed out that I

11   was wrong about this new or novel standard.  No, I'm not.  In

12   a normal copyright infringement case with just substantial

13   similarity and access that would be true.  New and novel is

14   not necessary.  But in selection and arrangement and they're

15   claiming selection and arrangement now, they're talking about

16   a combination of elements many of which they acknowledge are

17   unprotectable, but together they're claiming that selection

18   and arrangement is something that's now protectable.

19   9th Circuit standard is clear, unequivocal.  Requires

20   numerous elements.  It requires that they be arranged in a

21   new and novel way and it requires that the copying be

22   virtually identical.  That is the law and so I was dead right

23   when I said it.

24             Perfect Ten.  It was raised as to Perfect Ten.

25   Perfect Ten is an unauthorized use case just as Napster is.

1    It's a single defendant that used thousands of works in an

2    unauthorized way, and the question there is not is this new

3    and novel?  Is this a selection and arrangement?  There's no

4    question that they're using the work and is it copyrighted?

5    Is it infringing?  Is it fair use?  Those are the issues

6    there.

7           That's not this case.  This case is now either

8    substantial similarity with access, did you take it or is it

9    a combination, new, novel, numerous unprotectable elements

10   and virtual identity.  And if the works are not virtually

11   identical when you're dealing with building blocks, it's not

12   infringement.  So I'll stand on what I said before.

13          THE COURT:  All right.

14          MR. ZAKARIN:  I hope I was within a minute.

15          THE COURT:  A minute 37, but who's counting.  No,

16   I'm kidding.  I'm kidding.

17          MR. FREUNDLICH:  I may need two minutes.

18          THE COURT:  All right.  You get one as well.

19          MR. FREUNDLICH:  I'm gonna try my best.  I have

20   four points.

21          THE COURT:  I'll help you.

22          MR. FREUNDLICH:  All right.  So point one is that I

23   just want to on the scenes of faire point, um, the Landsberg

24   versus Scrabble Crossword Game Players case 736 F2d 485 at

25   489 and Skidmore as well said, plaintiffs in this case,

UNITED STATES DISTRICT COURT

1    actually, it's not what they said.

2            Plaintiffs here are claiming a monopoly in my view

3    over a stock element in a since developed genre which is

4    scenes a faire and granting such protection and here's the

5    quote, "would give the first author a monopoly on the common

6    place ideas behind scenes a faire which is impermissible."

7    And that's Landsberg and Skidmore.  That's my first point.

8            My second point is, um, regarding these cases from

9    the Southern District of New York which, first of all,

10   Your Honor is not obviously required to follow.  However, the

11   May versus Sony case 399 FSupp. at 169, it involved the use

12   of a Jamaican lyrical phrase with vocal melodies that were

13   alleged to be similar, cadence, rhythm and inflection.  It

14   was lyrics plus rhythm.  It was not rhythm alone.  It was a

15   different case.

16           And frankly, um, while I haven't recently read the

17   Danny Boy decision, I know the song and I think it was pretty

18   much rhythm that was associated with the melody, the

19   beautiful melody that is Danny Boy.  Again, it's not rhythm

20   alone.  The Danny Boy case was about, I don't want to bore

21   you, but it was a lyrical, beautiful song.

22           THE COURT:  Please don't sing.

23           MR. FREUNDLICH:  No, I won't.

24           And then the Vargas case.  The Vargas case, the

25   court there didn't filter out the instrument choices.

1     There's the issue in Vargas of a so-called ghost note which

2     is a sound and I don't know that the court actually covered

3     that properly in Vargas.  The plaintiff said that the

4     composition was more than a basic percussion pattern.  That's

5     not what's here.  Here we're alleging a rhythm.

6           The Vargas case never addressed whether percussion

7     is protectable standing alone.  It was assumed in that case.

8     And then there's the third case that they also cited which

9     you'll find if you go back which is this, um, Old New Music

10    versus Gottwald and that there, again, they did not discuss

11    whether or not rhythm was copyrightable.  They're confusing

12    selection of instruments and sounds with a beat.  That's what

13    the plaintiffs are doing.

14          The selection of instruments and sound is on the

15    sound recording side.  They talk about for instance in

16    Gottwald, the difference between a closed and an open high

17    hat.  The rhythm is exactly the same.  It's just there's a

18    different sound when you close and open the high hat.  That's

19    not a compositional element.  That's a sound element that

20    goes with the sound recording.

21          And the Gottwald case also cited Swirsky

22    incorrectly.  And the proper way to view that is at my reply

23    page 11 lines 1 through 10.  Um, I know I'm getting really

24    close to that bell.

25          THE COURT:  More than.

UNITED STATES DISTRICT COURT

1          MR. FREUNDLICH:  And so what I want to say finally

2     is just to remember, if you will, that we are -- we are not

3     looking to throw out this whole case except the need for an

4     amendment which I think is obvious.  The Bad Bunny portions

5     that he just pointed out not only didn't have all the songs,

6     but it also didn't say whether it was a sound recording or a

7     musical compositional copyright.  It's vague.  It blurs the

8     lines between sound recordings and music copyrights.

9          And Bad Bunny needs and requests the Court to

10    excise all the music composition copyright claims out of this

11    case and leave behind, perhaps with leave to amend so that we

12    can fix some of the problems that Mr. Zakarin has identified

13    and I agree with, the case as to the sound recordings.  And

14    then we'll do defenses there and we'll have summary judgment

15    and experts.  And Your Honor does not need experts to make

16    this decision either.  It's also in the briefs.

17         THE COURT:  All right.  Thank you.

18         MR. BURROUGHS:  Your Honor, may I correct one fact

19    without arguing?

20         THE COURT:  Mr. Burroughs, look, we've been going

21    at this a couple hours, and I think there's a gentleman on

22    video whose had his hand up so I've got to let him go.

23    Unless you want to start paying attorney fees for all the

24    lawyers sitting out there, I gotta wrap this up.

25         Mr. Font, you had something you wanted to say.



UNITED STATES DISTRICT COURT

1          MR. FONT:  Yes, Your Honor, just very quickly.  I

2    represent Vladimir Felix and Camilo Echevarrie.  My only

3    point is that as to plaintiff's comment that some defendants

4    talk about consolidation of the claims earlier on, I'm not

5    gonna debate that.  My two clients were not part of those

6    conversations.  That's my only point.  They were not part of

7    the conversations.  They did not consent to be consolidated.

8    If others did, good for them.  My two guys did not.  That's

9    my only point, Your Honor.

10          THE COURT:  Okay, fair enough.  All right.

11          Oh, Mr. Lifschitz.

12          MR. LIFSCHITZ:  Would it be possible to have one

13    minute to add one argument?

14          THE COURT:  Look, I'm gonna hold you to a minute.

15    Every lawyer here has gone well beyond it.  I'm gonna stop it

16    with you so go ahead.

17          MR. LIFSCHITZ:  You got it.

18          So the only thing I'd like to emphasize in the

19    arguments already made is the internorum effect of allowing

20    the lawsuit to proceed.  Uh, plaintiff's work is Fish Market

21    and the derivative recordings, but they've not really accused

22    the defendants of copying Fish Market with its melodic

23    flourishes.  They've argued that we've copied a stripped down

24    one-bar drum pattern popularized by Fish Market.  They've

25    referred to that drum pattern as inspiring a genre.

UNITED STATES DISTRICT COURT

1          Their counsel just claimed that the copying was

2     done in order for the defendants' work to be part of that

3     genre.  So in other words, they aren't claiming to own a

4     genre, not just their works, but the genre itself.  So

5     they're correct saying there's never been a case like this

6     before cause no plaintiffs have ever been so audacious as to

7     openly claim to own an entire musical genre.

8          And to argue they're not aiming to stifle

9     creativity is untrue because a mandatory tax to enter a genre

10    means that only those with means to pay get to participate

11    and licenses to sample or interplay are not compulsory.  If

12    they're granted exclusive ownership of this beat, they can

13    set the tax however high they want.  They can gate keep, they

14    can censor, they can snuff out and they're asking the Court

15    to bless that cartel.

16         And the courts have consistently warned while the

17    monopoly granted to a copyright holder may be essential to

18    encourage creative activity, it has to be limited to avoid

19    discouraging creative activity by subsequent parties.  And

20    the plaintiff's claim can only succeed if the second half of

21    that standard is ignored.  Sorry for going quick.  Wanted to

22    respect the minute.

23         THE COURT:  Thank you.  I appreciate it.

24         Okay.  So we've had a lot here.  I've got to wrap

25    this up.  I appreciate the comments.  There's a lot I'm gonna

UNITED STATES DISTRICT COURT

```
 1   have to go back.  News flash I'm not gonna have an order out
 2   in the next couple weeks cause I've got a lot to digest again
 3   and research and write.  So the matter will remain under
 4   submission until the Court issues its final order.
 5              MR. ZAKARIN:  Thank you, Your Honor.
 6              MR. BURROUGHS:  Thank you, Your Honor.
 7              MR. ZAKARIN:  The only thing I was gonna say
 8   there's some joinder motions which I think are submitted at
 9   this point.
10              THE COURT:  Yeah, don't worry about that.
11              All right.  Thank you all.  You all can leave.
12              (Proceedings were concluded at 1:20 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                                  CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE:  NOVEMBER 20, 2023

19

20        /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25