# MSJ, Bennett Decl. Ex. 2

Joe Bennett Music Services

# Expert witness musicologist rebuttal report

**Cleveland Constantine Browne, et al. v. Rodney Sebastian Clark, et al.**
**Case 2:21-cv-02840-AB-AJR**

February 28, 2025

## I. Summary of Instruction

I am instructed to review, analyze and comment upon the following documents (the "PE Reports") by Plaintiffs' proffered experts (collectively, "PEs"):

- Expert Report of Judith Finell ("Finell"), dated January 7, 2024 ("JF 2024 Rep."), together with its "Exhibit A," which is another "Expert Report by Judith Finell" and which is also titled "Preliminary Comparison of 'Fish Market' and 'Dem Bow' to 'Dame Tu Cosita' and 'Dame Tu Cosita Remix,'" and which is dated September 10, 2021 ("JF 2021 Rep.," and together with JF 2024 Rep," the "JF Rep.") • link to file

- Expert Report of Peter Ashbourne-Firman ("Ashbourne-Firman"), dated January 9, 2025 ("PAF Rep.") • link to file

- Expert Report of Kenneth Bilby, Ph.D ("Bilby"), dated December 17, 2024 ("KB Rep.") • link to file

Finell and Ashbourne-Firman identify themselves, respectively, as a musicologist (JF 2024 Rep. at 3) and a professional musician and composer (PAF Rep. at 3). Bilby identifies himself as an ethnomusicologist (KB Rep. at 4). Because I am a musicologist, I have been asked to focus at this stage primarily on the JF Rep. and the PAF Rep. (leaving a rebuttal of the KB Rep. primarily to ethnomusicologists). I do, however, comment herein on certain specific aspects of the KB Report, including points of agreement with my own Affirmative Report submitted on January 10, 2025 ("JB Aff. Rep."), Bilby's purported descriptions of the "specific elements and characteristics" of the "Fish Market" composition (at pages 41-46), and his cited "interview" with Plaintiff Cleveland Browne.[1]

## II. Summary of Rebuttal

A. Both Finell and Ashbourne-Firman assert (in a conclusory fashion) that the Plaintiffs' claimed works ("CWs"), and in particular the "combination" of

[1] Unless otherwise noted or defined herein, all capitalized terms have the same meaning as in the JB Aff. Rep.

certain rhythmic elements purportedly present in the CWs and which are at issue in this case (which Plaintiffs' have elsewhere described inconsistently and called the "Fish Market Elements," see JB Aff. Rep. at 3 & n. 4), are "original." (See, e.g., JF 2024 Rep. at 4-5; PAF Rep. at 4-5.) But neither Finell nor Ashbourne-Firman have even searched for, much less considered, preexisting works which contain the same or similar rhythmic elements (so called "Prior Art"). Indeed, both concede that they "do not opine on the impact or existence of prior art, if any." (JF 2024 Rep. at 3; PAF Rep. at 3.) Prior Art research is standard musicological practice. In fact, Finell's own writings confirm that Prior Art research is essential. Finell's and Ashbourne-Firman's failure to consider Prior Art undermines their originality conclusion and is methodologically indefensible.[2]

B. Finell and Ashbourne-Firman fail to subtract (filter out) commonplace pre-existing musical elements, or to even analyze whether some or all of the claimed rhythmic elements are unoriginal pre-existing musical elements. Their failure to do so is all the more egregious considering that Finell concedes in her JF 2021 Rep. (at 5) that "the individual tier rhythms [in FISH 89 and DEM90] ***would likely be found within the literature***, particularly of the Afro-Cuban, Caribbean, and jazz traditions . . . .") (emphasis added), and that Ashbourne-Firman likewise concedes that "***it may be possible to find another piece of music with a layer that is similar or even rhythmically identical***" to those in the CWs (and, indeed, Ashbourne-Firman has himself used at least some of Plaintiffs' claimed rhythmic elements in his own works that he has composed, including prior to FISH89).

C. Finell and Ashbourne-Firman appear to be asserting that it is Plaintiffs' particular "combination" (or selection and arrangement) of elements that is original and protectable and not the individual elements themselves, but, having done no prior art search, they do not identify: (i) which elements in such "combination" are pre-existing commonplace musical elements (while conceding that some or all are); (ii) which elements (if any) are original and protectable; or (iii) what it is about the "combination" that is original. And, again, they do not analyze any Prior Art with respect to those elements either alone or in combination before reaching an originality conclusion.

D. Moreover, Finell and Ashbourne-Firman do not demonstrate that what they claim to be an original "combination" (or "selection and arrangement") is

---

[2] Finell and Ashbourne-Firman both state that they have been "advised" about the "famously low bar for originality" "as the term is used in copyright," but the definition which they were given and upon which they rely appears to relate to whether a work as a whole may be copyrightable, not to whether or to what extent the work or elements within it exist in prior art. In this report and in my affirmative report I use the terms "original" or "originality" to mean "first used by" or "originated with" (as opposed to "previously existed").

anything beyond a common rhythmic structure. Of the four "tiers" identified by Finell (see JF 2024 Rep. at 6), three of the "tiers," when combined, form a commonplace kick-snare "Surf Beat" rhythm with a "bass" on 1 + 3, with her fourth "tier" being a commonplace 16th + 8th note tambourine part (which is not even accurately transcribed). Contrary to Finell, Ashbourne-Firman identifies eight "tiers," but concedes that a transcription (like Finell's) that "notat[es] just the snare drum, kick drum, bass drum, and tambourine elements of the interlocking rhythms of 'Fish Market' [would not] be incorrect" given that those elements or "tiers" "form the underlying rhythmic foundation of 'Fish Market.' . . . .") (PAF Rep. at 6.) The additional "tiers" noted by Ashbourne-Firman consist of two lines of timbales, which he describes as "instrumental material that complements. . . such rhythmic foundation," and a tom and hi hat, both playing TK rhythms that merely double the other parts and thus add no new rhythm. (*Id.* at 5-6.)

E. Finell suggests in her JF 2024 Rep. that instrumentation affects copyrightability (see, e.g., JF 2024 Rep. at 5), but I do not believe that simply choosing an instrument is an act of composition or protectable expression. Moreover, it appears Finell actually agrees with me that instrument choice is not compositional, as her JF 2021 Rep. asserts that a vocalization of a rhythmic pattern could be an infringement of an instrumental rhythmic pattern played across multiple instruments (see JF 2021 Rep. at 4).

F. Finell and Ashbourne-Firman contradict themselves (and each other) in their transcriptions of FISH89. The JF Report transcribes the kick-snare pattern both as a habanera (JF 2021 Rep. at 3) and as a Surf Beat (JF 2021 Rep. at 6). The JF Report also presents multiple conflicting versions of the FISH89 tambourine pattern (compare JF 2021 Rep. "Musical Example 2" to "Musical Exampe [sic] 4"). Finell's and Ashbourne-Firman's transcriptions of FISH89 are also inconsistent with each other (compare JF 2024 Rep. at 4 with PAF Rep. at 5) and with the USCO-registered version of FISH89.

G. Finell's and Ashbourne-Firman's transcriptions and opinions may be based in whole or in part on audio files (referred to by Plaintiffs as "stems") which are audibly and materially different than the USCO deposit copy or any other publicly released or available version of FISH89. It is incumbent on any expert musicologist to ensure that any musical work or sound recording that he or she is analyzing is in fact the musical work or sound recording that is at issue in the case (i.e., the deposit copy or other publicly available, released version).

H. Finell's assertion that the "underlying core expression" of DEM90 and POUNDER90 "share a near identity to that of" FISH89 (JF 2024 Rep. at 7) and Ashbourne-Firman's claim that DEM90 and POUNDER90 "contain the same shared musical elements discussed herein as those found in" FISH89

(PAF Rep. at 7) are unsupported by any musicological analysis or comparative transcription.

I. The KB Report is musicologically unclear and confusing, because it does not explain how any *compositional* elements of FISH89 or the other CWs that Plaintiffs have alleged are original to Plaintiffs and protectable (and have purportedly been infringed by Defendants) are, in fact, original to Plaintiffs. After discussing vague and amorphous concepts such as "feel" and "Jamaicanness," Bilby discusses (at pp. 41-46, points A-H) the so-called "specific elements and characteristics" of FISH89. His description of those "elements" includes timbral matters (e.g. "interlocking texture", "synthesized sound", "synthesized cymbal", "sonically distinct") which are unrelated to composition and are instead manifested, if anywhere, in the FISH89 sound recording rather than the FISH89 musical work. He also refers to the specifics of mixing, frequencies and timbres of individual drum sounds and recording methods. All of these elements, I would argue, pertain to the sound recording rather than the musical work, and Bilby's lack of differentiation between these elements represents poor methodology, because it does not enable the reader to understand what elements of the FISH90 *musical work* he is opining represent expression that is original to Plaintiffs and protectable. Moreover, apart from his description of non-compositional elements of FISH89, his description of the elements contain irrelevant comparisons between the CWs that only serve to show that elements in the CWs that Plaintiffs claim exist in all three works actually differ between or among those works. His description also largely tracks Plaintiffs' prior description of the so-called "Fish Market Elements" ("FMEs") (although it seeks to add additional "elements" that Plaintiffs have not previously identified as such or identified at all in the SCAC). Stripped of its vague and prolix descriptions, it is in the end just a description of the commonplace habanera or Surf Beat kick-snare rhythm, which as discussed in detail in my JB Aff Rep. was clearly not originated by Plaintiffs. Like the other PEs, Bilby makes no attempt to differentiate (or even acknowledge) the commonplace nature of the kick drum and snare drum parts of FISH89, describing them, without evidence or explanation, as "distinct", "particular", and "distinctive."

J. The KB Report includes an important inaccuracy in the transcription alleged to be provided by Ashbourne-Firman (KB Report Appendix 06). This transcription includes a timbale part ("timbale L", KB Report Appendix 06, p. 3) that does not appear in FISH89 at the point described. Although I have not undertaken and I do not include herein a detailed, bar-for-bar parsing of the Ashbourne-Firman transcriptions (because Plaintiffs do not appear to rely on them), this particular incorrect timbale transcription is significant in that it appears to align with Plaintiffs' equally inaccurate assertion (in FME *vi*) that FISH89 contains "Timbales that play a roll at the end of every other

bar […]". This is simply not true; there is no timbale that plays such a roll throughout FISH89, and, of course, a non-existent timbale part cannot possibly be part of the protectable expression in FISH89.

While the PE Reports are problematic for the reasons summarized above, they confirm several key opinions set forth in my Affirmative Report, as follows:

A. The Core Rhythmic Pattern ("CRP")—or what Finell calls the "underlying rhythmic foundation" (JF 2024 Rep. at 6)—of FISH89 is either a Surf Beat, or else it is a habanera played on kick and snare. Finell's transcription of the kick and snare "tiers" at page 6 of JF 2024 Rep. shows the beat as a Surf Beat. Her transcription at page 3 of JF 2021 Rep. shows it as a habanera. Either way, as shown in my JB Aff. Rep., neither rhythm is original to Plaintiffs and both were used in numerous musical works prior to FISH89.

B. Finell agrees that "the individual tier rhythms [in FISH 89 and DEM90] ***would likely be found within the literature***, particularly of the Afro-Cuban, Caribbean, and jazz traditions . . . ." (JF 2021 Rep. at 5, emphases mine.) Ashbourne-Firman similarly acknowledges that "[i]f one isolates any single layer of the recording, ***it may be possible to find another piece of music with a layer that is similar or even rhythmically identical***" to FISH89. (PAF Rep. at 7, emphases mine.) And he further concedes that, "[f]or example, the layer consisting of the kick drum on each beat of the bar, which is used in 'Fish Market', is common to many forms of popular music." (*Id.*) These statements are consistent with the analysis at Section VIII of my JB Aff. Rep., where I analyze each of Plaintiffs' claimed individual "Fish Market Elements" and demonstrate through Prior Art (including Afro-Cuban and Caribbean music) that none of these elements represent original expression, and all of them existed in well-known musical works created before 1989.

C. Finell and Ashbourne-Firman acknowledge that the timbales in FISH89 are "embellishments" (JF 2024 Rep. at 4; PAF Rep. at 5) (and Bilby similarly asserts that the timbales performer was "improvising various rhythms and patterns" (KB Rep. at 19)), i.e., these "embellishments" are not a part of the core rhythm (i.e., composition) in FISH89. In fact, Finell does not even include the timbales in any of her transcriptions of the "four tiers" which she asserts "form the underlying foundation of" the CWs (JF 2024 Rep. at 6), which is consistent with my opinion that the timbales are AUX elements, which Plaintiffs have not described or defined with any degree of specificity (JB Aff. Rep. at 20). The Ashbourne-Firman transcriptions attached to the KB Report, which Bilby characterizes as "highly detailed" (KB Rep. at 45), provide only a partial transcription of the "improvis[ed]" timbales line with an instruction to "play same style/improvised rhythm fills.ad lib." (See, e.g., *id.* Appx. 06, at p. 4.) Bilby further concedes (and confirms my own opinion)

that the timbale parts in POUNDER90 are not the same as the timbales in DEM90 or FISH89, noting that "On the 'Pounder' recording, in contrast [to FISH89], Denis Halliburton programmed a synthesized timbales part that was much simpler . . . ." (*Id.* at 43.). At no point do PEs make clear which of these different timbale parts, if any, they allege to be original or protectable, let alone how or why. This confirms what I stated in my affirmative report (e.g., JB Aff. Rep. at 17-18), which is that Plaintiffs appear to be claiming not that any particular timbales (or tambourine) line in any of the CWs is original and protectable, but rather that they originated and can claim a monopoly over the *idea* of playing timbales, tambourine or other AUX lines over a habanera or surf beat (which I showed in my affirmative report is not even an original idea).

## III. The JF Rep.

Finell's analysis in the JF Rep. is, in my opinion, insufficiently rigorous to test the bold assertion that is at the heart of Plaintiff's case (and which is to be tested in this phase), *i.e.,* that what Plaintiffs claim is a 2-bar excerpt of FISH89's rhythmic elements is original and protectable and has no precedent in any earlier music.

In this section, I shall parse the JF Rep.'s analyses and claims, identify points of agreement between the JF Rep. and my JB Aff. Rep., and provide commentary on any inaccuracies, methodological flaws, unevidenced claims, and omissions.

### A. Lack of Prior Art Search

The biggest and most fundamental flaw in Finell's analysis (and, in fact, the analyses of all of the PEs) is the failure to perform any search for or to analyze any Prior Art, a failure which the PEs admit openly. It cannot be overstated how ignoring earlier works makes any analysis of, and therefore any conclusion relating to, compositional originality essentially meaningless. Prior Art searches are the *only* replicable methodology by which musicologists can establish the originality (or lack of originality) of any musical work—or any isolated compositional element—and they are an established and expected methodology in Forensic Musicology, as discussed extensively in peer-reviewed musicology research:[3]

> "[Forensic musicologists] view prior art research as a major part of their job. And for many of them, that research is important not just because it can sift between copying and independent creation, but also because it informs their

[3] Joseph P. Fishman and Kristelia García, "Authoring Prior Art," *Vand. L. Rev.* 75 (2022): 1159; Joe Bennett, "We Can Work It Out: Forensic Musicology Methods," in *Music Borrowing and Copyright Law*, ed. Chen Zhu and Enrico Bonadio (Hart/Bloomsbury, 2023); M. Fletcher Reynolds, "'Selle V. Gibb' and the Forensic Analysis of Plagiarism," *College Music Symposium* 32 (1992): 55–78.

> normative view of what expression deserves legal exclusivity in the first place"[4]
>
> "The prior common source defense offers many good arguments to defendants, especially in cases involving musical styles that employ standard formulae, and therefore experts must consider not only similarities between the two that issue, but also similarities with prior art."[5]
>
> "If the combination of similar elements can be found in prior art, the original elements cannot have originated in either of the works being compared."[6]

Finell has herself noted the importance of Prior Art in expert reports (my emphases):

> "The expert's report … should be the basis for the allegations of the complaint. The report should provide the plaintiff's lawyer with information on the most obvious and important musical similarities at issue, and should also **warn against reliance upon musically insignificant similarities**. The expert's report should **indicate the extent of original material in the compositions** at issue and where appropriate **should discuss relevant prior art**."[7]

In my opinion, Finell's (and Ashbourne-Firman's) failure to perform any search for or to analyze any Prior Art constitutes a failure to fulfil their brief as musicologists.

## B. Incorrect and Unsupported Assertion of Originality of FISH89

Despite not providing or analyzing any Prior Art, Finell confidently asserts that FISH89 represents a unique combination of elements:

> "A prior art search has not yet been conducted. However, while the individual tier rhythms would likely be found within the literature, particularly of the Afro-Cuban, Caribbean, and jazz traditions, a combination of these four rhythmic tiers in near-identical popularity of "Fish Market" and "Dem Bow," and the subsequent emergence of the instrumentation pre-dating "Fish Market" would be far less likely to be found. Given the popularity of "Fish Market" and "Dem Bow," and the subsequent emergence of the "dembow" genre, the use of these rhythmic tiers with this particular instrumentation is likely to be deemed as influencing the music that followed it." (JF 2021 Rep. at 5.)

---

4 Fishman and García, "Authoring Prior Art."
5 Reynolds, "'Selle V. Gibb' and the Forensic Analysis of Plagiarism," 59.
6 Sandy Wilbur, "Music & Musicology Services & Fees," Musiodata, 2021, https://www.musiodata.com/services-fees.
7 Judith Greenberg Finell, "Using an Expert Witness In a Music Copyright Case," 2001, https://www.jfmusicservices.com/using-an-expert-witness-in-a-music-copyright-case-2/

Having admitted she did no prior art search, everything else that follows in this paragraph of the Finell Report is rank speculation. I know of no method in forensic musicology whereby "popularity" can be used to assess or opine on similarity, originality, or protectability. Nor should the "instrumentation" used to perform a particular musical composition have any bearing on whether that composition is original (e.g., if I play the main vocal melody of "Hey Jude" on a trombone I have not created a new composition that only I can use in the future).[8]

Finell's primary argument is that what is original to FISH89, DEM90 and POUNDER90 are four rhythmic "tiers"—consisting of parts played on snare, kick, bass or "tom" drum, and tambourine—which "tiers" "form the underlying basic rhythmic foundation of [those] Songs." (JF 2024 Rep. at 6.)

The top three "tiers" (which Finell calls Tiers 1-3 and also transcribes in her 2021 Report at page 3) are, again, simply a kick-snare Surf Beat rhythm, with a bass drum doubling the kick. I have shown this rhythm to be extremely common pre-1989. For example:

**Fig. 1 – JF 2024 Rep. at 6 - "Fish Market Tiers" (JB markup)**




[8] Finell's citation to "instrumentation" as a basis for originality is not only nonsensical and utterly unsupported by any musicological theory or evidence, it is contrary to her own analysis. Specifically, Finell's "Musical Exampe [sic] 4" on page 4 in her JF 2021 Rep. purports to compare the so-called "vocal hook rhythms" of a Defendant's song ("Dame Tu Cosita") to the "most distinctive rhythms" in FISH89, supposedly to show that FISH89's "4 tiers form a rhythmic composite (made up of parts played by four ***different*** percussion instruments) echoed in the vocal hook" of "Dame Tu Cosita." What Finell's "Musical Exampe 4" really demonstrates is that Finell considers all five "tiers" at issue—the four different instruments that make up the "rhythmic composite" plus the "vocal hook"—to be rhythmically interchangeable, thus belying Finell's contention (on the very next page of her report) that the "instrumentation" of FISH89 is an element of or contributor to its rhythmic composition or alleged originality. Moreover, while not relevant to this phase of the case, I would note that the "Dame Tu Cosita" vocal pattern is commonplace (it rhythmically matches the public domain nursery rhyme "Chick-en on a fence post" or the spiritual "Mar-y had a ba-by").

Shown above is the full extent of what the JF 2024 Rep. (at 6) refers to as the "four tiers [that] form the underlying rhythmic foundation" of the CWs (my markup in red). All of these elements have been shown in my JB Aff. Rep to be commonplace in music that predates 1989. Had Finell undertaken a Prior Art search, the commonplace nature of each of these 'tiers' would (and I believe should) have been highlighted in her report, to enable all parties, and the Court, to understand which of the rhythmic elements of FISH89 were in common use by composers in the 1980s and earlier. My JB Aff. Rep provides extensive evidence of this; shown below by way of an example is my comparative transcription of Rock Lobster (The B52's, 1979) (JB Aff. Rep, fig. 10, at 33), which compares the "Kick Drum" and "Snare Drum" tiers as defined by Finell, and demonstrates clearly the commonplace nature of what JF calls the "distinctive pulse" of the CWs.

**Fig. 2 – commonplace kick-snare Surf Beat (from JB Aff. Rep)**

(Reproduced from JB Aff. Rep fig. 10, at 33)




Note, however, that while Finell transcribes the kick-snare rhythm of FISH89 in her 2024 Rep. as a Surf Beat (in that she has included the so-called "ghost note," incorrectly notated using a downward stem[9]), she transcribes it inconsistently in her own 2021 Rep. attached as Exhibit A. In "Musical Example 1" in that report (at 3), she does not transcribe the "ghost note" at all, and instead transcribes the rhythm as a kick-snare habanera, as shown below:[10]

[9] In musicology, or music theory, stem direction is never used to denote dynamics; this is simply incorrect, even though both Finell and Ashbourne-Firman assert that it can be used in this way.

[10] To further confuse matters, Finell's transcription at "Musical Example 1" in her JF 2021 Rep, is inconsistent with her transcription in "Musical Exampe" [sic] 4" on the very next page of that same report (wherein she transcribes the FISH89 snare drum with the "ghost note."

**Fig. 3 – JF 2021 Rep. at 3, Musical Example 1 (JB markup)**[11]




Again, had Finell undertaken a Prior Art search, the commonplace nature of each of these 'tiers' would (and I believe should) have been highlighted in her report. My JB Aff. Rep provides extensive evidence (at, e.g., 11-12 and at 23-32) that what Finell describes as the "distinctive pulse" of FISH89 is, without the "ghost note," nothing more than a basic habanera rhythm that was commonplace long prior to 1989. Shown below by way of an example is my comparative transcription of Paulina Mineure (Jeff Louna, 1982) (JB Aff. Rep, fig. 9, at 32).

**Fig. 4 – commonplace kick-snare habanera (from JB Aff. Rep)**

(Reproduced from JB Aff. Rep fig. 9, at 32)




The Finell Report Musical Example 1 (see Fig. 3 above) apparently reduces the protectable elements of FISH89 to a kick-snare habanera pattern, combined with a 1 + 3 bass note doubling every other kick drum. (See also KB Rep. at 42 ("On beats 1 and 3… the kick drum part is combined with a pitched bass note.").) I would argue that the common

[11] Finell's transcription is inaccurate in another important way. Finell captions it as: **"Musical Example 1: Tiers 1 – 3 in "Fish Market," "Dem Bow," "Dame Tu Cosita," and "Dame Tu Remix."** Note that the transcription ends in a rest – where no drums play for a total of one quarter note – i.e. a quarter note of silence. This quarter note rest is present in "Dame Tu Cosita." It is not present in FISH89, DEM90 or POUNDER90. Put another way, what Finell is asserting to be a comparative transcription of FISH89 and DEM90 is, in fact, a transcription of "Dame Tu Cosita," captioned incorrectly to imply that it is a transcription of the drums we hear in all three works. At best, this is poor attention to detail; in practical terms, it deceives the reader into thinking that FISH89 and the other works are more similar than they in fact are.

practice of doubling any individual drum with another drum is not an inherently compositional gesture—it simply thickens the musical texture of the arrangement (i.e., the sound recording) for the duration of a single drum hit. But even if one were to take the position that this common drumming practice (of hitting two drums, or a bass and a bass drum, simultaneously) were somehow a protectable creative gesture by a composer, even this 'selection and arrangement' argument fails. Not only is playing a bass note on 1 + 3 a commonplace technique in countless prior works (JB Aff. Rep. at 21), but even the act of combining this commonplace gesture with a kick-snare habanera was not invented by Plaintiffs in 1989.

**Fig. 5 – JF 2021 Rep. at 3, Musical Example 1 / Mr. Bissessar (Drupatee Ramgoonai, 1988)**[12]




By way of an example, shown above is a comparison between the Finell Report Musical Example 1, and below it a near-identical transcription of "Mr. Bissessar," a prior work from 1988 that uses the same selection of commonplace elements—that is, a bass playing on 1 + 3, along with a kick-snare habanera beat.[13]

This is the type of Prior Art search that would have enabled PEs to analyze and determine which if any elements of FISH89 were original. As has been stated, none undertook such a search, yet all three of the PE Reports reach the baseless conclusion that FISH89

---

[12] Commonplace kick-snare habanera, with bass line playing 1+3. YouTube audio. Mr. Bissessar is an example of "Chutney Soca", a Caribbean genre related to Soca, and coined by Ramgoonai herself in 1987. It was common in the late 1980s, and was performed mainly by artists of Indian heritage.

[13] For ease of visual comparison, I have transcribed Mr. Bissessar in 2/4 time (as Finell does for FISH89 and the other CWs) and in the same visual style as Finell.

contains an original combination of bass/kick/snare in three of its 'tiers'. Clearly it does not.

### C. Incorrect and Inconsistent Tambourine Transcriptions

While Finell includes certain tambourine parts in what she asserts are the "four tiers [that] form the underlying rhythmic foundation of the Songs," she fails to transcribe consistently the tambourine in her report. She also provides one transcription that she claims to represent all three of the CWs or "Songs" (FISH89, DEM90 and POUNDER90), despite the fact that POUNDER90 does not even include any tambourine parts. Finell's failure to precisely identify what particular tambourine rhythm, if any, Plaintiffs claim to own is another failure to meet her brief as a musicologist.

Finell transcribes the tambourine line in FISH89 in two completely different ways in her own report, as follows:

**Fig. 6 – Finell's inconsistent "FISH89" tambourine transcriptions[14]**

(Ref JF 2024 Rep. at 6, and JF 2021 Rep. at 3, Musical Example 2)




Not only are Finell's own transcriptions of the FISH89 tambourine part inconsistent with each other, neither is consistent with Ashbourne-Firman's transcription of the tambourine part (which is the same as the transcription contained in Plaintiffs' Complaint):

**Fig. 7 – tambourine from PAF Rep. at 5[15]**




Further, the JF Rep does not supply a timestamp for the tambourine transcriptions, other than for "Musical Exampe [sic] 4" which shows a timestamp of "0:00," which does not match the USCO deposit copy of any commercially available version of FISH89 (given that the opening seconds of FISH89 are comprised only of an introductory snare drum passage).

[14] For ease of comparison to my own and to the PAF Rep., I have re-notated Finell's incorrect transcriptions here in a more typical/correct 4/4 format.

[15] The tambourine excerpt is taken from the PAF transcription in the PAF Report; this transcription is identical to the one that appears in the Complaint (e.g., at 36, and periodically throughout).

The transcription of the tambourine part at page 6 of the JF 2024 Rep. matches the one at Musical Example 2 of the JF 2021 Rep., which is said to be taken from a so-called "stem" audio file labeled **"16 Bars Slam on beats 1&3, Hat, Tambourine.mp3."** This suggests that both transcriptions were transcribed *not* from the USCO deposit or publicly available version of FISH89, but instead from an audio file of unknown provenance and unknown relation to this case or Plaintiffs' Claimed Works. As my affirmative report notes (at 41, and also at 20, fn 33), these Plaintiff-supplied "stem" files differ audibly from the drum parts we hear in FISH89 itself, and they do not sound like "stems" of FISH89 (i.e. elements of the original master recording) or even sound as if they were recorded in 1989.[16] Finell, however, appears to have not questioned or verified the authenticity of these supposed "stems," stating only that "sound files were provided by Doniger / Burroughs" (JF Rep, Appendix A). I believe that a musicologist should always verify that the files she or he is working with embody the actual musical material that is at issue (in this case, the USCO-deposit versions of Plaintiffs' Claimed Works or, at least, other publicly available versions).

Finell's transcription inconsistencies echo her text inconsistencies in relation to FISH89's tambourine part. The JF Rep contradicts itself, including on consecutive pages:

> […] a tambourine playing a repeated pattern through both bars, […] (JF 2024 Rep. at 4.)
>
> […] tambourine (played in various sixteenth note and/or eighth note patterns). (JF 2024 Rep. at 5.)
>
> Tambourine (various sixteenth note patterns). (JF 2021 Rep. at 2.)[17]

Given that Finell cannot even seem to agree with herself about the particular, identified or identifiable tambourine pattern in FISH89, the only available interpretation of Finell's position is that Plaintiffs are entitled to ownership over *any* use of a tambourine playing an AUX line over a habanera or Surf Beat, which interpretation is confirmed by Finell's comparison of (one version of) the tambourine line that she claims exists in FISH89 with the transcribed tambourine line from "Dame Tu Cosita." (See Musical Example 3 (at JF 2021 Rep. at 3.) Damningly, Finell's comparison reveals that the two tambourine lines are not, in fact, the same but, rather, only share four sixteenth notes at the start of the bar (which, incidentally, is another simple and commonplace musical building block (JB Report p.17)).

---

[16] I speculate, from the sonic characteristics of the files, that they were recently created. Regardless, the drums/percussion we hear in the "stems" files are not the same as the parts in the USCO deposit copy or in any other publicly-released version of FISH89.

[17] Finell's (and Ashbourne-Firman's) vague and inconsistent transcriptions and descriptions suggest that the tambourine part in FISH89 is, impossibly, both variable and repeating. As I observed (at page 17) of my JB Aff. Rep., that fundamental flaw in Finell's analysis also present in other documents generated by Plaintiffs (including their pleading).

### D. Undefined Timbale Parts Not Asserted to Be Part of FISH89 Composition

As noted above, Finell does not include timbale parts in any of her "four tiers [that] form the underlying rhythmic foundation of the Songs," as described and transcribed in her JF 2024 Rep. (at 6.) Her JF 2021 Rep. (at 2) references timbales (together with the snare drum) as part of one of the so-called "four tiers," but she does not transcribe any timbale parts in either that report or in her JF 2024 Rep. Consistent with her apparent conclusion that the timbale parts are not part of FISH89's (or any other CWs') "rhythmic foundation," as well as with my description of the timbale parts as AUX elements (JB Aff. Rep. at 20), she describes the timbales as 'soloistic' and an 'embellishment' that plays over FISH89's core composition features (JF 2024 Rep. at 4). I agree with Finell's relegation of the timbales to a non-compositional "embellishment."

Not only does Finell not transcribe any timbale parts, she does not identify which part, if any, of the timbales in any of the CWs represents unique and protectable expression (such uniqueness or otherwise being untested against Prior Art). Nor does she provide timestamped transcriptions of the timbales that the Complaint alleges have been copied by Defendants. And she notably provides no support for the assertion in the Complaint that the timbales "play a roll at the end of every other bar and a combination of 16th notes over the pattern…" As I demonstrated in my Affirmative Report (at 20, 40-41), neither the deposit copy of FISH89 nor any publicly available version includes a timbale "roll at the end of every other bar."

### E. Failure to Transcribe the CWs for Comparison

The JF Rep. makes a number of assertions that could only be tested through comparative transcription:

> "Pounder" incorporates the "Fish Market" composition. (JF 2024 Rep. at.3)
>
> "Dem Bow" is derivative of "Fish Market," and [] "Pounder" is a further derivative that contains the "Dem Bow" instrumental composition (including the composite drum pattern and its constituent elements, including the kick, snare, hi- hat, tom, and timbales, as well as the bass line). (*Id.* at.7)
>
> The underlying core expression of "Dem Bow" and "Pounder" share a near identity to that of "Fish Market." (*Id.*)

The JF Rep. does not provide any evidence for these claims. No comparative transcription has been done to illustrate this claimed similarity between the CWs. The obvious fact that the timbales are different between POUNDER90 and the other two CWs is ignored, as is the fact that there is no tambourine in POUNDER90, in the transcriptions and in the commentary.

Further, the JF Rep. claims that the similarities in the CWs include "the composite drum pattern and its constituent elements" (JF 2024 Rep. at 7). This is a sweeping statement and is demonstrably false. For example, POUNDER90, while sharing a basic kick-snare pattern with FISH89, contains obviously and demonstrably different hi-hat, tom, and timbales parts, as shown in the transcriptions at Appendix B of my JB Aff. Rep.

Finally, the JF Rep. does not analyze or discuss whether any elements of DEM90 or POUNDER90 that are not present in FISH89 are original or protectable (because it does not identify any such elements).

## IV. <u>The PAF Report</u>

Ashbourne-Firman is concededly not a musicologist, and his PAF Rep. is even less thorough, quantitatively and qualitatively, than the JF Rep., consisting of only 8 pages of commentary, no Prior Art search, and 2 bars of transcription (of FISH89 only). Curiously, the text of the PAF Rep. and the JF 2024 Rep, is identical to a large degree (see my Appendix B which identifies those identical portions), so presumably one or the other of those reports was mostly copied verbatim from and parrots the other.

As with the JF Rep., Ashbourne-Firman's analysis is insufficiently rigorous to test the bold assertion at the heart of Plaintiff's case (in this phase), *i.e.,* that what Plaintiffs claim is a 2-bar excerpt of FISH89's rhythmic elements is original and protectable and has no precedent in any earlier music.

In this section, I shall parse the PAF Report's analyses and claims, identify points of agreement between Ashbourne-Firman and the JB Report, and also provide commentary on any inaccuracies, methodological flaws, unevidenced claims, and omissions.

### A. <u>Lack of Prior Art Search</u>

Like Finell, Ashbourne-Firman states that he does "not opine on the impact nor existence of prior art, if any, in this report." (PAF Rep. at 3.) Yet, Ashbourne-Firman states: 'There is no evidence that I have seen to indicate they [the Songs, i.e., FISH89, DEM90 and POUNDER90] were copied from prior sources." (*Id.* at 8.)[18] He states further that: 'The plaintiffs "allege that 'Fish Market' has a drum pattern that differentiates it from prior works [...] I agree that the combination of these elements is original [...]" (*Id.*) It is entirely unclear how Ashbourne-Firman could have reached these conclusions without having conducted a search for and analysis of Prior Art and filtered out any commonplace pre-existing musical elements from his analysis (which he plainly did not do). While he says he has not "seen" evidence showing the CWs were copied from prior sources—which, again, is not the inquiry here—he does not state that he looked for such evidence, and,

[18] As I stated above, whether or not FISH89, DEM90 and POUNDER90 were "copied from prior sources" is a question that would appear directed to the issue of whether the works are entitled to copyright as a whole, not to whether Plaintiffs are entitled to the exclusive use of commonplace elements found in Prior Art, individually or in combination.

more importantly, he does not state that he looked for evidence that would either confirm or disprove Plaintiffs' claim that the rhythmic elements in the CWs that Plaintiffs allege are original and have been infringed are, in fact, original, or whether they exist in Prior Art, alone or in combination, and are therefore not original. Nor does he identify or describe any Prior Art review he conducted, nor is any Prior Art identified by him as having been "considered" in the "Materials Considered" section of his Report. As stated above, a Prior Art search is the *only* methodology by which originality can be established, and ignoring earlier works makes any analysis of, and therefore conclusion relating to, compositional originality essentially meaningless.

Ashbourne-Firman's conclusory assertions concerning originality in the absence of a search for and analysis of Prior Art are particularly troubling considering his own musical background (although, to be clear, he does not explain why he is qualified to serve as an expert in this case). He is a Jamaican composer who is affiliated with an organization called "Music Unites Jamaica," which "seek[s] to expand the awareness of Jamaica's longstanding musical heritage" https://www.musicunitesjamaica.com/. Having apparently been a composer in Jamaica since the 1970s, and given his involvement in an organization promoting the awareness of Jamaican music, Ashbourne-Firman should therefore certainly have been familiar at the time he wrote his report with the works of many of the Jamaican artists whose Prior Art is discussed in my Affirmative Report and in the reports of Drs. Wayne Marshall and Melvin Butler, including General Trees, Lee Perry, and Lovindeer,[19] as well as some of the traditional Jamaican Revival music discussed by Drs. Marshall and Butler.

Moreover, Ashbourne-Firman's own work demonstrates that he is aware of rhythmic conventions in Caribbean music. His compositions feature many examples of TK and CRP beats, in percussion/drum parts and in other instrumental parts (e.g., string tresillos in his string quartets). A clear illustrative example can be found in "Jamaican Suite for Symphonic Wind Orchestra - 'Brownskin Gal' / 'Lion Heart' / 'Key Man'" (Ashbourne, 1981 or 2002[20]) https://soundcloud.com/peter-ashbourne/14-jamaican-suite-for#t=234. There, the conga part plays an obvious one-bar habanera rhythm at [03:54] through to [5:47]. In other words, Ashbourne-Firman has composed a song with the exact rhythmic pattern (on a conga) that Plaintiffs' own expert Bilby calls a "generic Dem Bow beat."[21] Clearly, Ashbourne-Firman understands the commonplace rhythmic building blocks of Caribbean and Afro-Cuban musics, and so he easily could have and should have determined that the rhythmic elements claimed by Plaintiffs are commonplace and not original.

---

[19] Ashbourne-Firman himself is credited as a keyboard player on the 1989 Lovindeer album "One Day Christian."

[20] Ashbourne-Firman's recording of this composition is described on his SoundCloud page as "Release Date: 31 December 2002". Even if this date is correct for the Sound Recording, it is likely that the original composition (which I could not access) was in fact written in 1981, around 8 years before FISH89. Ashbourne-Firman's CV is, at the time of writing, accessible via his website at https://www.peterashbourne.com/bio/, and it credits an almost identically titled composition "Jamaican Suite for Symphonic Wind Orchestra and Percussion" dated 1981.

[21] This is consistent with Ashbourne-Firman's acknowledgement in his report that, while he did not look, "it may be possible to find another piece of music with a layer that is similar or even rhythmically identical." (PAF Rep. at 7.)

## B. Transcription Issues

The PAF Rep. presents (at 5) the same transcription of FISH89 as is present in the Complaint (at 36, para. 188).

**Fig. 8 – PAF Rep. transcription of FISH89 "8 tiers" (JB Markup)**




I have already indicated a number of issues present in this transcription, not least the inaccurate transcription of the timbales 1, tambourine, and hi-hat parts (see JB Aff. Rep. Appendix B). Moreover, the timbales 2 part (a 32-stroke roll at the end of consecutive

bars) notated in this transcription is not present in any version of FISH89.[22] Perhaps that is why neither Ashbourne-Firman, nor Finell, nor Plaintiffs describe this roll consistently with each other or with this transcription: "timbales that play a roll at the end of every second bar in most iterations of the interlocking components" (PAF Rep. at 4); "timbales that play a roll at the end of every fourth bar in most iterations of the interlocking components"' (JF 2024 Rep. at 4), 'Timbales that play a roll at the end of every other bar" (Plaintiff's 'FMEs'). This transcription also implies that the 'timbale 1' part is fixed and continuously repeated. However, as all PEs (and I) agree, the timbale 1 part varies throughout FISH89, being performed "live in the studio, improvising various rhythmic phrases and patterns with a Poco or Jamaican Revival church feel" (KB Report, at 19)[23]. Further, Ashbourne-Firman's transcription shows the snare drum part as a 'Surf Beat' due to the so-called "ghost note," which is largely consistent with one of Finell's transcriptions but not with the other. Additionally, this transcription does not contain a timestamp—essential in all forensic musicology to enable all parties to identify what section of the music is being analyzed.

By any accepted standard of forensic musicology (aka "Standard Musicological Practice"), the Ashbourne-Firman transcription is at worst misleading, and at best insufficiently thorough to serve its ostensible core purpose: identifying and highlighting original and protectable elements of a musical work (including to potentially test in a subsequent phase whether such original and protectable elements, if there are any, have been copied in any allegedly infringing work).

### C. <u>Contradictory Descriptions of Instruments</u>

Like the JF Rep., and consistent with my own analysis, the PAF Rep. repeatedly subtracts the timbales from FISH89's fundamental rhythmic pattern by describing them as "soloistic" and an "embellishment." (PAF Rep, at.5.) However, Ashbourne-Firman confusingly also describes the timbales as a "core instrument" (*id.*), perhaps drawing a distinction between the material played by the timbales, and the presence of the instrument itself. Regardless, neither Ashbourne-Firman nor Finell (nor Bilby) thoroughly and accurately transcribed the timbales, timestamped them, and compared them to Prior Art, suggesting at least tacit acknowledgement by all three that the timbales are simply a secondary, largely improvised, non-compositional part of the FISH89 rhythm.[24]

---

[22] While some bars of FISH89 do contain this roll in the final eighth beat, nowhere in the song does this happen in consecutive bars.

[23] I find significant Bilby's apparent concession that the improvised "timbale 1" part was performed using rhythmic norms that were commonplace in "Poco or Jamaican Revival church" music.

[24] Again, to the extent that Plaintiffs and/or the PEs are claiming that *choosing an instrument* represents composition and protectable expression, that position is indefensible as a musicological matter (as it would render every "cover" version of a preexisting composition, even one that contains no new arrangement, played on a different instrument, a new, original and separately copyrightable composition).

### D. Failure to Transcribe CWs For Comparison

Ashbourne-Firman asserts:

> "Moreover, "Dem Bow" and "Pounder" contain the same shared musical elements discussed herein as those found in "Fish Market. The underlying rhythmic accompaniment in "Dem Bow" is compositionally derived from "Fish Market," comprising the core compositional expression of "Fish Market." (PAF Rep. at 7.)
>
> "Dem Bow" is derivative of "Fish Market," and that "Pounder" is a further derivative that contains the "Dem Bow" instrumental composition (including the composite drum pattern and its constituent elements, including the kick, snare, hi- hat, tom, and timbales, as well as the bass line). (*Id.*)

Like Finell, Ashbourne-Firman fails to provide a comparison between the CWs. If the PEs are attempting to claim that FISH89 is the same core composition as DEM90 and POUNDER90, then they should have, methodologically, compared them (through transcriptions), and identified and removed elements that appear in only one or two of the CWs (e.g., the FISH89 timbale, or the DEM90 programmed timbale 2 roll, or the tambourine entirely). If the PEs had done that (rather than present one transcription that mixes and matches elements that appear in one or two works but not all three), the resulting transcription would have revealed that all that is common to *all three* CWs are a habanera kick-snare and a 1 & 3 kick drum—which we know appear in Prior Art.

The PAF Rep. does not provide any evidence for its claim that DEM90 and POUNDER90 "contain the same shared musical elements discussed herein as those found in 'Fish Market.'" Nor does it provide analysis or transcriptions to support the claim that "[T]he underlying rhythmic accompaniment in 'Dem Bow' is compositionally derived from 'Fish Market.'" (PAF Rep. at 7.) Nor does it analyze or discuss whether any elements of DEM90 or POUNDER90 that are not present in FISH89 are original or protectable.

## V. The KB Rep.

### A. Overarching Methodological Issues

Bilby tries to assert that FISH89 is an original composition, but his report has several shortcomings.

*First*, Bilby fails to focus his analysis on those rhythmic elements of FISH89 and the other CWs that Plaintiffs claim are original, protectable and infringed (i.e., the so-called "Fish Market Elements" described in Plaintiffs' Requests for Admission and their Complaint), asserting instead that the CWs in their entirety contain sufficient originality to be copyrightable under a legal standard provided to him. But even if those works in their entirety might be subject to copyright, that does not mean that any pre-existing

commonplace musical elements or "building blocks" contained therein (such as the rhythmic elements, which I have demonstrated exist in Prior Art) can be claimed exclusively by Plaintiffs and serve as a basis for claims of "infringement" where others use them.

*Second*, Bilby fails to differentiate between elements that are present in the FISH89 musical work from those that are present in the FISH89 sound recording, which are, musically, two separate properties, and (I understand) two separate copyrights under law. Bilby repeatedly refers to and relies on elements of FISH89's specific recording—such as timbral elements and the frequency content of particular drums—but fails to articulate and explain which aspects, if any, are part of FISH89 (or the other CWs) as a musical work, and how.

*Third,* Bilby describes FISH89 as distinctive while acknowledging that many of its elements were improvised embellishments rather than fixed compositional choices. His description of the timbales (like Finell's and Ashbourne-Firman's) makes clear that they were played live and were not a predetermined aspect of the composition, yet he later asserts that POUNDER90 copies these elements "almost verbatim," (it does not) ignoring the fact that improvisational elements are inherently fluid and not fixed. Furthermore, he claims that FISH89 was a marked departure from prior art but does not provide rigorous comparative analysis, relying instead on generalized assertions about Jamaican musical traditions (while ignoring Prior Art *from Jamaica* (as well as Prior Art from elsewhere in the Caribbean and US) that includes the rhythmic elements at issue) rather than demonstrating any specific, protectable musical features unique to FISH89.

*Fourth*, Bilby dedicates an extensive portion of the KB Rep. (pp. 47-55) to the concept of "feel,", describing it as an essential quality of Jamaican music that drives the creative process and distinguishes FISH89. However, his discussion is notably vague, and he never explains how this abstract quality is fixed in a tangible medium. Instead, his discussion leaves "feel" as a subjective, intangible quality that is experienced live and inherently transient. Without showing how "feel" is concretely captured—whether through a specific notation, a recording, or another fixed form—or reliably analyzed and quantified, Bilby's argument for the originality and protectability of FISH89 becomes problematic from the perspective of an expert musicologist. He uses terms like "rhythmic feel" and "the capacity to sense and creatively employ sonic materials" without establishing specific criteria or parameters (so that they can be compared to Prior Art, as well as (in a later phase of this case) to works Plaintiffs claim copied from the CWs). The KB Report is far removed from Standard Musicological Practice because it lacks precision, is not replicable, and fails to articulate the elements that are allegedly original to FISH89 and the other CWs.

### B. <u>The "KB Assertions"</u>

The only (arguably) musicological commentary in the KB Rep. appears at pp. 41-46, points A-H. I shall refer to these as the "KB Assertions," and parse them below, connecting them

where relevant to the so-called "Fish Market Elements" or "FMEs" asserted by Plaintiffs (which I discussed/parsed previously in my JB Aff. Rep.).

> A: Particularly, 'Fish Market' includes a specific rhythmic structure that is based on the synthesized sound of a drum kit playing a repeating rhythmic pattern consisting of four primary sounded pulses, against which a pattern of accentuated (in Western terms, "syncopated") counter-beats is sounded on a contrasting part of the kit. (This rhythmic structure, as well as other rhythmic patterns detailed below, can be represented graphically in court using either standard Western musical notation or TUBS [time unit box system] notation.) (KB Rep. at 41)

Point A is an overly complex yet deliberately ambiguous description of what Bilby elsewhere admits is a "generic dem bow beat" (i.e., a habanera or surf beat, as described in FMEs (i) and (iii)), and Bilby's parenthetical about "graphical representation" of the "rhythmic structure" could apply to almost all music that features drums and/or percussion. Notably, 'counter-beats' are not defined or notated (despite Bilby conceding they can be notated). Inexplicably, they are referred to elsewhere in the KB Rep. as "most often played on organ" (at 20).

> B. These overlapping parts are expressed with contrasting timbres. The part expressing the pulse emulates the "kick drum" of a drum set, while the part expressing the regularly accentuated counter-beats emulates a snare drum. (The "kick drum" part, which plays on all four of the primary sounded pulses, is combined with a synthesized cymbal [hi-hat] part playing on the same beats.) The distinct rhythmic lines assigned to the "kick drum" and "snare drum" parts are meshed together to create an interlocking texture. (KB Rep. at 42)

Point B maps to FMEs (i), (ii), and (iii). Again, it is describing a "generic" (to use Bilby's word) kick-snare habanera, and acknowledging that both the kick and hi-hat play 4 to the bar – i.e., the most common and simple thing that any rhythmic instrument can do. The "interlocking texture" of the kick and snare "parts…meshed together" is, again, an overly complex yet ambiguous description of "rhythm." But he has effectively admitted that the hi-hat duplicates the kick drum and, thus, adds nothing new to the rhythm.

> C: On beats 1 and 3 of this repeating pattern, the kick drum part is combined with a pitched bass note. (This pitched bass note was played by Mr. Johnson live [i.e. in real time] and more-or-less continuously on a keyboard throughout the recording.) This imparts to the repeating pattern a distinctive sense of alternating "low" and "high" beats. (Beats 1 and 3, featuring the added bass note, sound lower, while beats 2 and 4, featuring only the kick drum, sound higher). The pitch of these particularly placed bass notes (on beats 1 and 3) is Bb [B-flat]. (KB Rep. at 42)

Point C maps to FME (vii). As my JB Report establishes (JB. Aff. Rep, at 21), playing on beats 1 + 3 (whether as a bass drum or a bass instrument) is commonplace, and appears in countless earlier compositions. Also, the bass note on beats 1 + 3 doubles the kick and other instruments playing at the same time (as Bilby concedes when he states that "the kick drum part is combined with [the] pitched bass note") and, thus, also adds nothing new to the rhythm.

> D. A synthesized "tom" part was combined with the Bb bass note played on beats 1 and 3. (The particular sound of this "tom" part was created by Mr. Browne himself rather than

> being taken from a preexisting sample or pre-set "tom" sound; it was created by physically beating on an object in the studio, recording this with a microphone, and then equalizing and further processing it and sequencing it. Imagining it as a "tom" sound, Mr. Browne then began referring to it as such.) This sonically distinct "tom" part was intentionally added to ensure that the accentuation of beats 1 and 3 expressed through the bass part would remain audible to listeners even when the piece was played back on equipment with smaller speakers such as transistor radios or other small audio sets [...] which deep bass frequencies would be difficult or impossible to hear). A similar "tom" part (or sonic effect) is audible on beats 1 and 3 of the 'Pounder' / 'Dub Mix II' recording credited to Dennis The Menace. (KB Rep. at 42-43)

Point D maps to FME (v). Here, for the first sentence, Bilby simply describes a commonplace musical building block—a single hit playing on 1 + 3 of the bar. The rest of the paragraph describes compositionally irrelevant microphone and equalization techniques and other matters specific to making a sound recording. The fact that Bilby believes that a particular tom-tom sound is "sonically distinct" (an assertion for which he provides no evidence) is immaterial to the musical part being played – a commonplace, pre-existing 1 + 3 drum hit which doubles (and, accordingly, likewise adds no rhythm to) the kick and hi-hat.

> E. The particular counter-beats accented by the snare drum part between beats 1 and 2 and between beats 3 and 4 are immediately preceded by a "ghost note" that gives the pattern a distinctive feel. This element was consciously introduced by Mr. Browne in composing 'Fish Market' to create an effect that he believed (correctly) would appeal to Jamaican dancers. (KB Rep. at 43)

Point E maps to FME (ii) (and, particularly, the "ghost note" aspect of the "generic" habanera/surf beat). Like FME (ii), it uses complicated language (and no music notation) to describe a simple Surf Beat pattern. Bilby's repetition of Plaintiff Browne's own stated reason for including the so-called "ghost note" is, I would argue, irrelevant, because the element itself creates a commonplace Surf Beat, and was not originated by Browne or any other Plaintiff, as my JB Aff. Rep. Prior Art search has extensively demonstrated. Likewise, for the reasons set forth above, Bilby's invocation of "feel" is musicologically baseless and compositionally irrelevant.

> F. Beyond the accented "snare drum" counter-beats mentioned above, the rhythmic feel of the timbales-playing that forms an important part of 'Fish Market' is present in the 'Pounder'/'Dub Mix II' recording (produced by Dennis the Menace). When this recording is examined alongside 'Fish Market,' it becomes clear that the prominent timbales part featured in Halliburton's 'Pounder' mix is based on the timbales track in 'Fish Market.' On the 'Pounder' recording, in contrast, Denis Halliburton programmed a synthesized timbales part that was much simpler, consisting of a few brief rhythmic phrases that the engineer used to fashion an essentially unvarying loop. Not only does the simplified timbales pattern that Halliburton looped on 'Pounder' emulate the feel of the timbales on 'Fish Market' (for instance, incorporating similar rolls); it reproduces almost verbatim a few of the actual rhythmic phrases played live by Mr. Browne in the latter. (KB Rep. at 43)

In Point F, Bilby asserts that the FISH89 timbale pattern consists of a "rhythmic feel" that was later "emulate[d]" in POUNDER90. Here, as throughout the KB Rep., no replicable or testable definition of "feel" is provided. Factually, the timbales in

POUNDER90 are different from the timbales in FISH89, not least because, as Bilby correctly states here, they are in POUNDER90 an "essentially unvarying loop" (in contrast to the fully improvised and embellished timbales in FISH89 and DEM90).

I do not know why Bilby does not provide a comparative transcription of the respective CWs' timbales to demonstrate their similarities and differences clearly – again, such a simple methodology is Standard Musicological Practice. I offer such a transcription here, with timestamps and drum-specific notation for the timbales.

**Fig. 9 – JB comparative transcription of CWs' timbales**




The similarities and differences of the timbales between the three CWs are clear. The facts are as follows:

- Timbale 1 is the same between FISH89 and DEM90;[25]
- FISH89 contains a Timbale 2 part playing 2 x 16th notes on beat 4+ of each bar, which is not present in DEM90 or POUNDER90;
- POUNDER90 contains a 6-stroke (sextuplet) roll consistently at the end of every bar; FISH89 and DEM90 do not.

I offer the above factual bullet points as clear, methodologically defensible descriptions of the timbales that are contained in the CWs, which the KB Rep. consistently fails to do. Instead, it uses vague adjectives and unevidenced opinions e.g., "emulate the feel […] similar rolls […] almost verbatim […] a few." This language cannot be reliably parsed,

[25] I have, for the moment, confined my analysis to the bars and timestamps that Plaintiffs have transcribed and have alleged are protectable.

analyzed, or replicated, because it is subjective and un-specific (and factually inaccurate). Vague qualitative adverbs and adjectives like this, in my opinion, are methodologically unhelpful in forensic musicology. An expert musicologist should always explain to the reader precisely what musical elements are being compared and analysed, and should use replicable methods to establish facts about the works being compared.

> G. In 'Fish Market,' at approximately 1:38, a slight variation of the bass line is introduced. Instead of playing only Bb on beats 1 and 3, the bass switches to a distinct pattern consisting of differing pitches sounded on alternating beats, as follows: Eb (at an interval of a fourth higher) on beat 1—Eb to Bb (with eighth-note durations) on beat 2—Eb (again) on beat 3—Eb to Bb (again) on beat 4. This variation repeats only two and a half times. (Like the repeating bass pattern from which it departs, it was played by Mr. Johnson in real time, in a sudden moment of spontaneous improvisation.) On 'Dub Mix II' (i.e. 'Pounder'), at approximately 1:50, the exact same variation of bass line occurs, although in the latter case, it lasts slightly longer, being repeated four times. This constitutes additional evidence that 'Pounder' is itself a near-verbatim copy of Steely and Clevie's 'Fish Market'/'Dem Bow' composition. (KB Rep. at 44).

Point G is musically (and narrowly) correct: there is a brief move to an Eb bass note in FISH89 that also occurs in POUNDER90. This brief change of bass note is not referenced in the Complaint or identified as a "Fish Market Element" in Plaintiffs' RFAs, nor is it mentioned by the other PEs. Presumably, Plaintiffs are not asserting that Defendants have copied this element – certainly no such assertion appears in any document I have reviewed (including PEs' reports). Nevertheless, a bass line change from chord I (e.g. Bb) to chord IV (e.g. Eb) in a major key is one of the simplest chord changes in all music, and appears in countless compositions. [26]

I do not agree with Bilby's assertion that this brief bassline similarity (lasting around 5 seconds) provides "evidence that 'Pounder' is itself a near-verbatim copy" of FISH89 or any other work. Supporting such an assertion would require a comparative transcription of every element of the respective works, highlighting similarities and differences, while discounting commonplace elements. Bilby does not do this, and his methodology (such as it is) is not reliable.

> H. Dennis the Menace's 'Pounder'/'Dub Mix II' recording opens with almost the exact same introductory phrase as 'Fish Market,' consisting of an almost identical rhythmic pattern (in both cases, played by synthesized "snare drums"). The only difference between the two introductions is that in the 'Pounder' case, a single sounded beat is added at the end of the pattern before the rest of the instruments enter. (KB Rep. at 43)

[26] Public domain songs that use I-IV chord changes include "This Old Hammer" (folk song) and "Old Ship Of Zion" (African American Spiritual); copyright works predating 1989 that use I-IV chord changes prominently as a chord loop include "My Girl" (The Temptations, 1965), "Train to Skaville" (The Ethiopians, 1967), "Do The Reggay" (Toots & The Maytals, 1968), "I'll Take You There" (Staple Singers, 1972), "For What It's Worth" (Buffalo Springfield, 1966), "Bad" (U2, 1984), "Angel Of Harlem" (U2, 1987) and "The Cross" (Prince, 1987). Copyright works that change to the IV chord at the start of a new section (as alluded to in Bilby's Browne interview, discussed further below) include "Daniel" (Elton John, 1973), "Imagine" (John Lennon, 1971), "Paperback Writer" (The Beatles, 1966), and many others.

Point H is musically (and narrowly) correct, but utterly irrelevant. The three CWs all feature the same 1-bar snare drum pattern which serves as an introduction. The PAF Rep. and KB Rep. transcribe this one bar snare drum pattern correctly, as shown here.

**Fig. 10 – FISH89 intro snare drum (excerpt from KB Report Appendix 06)[27]**




That the CWs share a 1-bar snare drum intro pattern does not provide evidence that they are the same composition; rather, it demonstrates that one instrument plays the same rhythmic pattern for one bar (lasting approximately 2 sec). This musical element does not repeat anywhere in the CWs, so in my opinion it does not provide wider insight into any similarities or dissimilarities between the CWs (let alone provide any basis for asserting that any CW or the rhythmic elements in any CW are original.) In this respect, the assertion is also irrelevant because showing common elements between the three CWs does not make any CW more or less original and, moreover, this negligible two second intro is not alleged in the Complaint to be one of the elements of the CWs that Plaintiffs claim are original and infringed, nor was it identified by Plaintiffs in their RFAs as one of the so-called FMEs.

The KB Rep. summarizes the KB Assertions thus:

> This contextualization of each of the specific elements detailed above (elements that overlap and agree with those independently identified in the report and musicological analysis prepared for this case by forensic musicologist Judith Finell), demonstrates their interaction with and relatedness to one another, and the combination of the foregoing, within The Song's composition. (KB Rep. at 44)

On a musicological level, I have no idea what this vague statement means. Either the CWs are all the same composition (in which case, PEs should provide an annotated comparative transcription, highlighting similarities and differences, and subtracting commonplace elements found in Prior Art), or they are not the same composition. Bilby's assertion (if it is an assertion) in this statement makes no reference to compositional originality, and is not supported by thorough, note for note analysis. I would argue that all musical works in the world contain "specific elements" and that those elements exhibit "interaction with and relatedness to one another"; that is to say, the statement is so vague as to be meaningless.

Ultimately, Bilby concedes that the "3+3+2 rhythm," as an abstraction, is very widespread in African and African diasporic musics" and that the "boom-ch-boom-chik" "dem bow beat" is "generic" (KB Rep. at 11, 15), just as Finell appears to acknowledge that the "underlying

[27] The intro to FISH89 is a very simple rhythmic pattern, consisting of one note (drum), playing 8th and 16th notes for less than 2 seconds.

rhythmic foundation" of the CWs is a Surf Beat or habanera played on kick and snare. Bilby nevertheless tries to make it appear that this case (and Plaintiffs' claims) are about more than just that "generic" kick-snare Surf Beat or habanera, basing his "originality" opinion on "pitch, timbre, dynamics, tempo, rhythmic stress, and 'feel,'" or on vague "structural or 'spatial' considerations" (see KB Rep. at 15) or "Jamaicanness" (*id.* at 15). But even if these vague "considerations" could be properly and reliably analyzed (they cannot) and were compositional elements (they are not), none are actually cited or even mentioned in Plaintiffs' Complaint (or made part of Plaintiffs' FMEs), and Plaintiffs certainly have not alleged or claimed in the Complaint that any Defendant has copied or infringed any such "considerations." Instead, it is the "boom-ch-boom-chik" habanera/surf beat rhythm that Bilby himself calls "generic" (KB Rep. at 15) that Plaintiffs (at least primarily) appear to be claiming is original to them, protectable under copyright, and infringed by Defendants. That becomes self-evident when reviewing the sections of Plaintiffs' Complaint that purport to describe and transcribe similarities between the CWs and Defendants' works—those sections almost exclusively focus on purporting to show that Defendants' works have infringed on this "generic" "boom-ch-boom-chik" habanera/surf beat rhythm (and not AUX elements such as timbales, let alone "pitch, timbre, dynamics, tempo, rhythmic stress, [or] 'feel" or "structural or 'spatial' considerations" that are nowhere mentioned). (See, for example, Complaint¶ 221 (comparing only kick, snare, hi-hat and bass elements of "Fish Market with what those "drum & bass" (using Plaintiffs' phrase) elements in the work "Besame"); Complaint ¶ 221 (comparing same elements in "Calypso"); Complaint ¶ 223 (comparing same elements in "Date La Vuelta"); Complaint ¶ 279 (comparing kick and snare in "Fish Market" to kick and "rim click" in "Adictiva).)

### C. <u>The Browne "Interview"</u>

Bilby refers to an "interview" that he conducted with Plaintiff Cleveland Browne on September 13, 2022, and relies on that interview as support for certain of his assertions in his report, including assertions concerning certain of the "elements and characteristics" of "Fish Market." (KB Rep. at 41-44.). I have reviewed what seems to be only a partial recording of this "interview," as well as a transcript of same ("Dem Bow - 02-07-2025_Condensed.PDF" (<u>download link</u> • <u>audio recording link</u>). While I believe that any interview with an interested party can be of only limited value to an ethnomusicological analysis of the sort Bilby ostensibly was undertaking, this "interview" is particularly suspect as a reliable primary source because of the manner in which it was conducted. Specifically, rather than engaging in a good faith, open-ended effort to obtain whatever relevant information Browne may possess, Bilby almost exclusively asked leading questions, often interrupting Browne and interposing his own opinions and perspectives. In fact, Bilby dominates the interview, asking long, multi-part questions, often suggesting interpretations, adding historical context, and guiding the discussion. Quantitively, Bilby says around 8,500 words; Browne says around 3,200.

The following exchange (at pages 27-30 of the transcript) is illustrative:

> KENNETH BILBY: Now, but one thing you didn't mention is that, I noticed there's an alternating, you could say, either pitch or tambor between beat, alternating beats. So it's like a "Doon, doot. Doon, doot. Doon, doot. Doon."
>
> CLEVELAND BROWNE: (Laughs). That's most persons' perception, but that is not what actually was played. The kick drum marched straight or you know, it's "Doof, doof, doof, doof," and then the bass --
>
> KENNETH BILBY: So what accounts for the [...] the difference between alternating beats?
>
> CLEVELAND BROWNE: Because the bass only plays on one and three, where the kick bass, one, two, three, four. So the bass plays, "Boom," and the kick goes, "Toof," so "Boom, toof, doon, toof," so the kick is going straight
>
> KENNETH BILBY: Ah, okay.
>
> CLEVELAND BROWNE: -- but you have a "Doon, toof, doon, toof, doon, toof." So --
>
> KENNETH BILBY: All right.
>
> CLEVELAND BROWNE: -- if you (laughs)(indiscernible) --
>
> KENNETH BILBY: That's very good. That's very important, because it still creates an effect. You have a bass track.
>
> CLEVELAND BROWNE: Yes, a bass track.
>
> KENNETH BILBY: And you have a bass track, which is a definite pitch, and then you have a drum, a kick drum, a bass drum.
>
> CLEVELAND BROWNE: Yes, and it has a tom. It has a tom.
>
> KENNETH BILBY: And a tom as well, yeah.
>
> CLEVELAND BROWNE: Which are, on Pounder, is the same pattern again, but the sound of the tom on Pounder is a different sound, because most persons cannot find the exact sound that I use, because I sample myself.
>
> KENNETH BILBY: The reason I bring this up, though, is because on Pounder the -- you get that alternation in the exact same way.
>
> CLEVELAND BROWNE: Yes, exactly. Exactly.
>
> KENNETH BILBY: So this sets it apart as well. I mean, that's one thing that's shared, and I might have mentioned this to you before, and you might find it, you know, you might not find it relevant, but it does -- it matches a kind of aesthetic that you have in traditional Jamaican drumming, that you have in kumina and that you have in binghi drumming as well. You have the --
>
> CLEVELAND BROWNE: Yeah.
>
> KENNETH BILBY: -- on the bass drum, you have open/closed alternation --
>
> CLEVELAND BROWNE: Yeah.

> KENNETH BILBY: -- which makes it sound almost like similar to this --
>
> CLEVELAND BROWNE: Yes.
>
> KENNETH BILBY: -- which is not to take away from your originality at all. On the contrary, it's to show that your work deeply references your audience in Jamaica, your primary and first audience --
>
> CLEVELAND BROWNE: Right.
>
> KENNETH BILBY: -- that people, dancers and people who you have to be communicating with and appealing to, they're sensing something, right, that goes deep.
>
> CLEVELAND BROWNE: Yeah. Mm hmm.
>
> KENNETH BILBY: So if that shows up in another track that doesn't have that same type of community of listeners, like in Panama or -- you know, they don't do it that way, so that's evidence as well.

Such an exchange would not meet the standards of academic peer review in ethnomusicology. Bilby is simply making assertions and seemingly pushing Browne to agree. This does not represent accepted practice in the discipline of ethnomusicology, nor in ethnographic research generally. (See *SSRN Electronic Journal* "How to Conduct an Effective Interview: A Guide to Interview Design in Research Study" (2022), 1-11 ("The formulation of interview questions should be neutral and open-ended to allow participants to express their views without constraint, thereby minimizing the risk of bias."); Cairns-Lee, H., Lawley, J., & Tosey, P., "Enhancing Reflexivity About the Influence of Leading Questions in Interviews", *The Journal of Applied Behavioral Science,* 57(4) (2021), 501-523, here 502 ("Leading questions can unwittingly shape and bias interviewees' responses, thereby compromising the authenticity of the data collected."))

To the extent Bilby's interview with Browne does have any value, it bears noting that both Bilby and Browne acknowledge the influence on the CWs of earlier (pre-1989) Afro-Caribbean (including Jamaican) rhythmic and musical traditions (predating FISH89), and neither ever explains or identifies any rhythmic phrase or pattern in the CWs that was *not* present in these earlier traditions.

## VI. <u>Additional Notes on Transcriptions</u>

Bilby attaches to his report complete transcriptions of the CWs, which he states were prepared by Ashbourne-Firman. While there are some errors in these transcriptions, I do not focus on them because none of the PEs (including Ashbourne-Firman himself) rely on, quote from, or meaningfully cite to these transcriptions. I reiterate that the so-called "roll at the end of every other bar" sextuplet roll that appears in 'timbale L' at bar 6 of the Ashbourne-Firman transcription of FISH89 (KB Rep. Appendix 06 at 3) does not in fact appear in FISH89 at that point, meaning that FME (vi) is not supported with transcription evidence. It is an incorrect assertion about FISH89, and I describe it as "objectively untrue" in my JB Aff. Rep. (at 20).

## VII. Points of Agreement

While, as discussed above, the PEs fail to meet basic forensic musicology standards; rely on flawed methodology, vague language, sweeping statements, inconsistent transcriptions, and unsupported originality claims; and make numerous significant errors (most glaringly, the failure of all three PEs to perform any Prior Art search), each of the PEs makes admissions or assertions that confirm the accuracy of certain opinions I rendered in my Affirmative Report, including the following:

> "'3+3+2 rhythm,' as an abstraction, is indeed very widespread in African and African diasporic musics.'" (KB Rep. at 11.)
>
> "If one isolates any single layer of the recording, it may be possible to find another piece of music with a layer that is similar or even rhythmically identical." (PAF Rep. at 7.)
>
> "[I]ndividual tier rhythms would likely be found within the literature." (JF 2021 Rep. at 5.)
>
> "[T]he layer consisting of the kick drum on each beat of the bar, which is used in "Fish Market," is common to many forms of popular music." (PAF Rep. at 7.)

The above statements are consistent with the analysis at Section VIII of my JB Aff. Rep., where I analyze each of Plaintiffs' claimed individual FMEs and demonstrate through Prior Art (including Caribbean and Afro-Cuban music) that none of these elements represent original expression on their own.

In addition to the statements above, Finell states that the "underlying rhythmic foundation" of FISH89 consists of a kick and snare, together with a bass drum that doubles the hits on the kick drum on beats 1 and 3 (and so adds no new rhythm). (JF 2024 Rep. at 6.) Her transcription of those "tiers" clearly shows this combination of rhythmic elements as a Surf Beat. Her transcription at page 3 of JF 2021 Rep. shows it as a habanera. Either way, as shown in my JB Aff Rep., neither rhythm is original to Plaintiffs and both existed for years and had been used in numerous musical works prior to FISH89.

Both Finell and Ashbourne-Firman acknowledge that the timbales in FISH89 are "embellishments" (JF 2024 Rep. at 4; PAF Rep. at 5) and implicitly not a part of the core composition. In fact, Finell does not even include the timbales in her transcription of the "four tiers" which "form the underlying foundation of" the CWs (JF 2024 Rep. at 6), which is consistent with my opinion that the timbales are AUX elements which Plaintiffs have not described or defined with any degree of specificity (JB Aff. Rep. at 20). (Note that I have also shown that the timbales parts in the respective CWs are different from each

other (this Rebuttal document, fig. 9, supra). The Ashbourne-Firman transcriptions attached to the KB Report provide only a partial transcription of the “improvis[ed]” timbales line with an instruction “play same style/improvised rhythm fills.ad lib.” (See, e.g., *id.* Appx. 06, at p. 4.) And Bilby appears to further concede that the tambourine parts are not among the “specific elements and characteristics” that are original to FISH90 (KB Rep. at 41-44) and thus that they are essentially commonplace, unoriginal AUX elements (or merely the “idea” of playing tambourines over a habanera or Surf Beat) as I have described it. (JB Aff. Rep. at 17.)

**VIII. <u>Summary</u>**

The PE Reports fail to meet basic forensic musicology standards, relying on flawed methodology, inconsistent transcriptions, and unsupported originality claims. Their lack of a Prior Art search undermines, indeed, negates, their conclusions. Key elements they assert as original are demonstrably commonplace in music predating FISH89, and their own transcriptions contradict their claims. They also fail to distinguish between protectable composition and unprotectable performance or recording elements, rendering their arguments further unsubstantiated. This rebuttal demonstrates that the PE Reports lack the necessary musicological rigor to support their conclusion that the rhythmic elements of the CWs that Plaintiffs claim to own and claim were infringed are original and protectable.

Joe Bennett

Prof Joe Bennett PhD

# Appendix A
# Joe Bennett: Qualifications and Experience

Dr Joe Bennett (Berklee College of Music) has been analyzing and transcribing popular music for international publication since 1994. He has written more than 30 books, including transcription, teaching and reference works (published worldwide by Music Sales Group), and more than 300 articles for Total Guitar magazine and others, relating to classic songs, guitar techniques and songwriting. He is a writer member of PRS for Music and ASCAP, an academic member of the International Association for the Study of Popular Music (IASPM) and the American Musicological Society, and an associate of the Audio Engineering Society and the American Bar Association.

As an academic researcher, Dr. Bennett's primary area of expertise is the psychology of songwriting and similarity thresholds in popular songs; at Berklee he teaches forensic musicology analysis techniques. His PhD research (University of Surrey, UK) was entitled '*Constraint, Creativity, Copyright and Collaboration in Popular Songwriting Teams*' and it provided the world's first detailed systematic investigation into collaborative songwriters' creative processes. He has published widely, including peer-reviewed research about song analysis and music copyright infringement[28]. Dr. Bennett was awarded a National Teaching Fellowship (NTF) in 2004 by the UK Higher Education Academy in recognition of his contribution to the teaching and learning of popular music. He is a Fellow of the Higher Education Academy, a peer reviewer for Bloomsbury Publishing, Oxford University Press and IASPM, and a PhD examiner specializing in songwriting creativity.

As a forensic musicologist, Dr. Bennett's past clients include Universal Music Publishing, Warner/Chappell Music Publishing, APG, 88Rising, DLMDD, JWT, BBH, Loeb & Loeb LLP, Simpson & Marwick LLP, Edwards Wildman Palmer LLP, Swan Turton LLP, and Weber Shandwick, as well as many individual songwriters, publishers, record labels and corporate clients. Litigation experience includes Naxos v Salmon (Scottish courts, 2012 – written Report submitted, which was quoted by judge in the Decision), Hines v. W Chappell Music Corp (SDNY, 2021 – video testimony and Report submitted; preliminary Report quoted by judge), Third Side v Evenflo (Ohio, 2023) (advised client/parties settled) / Payne v Woods (Louisiana, 2023) (advised client/successful outcome). Academic presentations include Oxford University, Cambridge University, Berklee College of Music, NYU, and The Copyright Society. Media interviews include The New York Times, The Economist, Rolling Stone, Billboard, NPR, The LA Times, BBC TV, BBC radio, MTV, CNN, Discovery Channel, The Daily Telegraph, and The Guardian. Dr, Bennett currently co-presents the show "Midnight Musicology with Dr Beat" on BBC national radio.[29] He serves on the Copyright Society Music committee (2024-), and is listed on the UK Music Publishers' Association's Register of

---

[28] https://joebennett.net/publications/
[29] https://joebennett.net/5live

Expert Witness Musicologists and the American Musicological Society's database of forensic musicologists.[30]

Other than submitting a report in Hines v. Chappell Music Corp (as noted above), Dr. Bennett has not testified as an expert at trial or by deposition in during the previous four years.

## Publications Authored In Previous Ten Years

"We Can Work It Out: Forensic Musicology Methods." In *Music Borrowing and Copyright Law*, edited by Chen Zhu and Enrico Bonadio. Hart/Bloomsbury, 2023.

Bennett, Joe and O'Connor, Sean. "Determining The Composition: case studies of contemporary songwriters' creativity". In *The Oxford Handbook of Music Law and Policy.* Edited by Sean M O'Connor. Oxford University Press. Forthcoming, 2021.

"Wrongful Appropriation and Copyrightability in Music Copyright". Joe Bennett and Wendy Gordon. *Works-in-Progress Intellectual Property (WIPIP) Colloquium*, Boston University School of Law, February 2017.

"I Hate These Blurred Lines: The Intrinsic Test In Music Copyright Disputes". Joe Bennett and Wendy Gordon. The 11th Art of Record Production Conference, Aalborg University, Denmark, December 2016.

"Where is creativity? Locating intellectual property in collaborative songwriting and production processes." In *International Association for the Study of Popular Music (IASPM) UK & Ireland,* University College Cork, 12-14 Sept 2014.

"Who Writes the Songs? Creative Practice and Intellectual Property in Popular Music's Digital Production Chain." In *Creativity, Circulation and Copyright: Sonic and Visual Media in the Digital Age*, CRASSH Centre For Research In The Arts, Social Sciences And Humanities. Cambridge University 28-29 March 2014

[30] https://www.amsmusicology.org/page/ForensicMusicology

# APPENDIX B : Identical language between Finell and Ashbourne-Firman

## *INTRODUCTION*

*I have been engaged by Plaintiffs in this action to provide expert testimony in the above-captioned matter. My opinions as set forth herein and are based on my expertise, education, and the materials received, as detailed below. A true and correct copy of my Expert Report (the "Report") is attached hereto...*

*In addition, I have had the opportunity to review many of the materials currently available in this case, and my examination of these materials helped to inform my specific opinions.*

*If additional facts, materials, or circumstances become known or are made available to me after the rendering of this report, I reserve the right to amend or supplement this document as required to encompass fully the relevant facts.*

*Subject to the above, if I were to be called upon as a witness in this case, I would, based on my qualifications and experience, make the statements set forth herein and in my Report.*

## *QUALIFICATIONS*

*My qualifications and curriculum vitae are set forth in the Report and its attachments.*

## *COMPENSATION*

*For this matter, I am charging my current rate of _____ per hour for research and writing and _____ for deposition and trial testimony. My compensation is not contingent upon, or related in any way to, the outcome of this matter. I have not been promised any consideration beyond what is set forth herein regarding the contents of my Report.*

## *MATERIALS CONSIDERED*

*In preparing my Report I have based my opinions herein on the recordings, opinions, evidence, and material set forth or referenced in the Report. These materials include without limitation…*

*NOTE: proceeds to list files (a. through h.) but "c." file name differs between reports (see annotated PDFs)*

## *ASSUMPTIONS, OPINIONS, AND DISCUSSION*

### *Assumptions*

*I understand that the Plaintiffs in this action claim to have created and/or own certain copyrights related to the songs, Fish Market, Dem Bow, and Pounder (collectively, the "Songs"). My review of the Songs based on my musical comparison and the chronology set forth by the Plaintiffs reveals that "Dem Bow" derives from "Fish Market," and that "Pounder" incorporates the "Fish Market" composition. I have been asked to review the Songs to determine whether one or more of the Songs is creative and original. I note that "original" is used herein in accord with what I understand to be the direction of the Court, as set forth herein below.*

*I do not opine on the impact nor existence of prior art, if any, in this report. I understand that during the discovery process of this case it was requested of Defendants to provide any prior art that they believed to be relevant to the creativity and/or originality of the Songs and that, as … the submission of this Report, they have not produced any such material. Thus, I will assume at this juncture that Defendants are not relying on any prior art to challenge the originality and/or creativity of the Songs. Should Defendants provide such evidence in the future, I reserve the right to supplement this report to address same.*

*I am a _____ … not a lawyer … have been advised that the Court has set forth the standard for "originality in this case, advising the parties that:*

*"Original, as the term is used in copyright, means only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity."*

*"[I]t is not difficult to meet the famously low bar for originality."*

*"[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."*

*See Browne v. Donalds, No. 2:21-CV-02840-AB-AJR, 2024 WL 3468898, at *19 (C.D. Cal. May 28, 2024).*

### *Opinions*

*I have reviewed the Songs in light of the above and analyzed them to ascertain whether they were independently created by the author and were creative. Each of the songs is creative and original as I understand those definitions.*

*My review reveals that the core of the "Fish Market" composition features at least the following elements, which, together, form an original and creative work: a programmed*

*kick drum, snare drum, and hi-hat playing a _____ pattern… percussion instruments, including a tambourine playing a repeated pattern through _____ , a synthesized low 'tom' playing on _____ , and that play a roll at the end of every _____ bar in most iterations of the interlocking components described above. In "Fish Market," additionally, timbales play further, soloistic embellishments over the pattern for much of the song. A synthesized Bb (b-flat) _____ pitch also occurs on _____ of each bar.*

*Fish Market comprises a composite of interlocking components of multiple timbres constructed and layered in tiers of percussion patterns (played by percussion instruments). In addition, it includes harmonic patterns in the bass repeated throughout essentially the song's entirety. The interlocking tiers form the essential expression of "Fish Market," supporting the work's few additional elements (such as timbale embellishments referred to above). These core instruments, as described above, include snare drum, timbales, hi-hat, bass drum (_____ known as a "kick drum), _____ and tambourine (played in various sixteenth note and/or eighth note patterns). This combination of elements as expressed in the composition is original by the definition provided to me.*

*The underlying rhythmic accompaniment in "Dem Bow" is compositionally derived from "Fish Market," comprising the core compositional expression of "Fish Market." The instrumental music in "Dem Bow" contains the interlocking musical elements originating in "Fish Market" plus additional melodic, harmonic, and lyrical elements. In turn, "Pounder" incorporates the "Dem Bow" instrumental features, which are, based on the definition I have been provided and the scope of my opinion, original to "Fish Market."… the underlying composition of "Fish Market" and "Dem Bow" and "Pounder" share a high degree of correlation; the "Fish Market" composition is expressed in "Pounder."*

*… the songs … contain … similar interlocking rhythms … construct… tiers… (see annotated PDFs)*

*… tiers form the underlying rhythmic foundation… providing a distinctive pulse and support for the musical elements that synchronize with them.*

*… "Dem Bow" … same shared musical elements discussed _____ as those found in "Fish Market."*

*The Songs, as discussed above, are original. There is no evidence that I have seen to indicate they were copied from prior sources, and they possess substantial creativity, and certainly at the very least some minimal degree of creativity given what I understand to be the standard of "originality" as set forth above, in connection with the artists' creative decisions discussed above and the combination and arrangement of the musical elements comprising the Songs.*

*I understand that the Court wrote that the plaintiffs "allege that 'Fish Market' has a drum pattern that differentiates it from prior works, and features, inter alia, 'a programmed kick, snare, and hi-hat playing a one bar pattern; percussion instruments, including a*

*tambourine playing through the entire bar, a synthesized 'tom' playing on beats one and three, and timbales that play a roll at the end of every second bar and free improvisation over the pattern for the duration of the song; and a synthesized Bb (b-flat) bass note on beats one and three of each bar, which follows the aforementioned synthesized 'tom' pattern." See Browne v. Donalds, No. 2:21-CV-02840-AB-AJR, 2024 WL 3468898, at *19 (C.D. Cal. May 28, 2024). I also understand that the plaintiffs contend that the combination of these elements is original. I agree that the combination of these elements is original under the standard provided by the Court.*

*"Dem Bow" is derivative of "Fish Market," and … "Pounder" is a further derivative that contains the "Dem Bow" instrumental composition (including the composite drum pattern and its constituent elements, including the kick, snare, hi-hat, tom, and timbales, as well as the bass line). The underlying core expression of "Dem Bow" and "Pounder" share a near identity to that of "Fish Market."*

*My curriculum vitae is attached hereto as…*

*If further evidence or testimony in regard to the above is proffered by the parties, I respectfully reserve the right to supplement this Report and/or provide further rebuttal testimony.*

*I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently thereto.*