**PRYOR CASHMAN LLP**
Benjamin S. Akley (State Bar No. 278506)
*bakley@pryorcashman.com*
Shamar Toms-Anthony (State Bar No. 323246)
*stoms-anthony@pryorcashman.com*
1901 Avenue of the Stars, Suite 900, Los Angeles, California 90067
Telephone: (310) 683-6900

Donald S. Zakarin (admitted *pro hac vice*)
*dzakarin@pryorcashman.com*
Frank P. Scibilia (admitted *pro hac vice*)
*fscibilia@pryorcashman.com*
7 Times Square, 40th Floor, New York, New York 10036
Telephone: (212) 421-4100

James G. Sammataro (State Bar No. 204882)
*jsammataro@pryorcashman.com*
255 Alhambra Circle, 8th Floor, Miami, Florida 33134
Telephone: (786) 582-3003
*Attorneys for the Pryor Cashman-Represented Defendants*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEVELAND CONSTANTINE BROWNE, *ET AL.*, <br><br> Plaintiffs, <br><br> v. <br><br> RODNEY SEBASTIAN CLARK, an individual, *ET AL.*, <br><br> Defendants. | Case No.: 2:21-cv-02840-AB-AJR <br><br> **NOTICE OF MOTION AND MOTION TO PRECLUDE AND EXCLUDE THE TESTIMONY AND REPORTS OF PLAINTIFFS' PURPORTED EXPERT PETER ASHBOURNE-FIRMAN; MEM. OF POINTS AND AUTHORITIES** <br> [*Declaration of Benjamin S. Akley and [Proposed] Order filed concurrently*] <br><br> Date: September 26, 2025 <br> Time: 10:00 am <br> Courtroom: 7B |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 26, 2025 at 10:00 am, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable André Birotte Jr., Judge of the United States District Court for the Central District of California (Courtroom 7B), located at 350 West First Street, Los Angeles, California, 90012, the Defendants represented by Pryor Cashman LLP ("PC Defendants")[1] will and hereby do move the Court pursuant to Federal Rule of Evidence ("FRE") 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), to preclude Plaintiffs from submitting or relying on any testimony or evidence from their purported expert Peter Ashbourne-Firman ("PAF") in connection with the motion(s) for summary judgment made in this phase of this action and to exclude from evidence PAF's affirmative "expert" report served January 10, 2025 ("PAF Report") and rebuttal report served February 28, 2025 ("PAF Rebuttal").

As explained herein, this motion should be granted because the opinions expressed by PAF are not relevant, reliable, or helpful.

The motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Benjamin S. Akley ("Akley Decl."), the exhibits annexed thereto, and any and all additional submissions, evidence, and/or argument, including any reply briefing, as may be presented at or before the hearing on this motion.

**<u>L.R. 7-3 Statement of Compliance</u>**

This motion is made following the conference of counsel pursuant to LR 7-3 which took place on May 15, 2025.

---

[1] A list of the PC Defendants is available in the Appendix A attached to the PC Defendants' Notice of Motion and Motion for Summary Judgment.

1    May 23, 2025

2                           **PRYOR CASHMAN LLP**

3                           By: */s/ Benjamin S. Akley*

4                           Donald S. Zakarin (*dzakarin@pryorcashman.com*)
                            Frank P. Scibilia (*fscibilia@pryorcashman.com*)

5                           James G. Sammataro (*jsammataro@pryorcashman.com*)
                            Benjamin S. Akley (*bakley@pryorcashman.com*)

6                           Shamar Toms-Anthony (*stoms-anthony@pryorcashman.com*)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2  TABLE OF AUTHORITIES .................................................................................... ii

3  MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

4      I.     PRELIMINARY STATEMENT ..................................................... 1

5      II.     ARGUMENT ................................................................................. 3

6         A. Legal Standard For Admissibility Of Expert Testimony ............................ 3

7         B. Scope of This Phase of This Action ................................................. 5

8            1. "Plaintiffs' claimed works and/or portions thereof" ............................... 5

9
10            2. "Possess sufficient originality of authorship and are otherwise protectable under copyright law" ........................................... 7

11         C. PAF's Originality Opinion Is Irrelevant And Unreliable .......................... 10

12            1. PAF's Analysis Is Misdirected, Improper, And Irrelevant ................... 11

13            2. PAF Failed to Review Or Consider Prior Art ........................................ 12

14            3. PAF Relied on Irrelevant, After-the-Fact Created Stems ..................... 14

15            4. Other Deficiencies In PAF's Affirmative Report ................................. 17

16
17            5. Bennett Thoroughly Documented the Various Flaws In The PAF Report In His Rebuttal ........................................................ 18

18
19         D. PAF's Rebuttal of The Bennett Report Is Ineffective and Unreliable ........................................................................................... 21

20      III.     CONCLUSION ........................................................................... 25

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**PAGE(s)**

## CASES

*Banks v. Mortimer*,
   620 F. Supp. 3d 902 (N.D. Cal. 2022).......................................................................... 7

*Brighton Collectibles v. RK Texas Leather Mfg.*,
   923 F. Supp. 2d 1245 (S.D. Cal. 2013) .................................................................... 14

*Browne v. Donalds*,
   No. 2:21-cv-02840-AB-AJR, 2024 WL 3468898 (C.D. Cal. May 28, 2024)........... 8

*City of Pomona v. SQM N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) .................................................................................... 3

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................................................................................... 3, 4

*Elsayed Mukhtar v. Cal. State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) .................................................................................... 4

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .................................................................................................... 4

*Gray v. Hudson*,
   28 F.4th 87 (9th Cir. 2022) ..................................................................................... 6, 8

*Johannsongs-Publ'g Ltd. v. Lovland* ("*Johannsongs*"),
   No. CV 18-10009-AB, 2020 WL 2315805 (C.D. Cal. Apr. 3, 2020),
   *aff'd*, 2021 WL 5564626 (9th Cir. 2021) (Birotte, J.)................................. 6, 9, 12, 13

*Leite v. Crane Co.*,
   868 F. Supp. 2d 1023 (D. Haw. 2012), *aff'd*, 749 F.3d 1117 (9th Cir. 2014) .......... 3

*Moses v. Payne*,
   555 F.3d 742 (9th Cir. 2009) ...................................................................................... 4

*Murray v. Southern Route Maritime SA*,
   870 F. 3d 915 (9th Cir. 2017) ..................................................................................... 4

*Newton v. Diamond*,
   204 F. Supp. 2d 1244 (C.D. Cal. 2002), *aff'd*, 388 F.3d 1189 (9th Cir. 2004).......... 6

ii

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) ..................................................................... 4

*Rogers v. Raymark Indus., Inc.*,
    922 F.2d 1426 (9th Cir. 1991) ................................................................... 4

*Satava v. Lowry*,
    323 F. 3d 805 (9th Cir. 2003) .................................................................... 8

*Smith v. Weeknd*,
    No. 19-cv-2507 PA, 2020 WL 4932074 (C.D. Cal. July 22, 2020)........... 13

*Stone v. Carey*,
    No. 2:23-CV-09216-MRA-JDE, 2025 WL 1190518 (C.D. Cal. Mar.
    19, 2025) .................................................................................................. 13

*U.S. Sec. & Exch. Comm'n v. Jensen*,
    835 F.3d 1100 (9th Cir. 2016) ................................................................... 4

*United States v. 87.98 Acres of Land*,
    530 F.3d 899 (9th Cir. 2008) ..................................................................... 5

*United States v. Ramirez-Robles*,
    386 F. 3d 1234 (9th Cir. 2004) .................................................................. 4

*United States v. Redlighting*,
    624 F.3d 1090 (9th Cir. 2010) ................................................................... 4

*Waymo LLC v. Uber Techs., Inc.*,
    No. 17-cv-00939, 2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ............... 4

*Wendell v. GlaxoSmithKline LLC*,
    858 F.3d 1227 (9th Cir. 2017) ................................................................... 3

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ................................................................... 6

*Yonay v. Paramount Pictures Corp.*,
    No. 22-CV-3846 PA, 2024 WL 2107721 (C.D. Cal. Apr. 5, 2024) ......... 13

**STATUTES AND RULES**

FRE 403 ............................................................................................................. 4

FRE 702 ......................................................................................................... 3, 4

# MEMORANDUM OF POINTS AND AUTHORITIES[2]

## I.    PRELIMINARY STATEMENT

Peter Ashbourne-Firman ("PAF") is not a musicologist.  Nor is he an impartial third-party with specialized knowledge.  Instead, he is a long-time friend of Plaintiff Cleveland Browne (the "Clevie" in the musical production duo "Steely and Clevie") tasked with claiming that Plaintiffs' Claimed Works are "original."  In arriving at this opinion, PAF did not perform any methodological, replicable, reliable analysis.  He did **not**, for example, conduct a prior art search, perform any comparative transcriptions, or make any attempt to identify and separate the protectable elements from unprotectable elements.  Rather, he relied upon a definition of "originality" supplied to him by Plaintiffs' counsel which is skewed and ultimately irrelevant to this phase of the litigation because it: (i) focuses on the entirety of Plaintiffs' Claimed Works (rather than the specific "drum pattern" at issue); and (ii) asks only whether Plaintiffs' Claimed Works were independently created and minimally creative, without considering (much less determining) whether and to what extent Plaintiffs' drum pattern exists in prior art and/or is made up of commonplace musical building blocks.[3]

PAF's "analysis" is further tainted by his inability to even identify (let alone meaningfully analyze) what Plaintiffs created and claim to own.  In that regard, PAF: (i) mistakenly relied on supposed "stems," believing them to be isolated tracks taken from the master recordings of Plaintiffs' Claimed Works, when, in fact, they are **not** stems (which Browne concedes), but recordings prepared for the purposes of this litigation and that differ from the Claimed Works; (ii) admits that he could not hear and,

---

[2]  Unless otherwise stated, all emphases herein are supplied, and all internal citations and quotations are omitted.

[3] Contrary to the definition given to and employed by PAF, Plaintiffs have previously acknowledged that determining "originality" requires "looking at works within the implicated musical landscapes" and considering whether the work's elements "are commonplace, and thus unprotectable, as a matter of law."  (Dkt. 609 at 14.)

consequently, had to "imply" certain aspects of Plaintiffs' drum pattern; (iii) invents elements to the drum pattern that do not exist; and (iv) offers transcriptions and opinions pertaining to the drum pattern that conflict with those offered by Plaintiffs' other experts (not to mention Defendants' experts).[4]  In short, and as further detailed in Dr. Joe Bennett's rebuttal report, PAF's affirmative opinion regarding the supposed "originality" of Plaintiffs' Claimed Works is unreliable, irrelevant, unhelpful, and should be excluded.

PAF's Rebuttal—which "disagrees" with Bennett's affirmative opinions—fares no better.  Unlike PAF, Bennett is a non-partial, qualified, trained expert musicologist who employed standard musicological methods (including a prior art search and comparative transcriptions).    Most indefensibly, ***PAF's Rebuttal completely ignores the vast majority of Bennett's prior art examples*** and, in the few instances where PAF does bother to address Bennett's prior art, his analysis is cursory (largely relegated to footnotes), meaningless (because he again focuses on the incorrect definition of "originality"), and unreliable (because he fails to employ comparative transcriptions or any other methodology).  PAF's other critiques of Bennett's affirmative report are similarly ineffectual.  In short, the Rebuttal fails to refute or call into question Bennett's well-founded opinion that Plaintiffs' drum pattern "contains no unique or original elements [and] is based on a number of rhythmic building blocks that are common to many works that pre-date it."

Importantly, and notwithstanding all the various flaws in PAF's reports, PAF ultimately acknowledges the central point made by Bennett and Defendants' other experts: "it may be possible to find another piece of music with a layer that is similar or even rhythmically identical" to the drum pattern in Plaintiffs' Claimed Works, (Akley

---

[4] As discussed below, Plaintiffs' purported experts disagree about what is included in the claimed combination of elements in Plaintiffs' drum pattern, and Plaintiffs' pleading (the "SCAC") mixes and matches elements from each of Plaintiffs' three Claimed Works (while misrepresenting that they all exist in "Fish Market," which they do not).

Decl., Ex. 1 ("PAF Report") at 7), including "a habanera or Surf Beat, played over basic timekeeping patterns [here the kick drum, hi-hat, tom, and bass synth, which double each other] lasting one or two beats, with [auxiliary] parts combining 8th and/or 16th notes played on high frequency percussion instruments." (Akley Decl., Ex. 2 ("PAF Rebuttal") at 17.)  Yet, even having made that critical admission (which, again, *confirms* and *reinforces* the conclusions of Defendants' experts), PAF nonetheless ignored it and chose not to look for and consider the impact of such pre-existing and/or common musical "layers" on his analysis and opinions.  PAF's sole justification for his failure is that he was considering only the entire "specific expression that is the Fish Market" drum pattern, but, as detailed below, his own reports and testimony (and those of Defendants' experts) reveal an irrefutable and damning truth: PAF *intentionally* avoided consideration of prior art and common building blocks because he appreciated that doing so would have left Browne, his friend, with no original compositional elements in his claimed drum pattern and ultimately nothing protectable.  PAF's reports and testimony thus do not pass muster and should be excluded.

## II.    ARGUMENT

### A.    Legal Standard For Admissibility Of Expert Testimony

Expert testimony is only admissible if "the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  FRE 702.  Expert testimony admitted under FRE 702 must be both relevant and reliable.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  Expert testimony "must meet the 'fit' requirement, i.e., it logically advances a material aspect of the proposing party's case." *Leite v. Crane Co.*, 868 F. Supp. 2d 1023, 1036 (D. Haw. 2012), *aff'd*, 749 F.3d 1117 (9th Cir. 2014).  Even

relevant expert testimony is only "helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009).

As for reliability, a proponent of expert testimony must show that the witness bases the testimony "upon sufficient facts or data"; that "the testimony is the product of reliable principles and methods"; and that "the witness has applied the principles and methods reliably to the facts of the case." FRE 702; *United States v. Redlighting*, 624 F.3d 1090, 1111 (9th Cir. 2010). Where testimony does "not apply any coherent principle, methodology, theory, or technique, much less one possessing any discernible indicia of reliability," it must be excluded. *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939, 2017 WL 5148390, at *2, *5 (N.D. Cal. Nov. 6, 2017). The trial court has broad latitude in deciding how to test an expert's reliability and the reliability of that expert's testimony. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Notably, *Daubert* bars the admission of "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Even if expert testimony is admissible under FRE 702, it may be excluded under FRE 403, *see Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1430 (9th Cir. 1991), under which "a court may exclude evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury." *U.S. Sec. & Exch. Comm'n v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016). "Where the probative value [of testimony] is slight, moderate prejudice is unacceptable." *United States v. Ramirez-Robles*, 386 F. 3d 1234, 1243 (9th Cir. 2004).

The trial court must act as a "gatekeeper" by preliminarily determining whether the expert's proposed testimony is acceptable and by "preventing shoddy expert testimony . . ." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002); *Murray v. Southern Route Maritime SA*, 870 F. 3d 915, 923 (9th Cir. 2017). The proponent of expert testimony bears the burden of establishing that it is

both relevant and reliable by a preponderance of the evidence.  *See United States v. 87.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir. 2008).

**B.    Scope Of This Phase Of This Action**

Before detailing the flaws in PAF's work, it is helpful to reiterate and re-examine the proper scope of this phase of the litigation, which concerns only "whether Plaintiffs' claimed works and/or portions thereof possess sufficient originality of authorship and are otherwise protectable under copyright law."  (Dkt. 143 at 1-2.)

**1.    "Plaintiffs' claimed works and/or portions thereof"**

"Plaintiffs' Claimed Works" are the composition and recording of "Fish Market" (the instrumental B-side of a recording performed by Gregory Peck titled "Poco Man Jam"); the composition of "Dem Bow" (performed on a recording by Shabba Ranks); and the recording of "Pounder Dub Mix II" ("Pounder," which either is the same as, or incorporates, another instrumental recording Plaintiffs call the "Pounder Riddim.") According to Plaintiffs: (i) Steely and Clevie "wrote and recorded" "Fish Market," and then (ii) an "alternative mix" of "Fish Market" "based on the same multi-track recording" was used for the "Dem Bow" instrumental, and then (iii) "Dem Bow's" "instrumental, sound, arrangement, and composition" were copied to create "Pounder." (SCAC ¶¶179-89.)

Contrary to PAF's originality opinion (which, again, applies to the entirety of Plaintiffs' Claimed Works), only the "drum pattern" contained in "Fish Market" (and allegedly copied in "Dem Bow" and recreated in "Pounder") is at issue.  Per Plaintiffs, that drum pattern is an original "combination" that consists of up to eight so-called "elements" (a particular rhythmic pattern played by a particular instrument or sound). These elements are described in words at paragraphs 180 and 648, and transcribed (erroneously) in musical notation at paragraph 188 (page 36), of the SCAC.

Critically, Plaintiffs' putative experts disagree about what their claimed original "combination" drum pattern is.  PAF opines that the drum pattern consists of ***eight***

5

separate instrument parts.  (PAF Report at 5-6.)  Kenneth Bilby contends that the drum pattern consists of **six *(sometimes seven)*** instrument parts but also, in an improper *post hoc* attempt to amend the SCAC, adds "timbre" and amorphous concepts such as "feel" and "Jamaicanness" as part of the supposed "combination" (which ignores that most of the sounds in the drum pattern were generated by a drum machine and also improperly conflates the "Fish Market" composition with the "Pounder" recording).  (Akley Decl., Ex. 3 ("Bilby Report") at 14, 15-16.)  Judith Finell opines that the drum pattern consists of ***four or maybe five*** instrument parts ("elements" or "tiers") but, like Bilby, conflates the recording and compositional elements by relying on the timbre of the instruments. (Akley Decl., Ex. 4 ("Finell Report") at 5.)[5]

It is Plaintiffs' burden to demonstrate what their combination is and show that such combination does not exist in prior art, *see Johannsongs-Publ'g Ltd. v. Lovland* (*"Johannsongs"*), No. CV 18-10009-AB (SSx), 2020 WL 2315805, at *7 (C.D. Cal. Apr. 3, 2020), *aff'd*, 2021 WL 5564626 (9th Cir. 2021) (Birotte, J.), and, whatever Plaintiffs' "combination" may be, at most it can consist of only some or all of the "elements" identified in the SCAC that Plaintiffs contend were "original" to Steely and Clevie, "form[ed] an entire protectable section of music…not found in…any work that predates Fish Market," and have been "copied" "in the same configuration" in all of

---

[5] All three of Plaintiffs' proffered experts repeatedly conflate the ***recordings*** of Plaintiffs' Claimed Works with the ***compositions*** embodied therein, seeking to import sonics and instrument selection into Plaintiffs' compositional claim, which is a percussive rhythm claim.  How that rhythm sounds on a recording or the particular instruments that are used are irrelevant to a compositional claim.  *See Gray v. Hudson*, 28 F.4th 87, 99 (9th Cir. 2022) ("[T]he choice of a particular instrument (whether acoustic or electronic) to play a tune relates to the performance or recording of a work, which are protected by distinct copyrights."); *Williams v. Gaye*, 895 F.3d 1106, 1121 (9th Cir. 2018) ("sound recordings and musical compositions are separate works with their own distinct copyrights."); *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1258 (C.D. Cal. 2002), *aff'd*, 388 F.3d 1189 (9th Cir. 2004) (distinguishing between "elements protected by [the plaintiff's] copyright over the musical composition" at issue and "those attributable to his performance of the piece or the sound recording.")

Defendants' alleged 1,700+ infringing works. (SCAC ¶¶ 180, 188, 648.) Simply stated, Plaintiffs are bound by their SCAC, and they cannot "amend" their complaint through new embellishments ("timbre," "feel," "Jamaicaness") belatedly offered by their putative experts. *See Banks v. Mortimer*, 620 F. Supp. 3d 902, 917 n.3 (N.D. Cal. 2022) ("It is well-established that plaintiffs must adequately allege the facts underlying their claims and may only add new theories of liability by moving to amend their pleadings. ***Summary judgment is simply not the place for new theories***." (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).)

Accordingly, the relevant analysis in this phase is whether some particular combination of the "Fish Market" drum pattern elements alleged in the SCAC is, in fact, original and protectable. PAF's focus on whether Plaintiffs' Claimed Works ***in their entirety*** are original (in the sense of being independently created and having a minimum level of creativity) is irrelevant because that is not the percipient inquiry. The relevant inquiry at this phase is whether the composition of Plaintiffs' claimed drum pattern (not including sonics, specific instruments, or other elements that are only in the recording) is original and protectable.[6]

### 2. "Possess sufficient originality of authorship and are otherwise protectable under copyright law"

PAF was directed to consider whether Plaintiffs' Claimed Works are "original" and "protectable" based solely on whether they were independently created and possess a minimum level of creativity. (PAF Report at 4.) But as Plaintiffs have previously conceded, that is not the proper inquiry at this juncture, because it intentionally eliminates any consideration of prior art or whether the claimed elements or combination of elements are commonplace pre-existing musical building blocks. In

---

[6] To be clear: Plaintiffs' Claimed Works also contain other elements (*e.g.* lyrics, vocal melodies, and piano and synth parts) which Plaintiffs are not claiming to have been infringed by Defendants' works and, thus, are not at issue in this phase or this case.

Plaintiffs' own words (from prior briefing concerning the proper scope of discovery during this phase):

> [W]hether the allegedly common material at issue is original and protectable—which is what Defendants will challenge in dispositive motions at the conclusion of this phase—is not analyzed in a vacuum. *See Hanagami*, 85 F.4th at 946-47 (assessing protectability by looking at, among other things, "other routines the Copyright Office has deemed uncopyrightable" and elements that "choreographic works typically contain," as "[c]opyrightable choreography and uncopyrightable dance exist on a continuum"). ***Rather, the originality and protectability inquiries involve looking at works within the implicated musical landscapes in relation to other works*** within those landscapes to see how the expression at issue is treated. Specifically, "[g]enre or 'a genre's tradition'"—namely, "[t]he history of the reggaeton and dancehall genres," and "the genres' features"—are "relevant in determining the compositional significance or protectability of the alleged musical elements at issue here," including *"**whether the elements common between the allegedly infringing works and the Subject Works are commonplace, and thus unprotectable, as a matter of law.**" See Browne v. Donalds*, 2024 WL 3468898, at *20 (C.D. Cal. May 28, 2024); *Feist*, 111 S. Ct. at 1297 (stating a work is "unoriginal and thus uncopyrightable" if it is the result of an "age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course"). As such, this phase cannot fairly be limited to solely and only Plaintiffs' works.

(Dkt. 609);[7] *see also Gray*, 28 F.4th at 101 ("despite 'the famously low bar for originality,' '[t]rivial elements of compilation and arrangement . . . fall below the threshold of originality.'" (quoting *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1069 (9th Cir. 2020)); *Satava v. Lowry*, 323 F. 3d 805, 811 (9th Cir. 2003) ("it is not true that any combination of unprotectable elements automatically qualifies for copyright protection . . . a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.")

---

[7] Plaintiffs' quote from *Browne v. Donalds* refers to this Court's May 2024 Order denying Defendants' motions to dismiss in this case. (Dkt. 421.)

It bears reiterating that the express purpose of the "phased case administration plan" outlined in the parties' January 2023 Stipulation Re: Case Administration ("Stipulation") (Dkt. 142) and adopted by the Court (Dkt. 143) was to "streamline the matter," by first determining the "common threshold question" of "whether the allegedly infringed works (and/or portion(s) thereof) are original or otherwise protectable under copyright law."  In other words, the goal of this phase is to establish whether Plaintiffs can monopolize all or any portions of their drum pattern elements.  If the answer is "no," then the parties can avoid litigating whether "over 1,700 separate works infringe on Plaintiffs' rights in their claimed works which, on an individual basis . . . may require, *inter alia*, evidence analyzing each work separately and comparing to Plaintiffs' claimed works for purposes of determining the issues of both access by the defendants associated with each individual work and whether each individual work is substantially similar to Plaintiffs' works."  (Dkt. 142.)

Yet, the definition of "originality" provided by Plaintiffs to their experts (which, again, focuses only on whether "the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity," (PAF Report at 4; Bilby Report at 6; Finell Report at 4)), is directly contrary to the purposes of "streamlining" and "efficiency" set forth in the Stipulation (and adopted by the Court), and contrary to the law concerning the proper scope and focus of the originality inquiry in this phase (as accurately set forth in Plaintiffs' previous briefing).  And that is because it (intentionally) does not address the "common threshold issue" that is the actual focus in this phase: *i.e.*, whether the elements or a combination of the elements alleged in the SCAC to have been infringed are original and protectable under copyright law such that the copyright owner can have a monopoly over such element.  To determine that issue, one must consider whether the elements or combinations thereof exist in prior works and/or are musical building blocks freely available for all to use.  *See Johannsongs*, 2020 WL 2315805, at *3 (Birotte, J.)  ("filter[ing] out unprotectable prior art

1  elements…is the foundation of the extrinsic test"), *aff'd*, 2021 WL 5564626 (9th Cir.

2  Nov. 29, 2021) ("filter[ing] out similarities that are attributable to prior art [is] required

3  under the extrinsic test.")

4      Accordingly, Plaintiffs' definition of "originality" is inapplicable and designed to

5  omit any reference to prior art and commonality, precisely because, as Plaintiffs fully

6  know and as Defendants' experts have documented, both the elements and combination

7  of elements in Plaintiffs' drum pattern are commonplace musical building blocks used

8  long before Plaintiffs' Claimed Works were created.  To be clear: if Plaintiffs' definition

9  of "originality" were employed, it would negate the purpose of this phase of the case

10  because it tells the Court nothing about whether or to what extent Plaintiffs can claim

11  exclusivity of such elements or combination of elements.

12  **C.**    **PAF's Originality Opinion Is Irrelevant And Unreliable**

13      PAF is a Jamaican songwriter and musician.  (PAF Report, Ex. A.) He has a

14  Bachelor's degree in music composition from Berklee College of Music, but does not

15  possess any graduate or other advanced degrees, has not undertaken any graduate-level

16  education or studies, and is not a musicologist.  (*Id.*;  Akley Decl., Ex. 5 (March 20,

17  2025 Deposition of PAF ("PAF Dep.")) at 37:19–38:10, 66:23-25.)  PAF has had a

18  personal and professional relationship with Plaintiff Browne and his family for over 40

19  years.  (PAF Dep. at 70:22-71:18.)

20      PAF's mandate was to "review [Plaintiffs' Claimed Works] to determine whether

21  one or more . . . is creative and original."  (PAF Report at 3; PAF Dep. at 97:8-13.)  PAF

22  defined "creative" to mean "somebody…conjured ideas out of their experience and their

23  talent and contributed to the making of the work."  (PAF Dep. at 100:23–101:6.)  Like

24  Plaintiffs' other experts, PAF used the definition of "original" provided to him: "that

25  the work was independently created" and "possesses at least some minimal degree of

26  creativity."  (PAF Report at 3-4; PAF Dep. at 102:22-104:6.)

27

28

10

Based on this inapplicable definition and his flimsy analysis, PAF's affirmative report opines that "[e]ach of [Plaintiffs' Claimed Works] is creative and original as I understand those definitions."[8]  (PAF Report at 4; PAF Dep. at 112:22–113:3, 295:5–10.)  PAF's opinion that Plaintiffs' Claimed Works are original should be excluded because it is not probative.  As demonstrated herein (and also in Bennett's rebuttal), PAF's reports and opinions are unreliable and irrelevant because, among other reasons: (1) they are based on Plaintiffs' irrelevant definition of "originality" that applies to whether a work as a whole is entitled to a copyright, not to the question in this phase, which is whether the rhythmic elements actually at issue in this case (*i.e.*, those alleged in the SCAC to be original and to have been infringed) exist in prior art and/or are commonplace and therefore may not be exclusively claimed by Plaintiffs; (2) PAF did not search for or analyze any prior art that might show whether the relevant portions of Plaintiffs' Claimed Works existed in other works or were common before Plaintiffs' Claimed Works were created; (3) they are based on supposed "stems" of "Fish Market" provided by Plaintiffs—which are not stems and do not come from "Fish Market" but are recreations; and (4) PAF otherwise demonstrates a severely compromised understanding of the actual content of the "Fish Market" drum pattern.

### 1.    PAF's Analysis Is Misdirected, Improper, And Irrelevant

To reiterate: the relevant question in this phase is whether the elements or combination of elements allegedly contained in the "Fish Market" drum pattern, as detailed in the SCAC, "possess sufficient originality of authorship and [are] otherwise protectable under copyright law."  As Plaintiffs have acknowledged (before it became expedient to completely change their position in effort to avoid the impact of prior art

---

[8] Notably, PAF's own personal definition of "original" departs significantly from the inapplicable definition Plaintiffs gave him: "something that sounds reasonably unique. Unique.  Something that sounds unique, that has unique qualities about it."  (PAF Dep. at 106:13-17.)  Of course, PAF could not use his (or the legally appropriate) definition of "originality" in his analysis because it would have forced PAF to concede (as he ultimately does anyway) that Plaintiffs' drum pattern is not, in fact, original to them.

on their claims in this case) "originality" must consider whether the claimed elements or combination thereof are commonplace and/or exist in prior art in order to determine whether and to what extent Plaintiffs' can claim exclusive rights in, and are able to preclude anybody else from using, some or all of the drum pattern they supposedly created in 1989. (*See* Dkt. 609.)

In light of established law, Plaintiffs' dictated definition employed by PAF intentionally does not address the issue to be determined in this phase. Per PAF: he was "asked to review [Plaintiffs' Claimed Works] to determine whether one or more of the Songs is creative and original," meaning "independently created by the author" and "possess[ing] at least some minimal degree of creativity." (PAF Report at 3-4.) PAF's applied definition is meaningless because: (i) PAF was asked to assess the originality of the entirety of Plaintiffs' Claimed Works (including synth parts, etc.) rather than just the drum pattern at issue; (ii) PAF has no personal knowledge of or expertise relevant to Plaintiffs' "independent creation" of Plaintiffs' Claimed Works (which is also not at issue in this phase) (PAF Dep. at 113:8-10); and (iii) "independent creation" and "minimal creativity" are not the focus of the inquiry as to protectability, since neither accounts for or accommodates the indisputably numerous unprotectable elements of Plaintiffs' drum pattern (as detailed in the reports of Defendants' experts and at least partially acknowledged by PAF himself) that are commonplace and/or exist in prior art.

Simply put, PAF was asked by Plaintiffs' counsel to employ an irrelevant definition in order to avoid considering whether Plaintiffs' claimed drum pattern, individually or in combination, preexists in prior art or is common, which is the central focus of this phase. As such, both of PAF's reports are irrelevant, not useful, impermissibly prejudicial, and ultimately disqualifying.

### 2. PAF Failed To Review Or Consider Prior Art

Contrary to standard musicological practices (the importance of which this Court has underscored in *Johannsongs*, 2020 WL 2315805, at *5), ***PAF did not rely on,***

***consider, or even review any "prior art" in doing his analysis or forming his opinions.***
(PAF Report at 3; PAF Dep. at 112:5-8, 113:11-16, 136:3-5, 300:21–301:10.)  This
failure is inexcusable given both the law, and PAF's admission that prior art is
"significant" because ***"the existence of prior art would contradict" his contention that
Plaintiffs' Claimed Works "ha[ve] originality."***  (PAF Dep. at 109:25–112:1.)

The failure to conduct a methodologically sound and replicable prior art analysis is
fatal to a musicological analysis of originality.  *See Johannsongs,* 2020 WL 2315805,
at *5 (excluding musicology opinion as unreliable, among other reasons, because
"critically, the Report expressly admits that [the expert] had 'not yet conducted a prior
art investigation"); *Smith v. Weeknd*, No. 19-cv-2507 PA (MRWx), 2020 WL 4932074,
at *2, *6 (C.D. Cal. July 22, 2020) (finding musicology opinion deficient, among other
reasons, because it failed to "provide any information about prior art or how common
it is for songs" to share alleged similarities)*; see also, e.g., Stone v. Carey*, No. 2:23-
CV-09216-MRA-JDE, 2025 WL 1190518, at *9 (C.D. Cal. Mar. 19, 2025) ("Because
he did not consider any prior art, Fink's comparison 'fail[s] to filter out unprotectable
prior art elements, which is the foundation of the extrinsic test.' . . .   Because Fink did
not compare the works in the manner required, his opinions about the similarities
between the works are 'legally deficient and irrelevant.'"); *Yonay v. Paramount
Pictures Corp.*, No. 22-CV-3846 PA (GJSx), 2024 WL 2107721, at *3 (C.D. Cal. Apr.
5, 2024) (finding that expert's failure to filter out unprotected elements "render[ed] his
opinions unhelpful and inadmissible.")

PAF's ostensible reason for ignoring prior art is that, "based on [his] personal
experience" and "what [he] remember[s] of what was going on at that time" that "Fish
Market" was released, "Fish Market" was "a new offshoot of the dancehall thing and it
was just quite fresh, and by the time you get to all of the components of it you find that
there's nobody else doing exactly the same thing."  (PAF Dep. at 112:5-19.)  This
explanation is both meaningless and plainly an attempt to explain away PAF's use of

the irrelevant definition he was instructed to use so that he could ignore prior art.  But even accepting PAF's *post hoc* attempted justification, PAF's opinion on "Fish Market's" originality ignores prior art and relies instead solely on *ipse dixit*.  That is not sufficiently reliable. *See Brighton Collectibles v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1256 (S.D. Cal. 2013) (excluding opinion where expert "could not identify the factual basis for his assumptions or provide any assurance that his conclusion is based upon a method that is generally accepted in the field or that has a known margin of error that could be tested by other professionals.") PAF's originality opinion should be excluded for that additional reasons as well.

### 3.    PAF Relied On Irrelevant, After-The-Fact Created Stems

PAF arrived at his originality opinion in part by listening to five MP3 audio files that PAF identifies, and believes to be, "stems" of "Fish Market."  (PAF Report at 2-3; PAF Dep. at 87:2-7.)  According to PAF, "stems" are "portions of…a complete recording" which can "allow[ ] you to . . . hear components of the recording a little more clearly." (*Id.* at 79:19–80:5.)  PAF was given (without asking) the five "stems."  While he admits he has no personal knowledge of their provenance, by listening and comparing the "stems," PAF claims that they come from Plaintiffs' "Fish Market" sound recording as registered with the USCO (the "FM Deposit Copy").  (PAF Dep. at 82:9-24, 83:5-7, 86:2-16, 88:9-13, 89:13-20, 139:2-4.)

***PAF admits to using the "stems" to transcribe and understand "everything that was happening" in "Fish Market,"*** and that ***the "stems" helped him "hear the various components and what they're doing."***  (PAF Dep. at 82:25-83:16.)  The "stems" gave PAF information that he was not able to glean from the FM Deposit Copy, particularly when "more than one instrument is playing" because ***"the various instruments that are being played at the same time might be obscured by the fact that they're being played at the same time."***  (*Id.* at 82:25 – 85:10.)

But contrary to PAF's analysis, Plaintiffs ***admitted*** that none of the "Fish Market"

14

"stems" are, in fact, stems—rather, they are "recreations" of certain aspects of the "Fish
Market" sound recording made by Browne in 2021 (*i.e.*, over 30 years after "Fish
Market" was recorded) supposedly to "create a clarity" "for identifying what was
actually played."[9]  This accounts for several inaccuracies in PAF's transcriptions.

In particular, PAF inaccurately notates the tambourine part (which is accurately
transcribed in Appendix B of Bennett's affirmative report).  (Akley Decl., Ex. 6
("Bennett Report") at 39-41.)  PAF admitted he had difficulty hearing the tambourine
line in the FM Deposit Copy so he had to "imply" certain aspects of that line without
actually knowing whether those aspects exist.  (PAF Report at 5 n.1; PAF Dep. at
137:15–141:18.)[10]  PAF also suggests that the "timbale 1" part is fixed and continuously
repeated, when in fact it is a "soloistic embellishment" (to use PAF's words) that "varies
throughout" "Fish Market." (PAF Report at 4; PAF Dep. at 155:16-156:10, 187:16-
188:4.)  Perhaps most egregiously, PAF transcribes and describes the "timbale 2" part
as playing a 32-stroke roll at the end of consecutive bars (PAF Report at 4-5, 8), which
"roll" is not present in "Fish Market"—an error PAF admitted at his deposition, (PAF
Dep. at 183:7–185:16), and in his rebuttal report.  (PAF Rebuttal at 13-14.)  In fact, the
timbales in the SCAC and in PAF's transcription are the looped timbales in the
"Pounder" recording and not the improvised timbales in "Fish Market," and their
inclusion in a supposed "stem" of "Fish Market" is an effort by Plaintiffs to mislead and

---

[9]  (Akley Decl., Ex. 7 ("Plaintiffs' Interrogatory Resps."); (Akley Decl., Ex. 8
(Deposition of Cleveland Browne ("Browne Dep.") at 182:19-189:8, 193:16-197:21,
202:8-206:19, 220:13-227:12, 228:24-230:24).)  The PC Defendants' rebuttal expert
Paul Geluso confirmed that each of the (fake) "stems" are materially distinct from the
FM Deposit Copy (and, thus, cannot be useful to any analysis of the originality of the
"Fish Market" composition as embodied in that sound recording).  (Akley Decl., Ex. 9
("Geluso Rebuttal") ¶¶ 21-50, Figs. 1-15).)

[10] Plaintiff Browne likewise admitted during his deposition that the "stems" provided
to PAF were intended "to identify the true patterns [of the tambourine] as they were not
so clear." (Browne Dep. at 188:15–189:8.)

to mix and match elements from different works to create a "combination" that does not actually exist in any of Plaintiffs' Claimed Works. (Akley Decl., Ex. 10 ("Marshall Report") at 24; (Akley Decl., Ex. 11 ("Manuel Rebuttal") at 26-27); (Browne Dep. at 86:22-87:1); (Akley Decl., Ex. 12 ("Finell Dep.") at 198:5-14.) [11]

Ultimately, any protectable content in the "Fish Market" composition is determined by the Plaintiffs' copyright registration and the FM Deposit Copy, but the "stems" on which PAF relied are not only *not* taken from or part of the FM Deposit Copy, they are materially distinct from the FM Deposit Copy (as admitted by PAF and Browne and confirmed by Bennett and Paul Geluso). That is at least one reason why PAF's transcription of "Fish Market" in his affirmative report (which is the same transcription in the SCAC) is admittedly inaccurate, and his opinions unreliable.[12]

---

[11] These same flaws exist in PAF's supposedly complete transcription of "Fish Market" attached as Appendix 6 to Bilby's affirmative report. Worsening matters, during his deposition PAF testified that the two timbale tiers shown in his transcriptions are both "set timbale riff[s] that repeat[ ] throughout the song" and that "Fish Market" also contains another, separate, *third* timbale part which is the "soloistic embellishment" that is *not* part of the "essential expression" of "Fish Market." (PAF Dep. at 132:11–134:3, 152:15–156:14.)   Setting aside that PAF's supposed third timbale line is inconsistent with (or at least not reflected in) his own transcriptions and analysis, and that neither Plaintiffs, nor their other two experts, nor any of PC Defendants' six experts, nor anybody else involved with or discussing this case, has ever mentioned or discerned a third timbale line in any of Plaintiffs' Claimed Works, the works themselves audibly evidence that no such third timbale line actually exists. PAF's apparent confusion on such a basic point (*i.e.*, the nature and content of the works he was supposed to be analyzing) underscores his lack of qualification as a musicologist.

[12] If Plaintiffs' own experts could not hear or misheard certain portions of the combination they claim is original—such as the tambourine parts, the so-called "ghost note," PAF's phantom (and actually nonexistent) third timbales line, or where certain beats were "doubled" by multiple drum sounds playing on the same beats—such that they had to be created or re-created in new recordings where those parts were audible, how could such inaudible portions be part of any original "combination?" And how could any Defendant have copied those portions?

### 4.    Other Deficiencies In PAF's Affirmative Report

PAF also makes clear that his opinion that Plaintiffs' Claimed Works are original concerns and addresses ***only*** the particular and entire combination of eight "elements" of the "Fish Market" drum pattern that he opines is original.  (PAF Report at 5, 7-8; PAF Dep. at 135:21-136:2, 136:24-137:2, 195:10-15, 212:3-4, 215:17-24, 222:24-223:3, 296:22-297:1.)   He does not analyze any of those "elements" alone or in combination against pre-existing or common drum patterns.   And the only actual transcription in the Report (which is the same as the transcription at paragraph 188 of Plaintiffs' SCAC) supposedly is of "two bars…representing the core" drum pattern in "Fish Market."  (PAF Report at 4-7; PAF Dep. at 117:11–118:9.)[13]

PAF's originality opinion as to "Dem Bow" and "Pounder" is based solely on his understanding that those works derive from and "contain the same shared musical elements" as "Fish Market."  In other words, according to PAF, "the rhythm in 'Dem Bow' and 'Pounder' is also original to Plaintiffs" only because "'Dem Bow' and 'Pounder' derived from or incorporate" "all the combination of eight elements in the 'Fish Market' rhythm."  (PAF Dep. at 215:17–216:4.)  But PAF himself acknowledged, at least as to "Pounder," that is not the case.  (*Id.* at 216:15-220:2.)   And PAF admitted that, "if the rhythm in 'Dem Bow' and/or 'Pounder' is different from 'Fish Market,'" then his analysis and opinion of originality as to "Dem Bow" and Pounder" "doesn't hold."  (*Id.* at 216:5-11.)  Because Plaintiffs' Claimed Works do not "contain the same shared musical elements," and because PAF did no analysis of "Dem Bow" or "Pounder" (the latter which Plaintiffs claim to own a copyright interest in only the sound recording and not the composition, so its compositional elements are not at issue in this case) separate from his superficial "analysis" of "Fish Market," PAF's originality

---

[13] PAF claims he made full supposed transcriptions of all three of Plaintiffs' Claimed Works, (*see* Bilby Report at 45, Appendices 6-8; PAF Dep. at 150:10-22, 156:25–157:5, 157:25–158:21, 159:21–160:23), but did not attach them to his report for reasons he could not provide.  (PAF Dep. at 214:1-3.)

opinion as to those works is defective for the same reasons as his opinion concerning "Fish Market," and concededly "doesn't hold."

### 5.   Bennett Thoroughly Documented The Various Flaws In PAF's Report In His Rebuttal

The flaws discussed above were also recognized and discussed by the PC Defendants' expert Bennett, who served a rebuttal to PAF's Report on February 28, 2025. (Akley Decl., Ex. 13 ("Bennett Rebuttal.")[14]  Bennett is "an expert in musicology and forensic musicology with 17 years' experience in analyzing and evaluating musical works," "has written more than 30 books, including transcription, teaching and reference works," "is a writer member of PRS for Music and ASCAP, an academic member of the International Association for the Study of Popular Music (IASPM) and the American Musicological Society," and is a tenured professor at Berklee College of Music, where he teaches, among other things, "forensic musicology analysis technique." (*Id*., Appendix A.)

Bennett's overarching conclusion is that PAF's "analysis is insufficiently rigorous to test the bold assertion at the heart of Plaintiff's case in this phase, *i.e.*, that what Plaintiffs claim is a 2-bar excerpt of FISH89's rhythmic elements is original and protectable and has no precedent in any earlier music." (*Id.* at 15.)  Bennett's primary critiques of PAF's Report (which are fully adopted and set forth in this motion) are as follows:

1. Despite acknowledging that both: (a) "the layer consisting of the kick drum on each beat of the bar…is common to many forms of popular music"; and (b) "it may be possible to find another piece of music with a layer that is similar or even rhythmically identical" to Plaintiffs' drum pattern, PAF failed to search for, consider, or filter out commonplace or pre-existing elements of Plaintiffs' drum

---

[14] The Bennett Rebuttal also responded to the affirmative reports served by Plaintiffs' other putative experts, Finell and Bilby.

pattern.  Bennett notes that searching for, and filtering, prior art is "standard musicological practice" and "essential" to any analysis of originality.  PAF's "failure to consider Prior Art undermines [his] originality conclusion and is methodologically indefensible." (*Id.* at 2, 15-16.)

2. PAF's assertion that Plaintiffs' eight-element (or "tiered") drum pattern is an original "combination" does not specify what about the "combination" is original and ignores that "three of the 'tiers,' when combined, form a commonplace kick-snare 'Surf Beat' rhythm with a 'bass' on 1 + 3," another tier is simply "a commonplace 16th + 8th note tambourine part (which is not even accurately [or consistently] transcribed" by Plaintiffs and their experts, two other tiers are "two lines of timbales, which [PAF] describes as 'instrumental material that complements…such rhythmic foundation,'" and the remaining tiers are timekeeping beats that "that merely double the other parts and thus add no new rhythm." (*Id.* at 2-3.)

3. PAF's transcriptions and opinions are based at least in part on the "Fish Market" "stems," which are "audibly and materially different than the [FM Deposit Copy] or any other publicly released or available version" of "Fish Market," and which Browne admitted at his deposition were not stems, but after-the-fact recreations. For this reason, PAF's two-bar transcription of the drum pattern in the PAF Report is faulty in that it: (i) inaccurately notates the tambourine part (which is accurately transcribed in Appendix B of Bennett's affirmative report), (ii) "implies that the 'timbale 1' part is fixed and continuously repeated," when in fact the "timbale 1" tier is a "soloistic embellishment" (to use PAF's words) that "varies throughout" "Fish Market," and (iii) indicates that the "timbale 2" tier plays "a 32-stroke roll at the end of consecutive bars," which "is not present in any version" of any of Plaintiffs' Claimed Works (an error which PAF admitted at his deposition (PAF Dep. at 183:7-185:16) and in his own rebuttal report (PAF

Rebuttal at 13-14.)) Based on those (and other) errors, and because the "transcription does not contain a timestamp," which is "essential in all forensic musicology to enable all parties to identify what section of the music is being analyzed," Bennett concludes that "[b]y any accepted standard of forensic musicology…the [PAF] transcription is at worst misleading, and at best insufficiently thorough to serve its ostensible core purpose: identifying and highlighting original and protectable elements of a musical work." (Bennett Rebuttal at 3, 17-18.)

4. Notwithstanding PAF's conclusion that the drum patterns in "Dem Bow" and "Pounder" are also original because they "contain the shared musical elements" with "Fish Market" (and it is worth reiterating that Plaintiffs claim no compositional copyright in "Pounder" nor recording copyright in "Dem Bow"), PAF does not employ any actual methodology (*e.g.*, transcriptions) to compare "Dem Bow" and "Pounder" to "Fish Market," and thus, "does not provide any evidence for [his] claim."  Indeed, as noted by Bennett, if PAF had "compared them (through transcriptions), and identified and removed elements that appear in only one or two" of Plaintiffs' Claimed Works "(rather than present one transcription that mixes and matches elements that appear in one or two works but not all three), the resulting transcription would have revealed that all that is common to all three [of Plaintiffs' Claimed Works] are a habanera kick-snare and a 1 & 3 kick drum."[15]

Based on his critiques, Bennett's ultimate opinion in his rebuttal report was that the PAF Report "fail[s] to meet basic forensic musicology standards, relying on flawed methodology, inconsistent transcriptions, and unsupported originality claims.  [Its] lack of a Prior Art search undermines, indeed, negates, [its] conclusions. Key elements [it]

---

[15] Bennett also notes that that tom, hi-hat, and bass all "merely double the other parts and thus add no new rhythm."  (Bennett Rebuttal at 3.)

20

assert[s] as original are demonstrably commonplace in music predating FISH89, and [its] own transcriptions contradict [its] claims. [It] also fail[s] to distinguish between protectable composition and unprotectable performance or recording elements, rendering [its] arguments further unsubstantiated." (Bennett Rebuttal at 30).[16]

**D.**    **PAF's Rebuttal Of The Bennett Report Is Ineffective And Unreliable**

PAF's Rebuttal of Bennett's report is also unreliable and should be excluded because: (i) it does not employ any actual methodology, (ii) it does not specifically identify any errors or flaws in Bennett's transcriptions or analyses, (iii) it does not actually meaningfully engage with and analyze Bennett's myriad examples of prior art, and (iv) PAF actually concedes that various aspects of Plaintiffs' drum pattern exist in prior art or are commonplace but still refused to change or even re-examine his opinion that the drum pattern is original.

The Rebuttal offers four specific critiques of the Bennett Report, which ultimately lead PAF to "disagree with [Bennett's] opinions" and to decline to "change [PAF's] opinion that the Fish Market riddim is original." (PAF Rebuttal at 19.)

PAF's first critique of the Bennett Report (under the heading "Methodology") is that Bennett "states that he used stem demixing software to isolate drum and other rhythmic parts in the mix." PAF claims that these industry-standard software tools "struggle with precision" and have "limitations." (PAF Rebuttal at 4-5.) Beyond providing no support for this contention, PAF does not even identify (much less examine) any specific aspect of Bennett's analysis allegedly impacted by such supposed "limitations." Even after being given time off the record during his deposition to refresh his recollection, PAF could only vaguely cite an unspecified "problem" with Bennett's "tambourine line" and "the difference between a bass, a sample bass and a sample drum." (PAF Dep. at 229:8-

---

[16] Bennett's rebuttal report also notes that the specific verbiage of the PAF Report and the Finell Report is "identical to a large degree." PAF testified that he wrote his entire report, without any outside contribution. (PAF Dep. at 17:19–19:7, 20:15-16, 26:1-3.) Yet, PAF could not explain how the identical verbiage came to be. (*Id.* at 23:22–24:9.)

230:10, 236:9-239:5.)[17]  Further, as PAF acknowledged, "stem demixing software" was only one aspect of Bennett's methodology and analysis, which also included, among other things, "a technical analysis of each of the elements of" Plaintiffs' Claimed Words" and "traditional pen-and-paper transcription skills" (Bennett Report at 2-3; PAF Dep. at 239:11-240:6), as well as an extensive prior art analysis.  Thus, the supposed demixing issue has no effect on Bennett's analysis or conclusion.

PAF's second critique of the Bennett Report (under the heading "Harmonic and rhythmic patterns") takes issue with Bennett's "attempt to equate the 'Dembow' riddim with merely an existing kick/snare pattern." (PAF Rebuttal at 5-7.)  But during his deposition, PAF admitted that both a kick-snare habanera (as depicted and described on page 6 of the Bennett Report) and a kick-snare "surf beat" (as depicted and described on page 7 of the Bennett Report) are "common" and, while PAF did no prior art analysis, he admitted those patterns were used in prior art.  (PAF Dep. at 200:6-201:3, 202:2-13, 207:10-208:6.)  And, although PAF argues that the "Fish Market" kick-snare drum pattern is distinct from either a kick-snare habanera or a kick-snare surf beat because "the first note of the snare pattern is a [softer] ghost note," which is supposedly "integral" and "important" to the "overall riddim" (PAF Rebuttal at 10-11), PAF admitted that at least one of Bennett's prior art examples ("Mr. Rebel" by Eddie and the Showmen) also "contains a surf beat with a quieter first sixteenth note."  (PAF Dep. at 247:15–250:7, 256:14-18.)[18]

---

[17] Again, PAF and Browne both admitted that the tambourine line in the FM Deposit Copy was so indistinct it could not be transcribed without resorting to "implying" certain notes and/or referring to the "recreated," distinct, fabricated "stems."

[18] PAF tried at his deposition to contend that "Mr. Rebel" (and others of Bennett's prior art examples) do not qualify because the similar patterns were not used "all the way through the song" (whereas the drum pattern in "Fish Market" supposedly "repeats for the entire length of the song"), but PAF could not explain, elaborate on, or provide any foundation for the significance of this supposed distinction, and when pressed, PAF eventually simply gave up responding (after noting that he was "losing his thread" and "getting tired").  (PAF Dep. at 251:11-257:6.)

Moreover, Plaintiffs' other expert, Finell (who is a musicologist) stated in her rebuttal report that "[t]he level of volume of a particular sound in a recording as compared to another sound is a function of a performance, and not a property of the underlying composition." (Akley Decl., Ex. 14 ("Finell Rebuttal") at 7-8.) Given that that the *only* difference PAF identified between a surf beat and the "Fish Market" kick-snare drum pattern is the "quieter first sixteenth note" (PAF Dep. at 206:19-207:8), that difference is compositionally irrelevant. Thus, rather than rebut or refute Bennett's analysis, the PAF Rebuttal, consistent with Finell's analysis, actually confirms Bennett's point that the "core rhythmic pattern" of "Fish Market" (*i.e.*, the kick-snare habanera or surf beat) does in fact occur in prior art and was not originated by Plaintiffs in 1989. This point also has no effect on Bennett's analysis or conclusion.

PAF's third critique of the Bennett Report (under the heading "The Fish Market elements") expresses concern about Bennett's "decontextualization, isolation, and analysis of dissected individual elements in a vacuum," which PAF argues "misses the forest for the trees." (PAF Rebuttal at 8-17.) The crux of this section is PAF's superficial attempt to distinguish and refute the applicability of the element-specific prior art presented in the Bennett Report (which PAF addresses only summarily, in footnotes, without employing comparative transcriptions, and without meaningful explanation or analysis). Even on top of PAF's failure to employ any actual musicological (or other) methodology in this section, virtually all of PAF's purported prior art distinctions rely on: (i) strict adherence to the exact same rhythmic pattern (which ignores Bennett's point that Plaintiffs at least in part appear to be claiming rights in the "the idea of" certain rhythmic elements, rather than their specific pattern (Bennett Report at 17); (ii) instrument selection (which PAF was clear is "part of what [he] consider[s] creative and original about the Fish Market composition" (PAF Dep. at 119:16-120:10) and which are purely recording, not compositional, elements); and (iii) picayune and obscure and irrelevant musical concepts (*e.g.*, "the tom has a longer

23

envelope than that of a kick," "a 4/4 bar contains 16 sixteenth-note positions, each of which can be either a note or a rest…[which] results in $2^{16}$, or 65,536 possible combinations," "bass patterns are largely comprised of minims…not crotchets.")[19]

Moreover, PAF fully ignores Bennett's well-supported point that virtually all of the elements in the "Fish Market" drum pattern are commonplace musical building blocks. The kick and snare combination is either a habanera or a surf beat rhythm (depending on whether one considers the "ghost note" snare hits), and both rhythms existed long before "Fish Market." The bass synth, the hi-hat and the tom provide basic timekeeping beats which double the kick drum and each other (the hi-hat hitting all four same beats as the kick and the tom and bass synth hitting the same one and three hit by the kick) and thus add no additional rhythm. The remainder (the timbales and tambourine) are auxiliary and extraneous. (Bennett Report at 5-21.) In short, again, even setting aside that PAF's purported distinctions are both irrelevant and rely on elements that are recording elements and not compositional elements, PAF does not effectively rebut Bennett's extensive demonstration that each of the individual elements, alone and in combination, of the "Fish Market" composition drum pattern is commonplace and/or exists in prior art. PAF's criticism has no effect on Bennett's analysis or conclusion.

---

[19] For example, PAF goes to great lengths in distinguishing the entirety of the "Fish Market" drum pattern from the "drum lesson" and "1812 Overture" cited in the Bennett Report (PAF Rebuttal at 8-10), ignoring that both were employed by Bennett simply to show that the surf beat and four-on-the-floor kick drum patterns are common musical building blocks (Bennett Report at 10, 12), which, again, PAF himself admitted during his deposition. (PAF Dep. at 261:11-14, 208:2-6.) Likewise, PAF faults Bennett for treating the "bass note" as a rhythmic (rather than "pitched") element (even though PAF himself says the bass is part of the "Fish Market" "drum pattern" and admitted that it "serve[s] a rhythmic function" (PAF Report at 8; PAF Dep. at 258:8-12).) Indeed, Marshall confirmed that a pitch that does not change is rhythmic only. (Akley Decl., Ex. 15 ("Marshall Dep.") at 180-189.) PAF also raises meaningless technical quibbles with—but does not actually dispute—Bennett's observation that tambourines and timbales often play 8th and 16th note patterns which are auxiliary to the "rhythmic foundation" (to use PAF's expression) of a work. (PAF Rebuttal at 8, 12-14.)

PAF's final proffered critique of the Bennett Report (under the heading "Dr. Bennett's remaining 'prior art' references," PAF Rebuttal at 17-19) addresses Bennett's holistic prior art, which "demonstrates that not only are the individual rhythmic elements claimed by Plaintiffs not unique or original, but also the combination of the rhythmic elements.…is also not unique or original" and "exists in countless pre-1989 works." (Bennett Report at 22-34.)  Significantly, PAF admitted at his deposition that Bennett's characterization of the "Fish Market" drum pattern—"a habanera or Surf Beat, played over basic timekeeping patterns lasting one or two beats, with AUX parts combining 8th and/or 16th notes played on high frequency percussion instruments"— "does capture at least some aspect of Fish Market's rhythm" and that Bennett did provide prior art examples conforming to that characterization.  (PAF Dep. at 277:7– 280:6.)  And, as with PAF's response to Bennett's element-specific prior art, PAF does not employ any actual methodology to identify distinctions.

In fact, PAF only analyzes only two of Bennett's eight "combination" prior art examples ("Groove Master" and "Rock Lobster") in any sort of detail, and in both cases ignores many of the significant similarities shown in the Bennett Report (while acknowledging "[b]oth Groove Master and Fish Market include a cell that can be characterized as playing a habanera rhythm.")  (PAF Rebuttal at 18.)  PAF does not analyze Bennett's other eight combination prior art examples at all, undoubtedly because he has no meaningful response.

### III.   CONCLUSION

For the foregoing reasons, the Court should grant PC Defendants' motion, exclude the PAF Report, the PAF Rebuttal, and any testimony from PAF from the Court's consideration of the motion(s) for summary judgment, and grant Defendants such other and further relief as may be just and proper.

1    May 23, 2025

2                                **PRYOR CASHMAN LLP**

3                                By: */s/ Benjamin S. Akley*

4                                Donald S. Zakarin (*dzakarin@pryorcashman.com*)
                                 Frank P. Scibilia (*fscibilia@pryorcashman.com*)

5                                James G. Sammataro (*jsammataro@pryorcashman.com*)
                                 Benjamin S. Akley (*bakley@pryorcashman.com*)

6                                Shamar Toms-Anthony (*stoms-anthony@pryorcashman.com*)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28