1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10

11   CLEVELAND CONSTANTINE           No. 2:21-cv-02840-AB-AJR
     BROWNE, ET AL.,
12                                   **MEMORANDUM DECISION
                 Plaintiffs,         AND ORDER GRANTING IN
13                                   PART PLAINTIFFS' MOTION
          v.                         FOR SANCTIONS (DKT. 688)**
14
     RODNEY SEBASTIAN CLARK, ET
15   AL.,

16               Defendants.

17

18                        **I.**

19                 **INTRODUCTION**

20        This is a copyright dispute brought by four plaintiffs (the "Plaintiffs")

21   alleging direct infringement against 162 defendants (the "Defendants").[1]  (Dkt. 305

22   at 7-32, 36.)  Plaintiffs possess copyright ownership and U.S. registrations for the

23   musical works known as the *Fish Market* composition and sound recording, the

24   *Dem Bow* composition, and the *Pounder* sound recordings (and the composition

25

26   _____

27        [1] Plaintiffs' secondary copyright infringement claims were dismissed with leave
     to amend on May 28, 2024.  (Dkt. 421 at 37.)  Plaintiffs declined to file a third
28   consolidated amended complaint.

captured thereupon due to the composition being copied from *Fish Market*).  (Id. at 36.)  Plaintiffs allege that Defendants are responsible for the creation and exploitation of numerous infringing works which are identified in Exhibit A to the Second Consolidated Amended Complaint (the "Allegedly Infringing Works").  (Id.)

The parties have stipulated to a case administration order that directs this action to proceed in phases.  (Dkts. 142, 143.)  The case is currently in the "protectability/original authorship" phase, where the parties have agreed that they will engage in "limited fact and expert discovery concerning the common questions of whether Plaintiffs' works and/or portions thereof possess sufficient originality of authorship and are otherwise protectable under copyright law."  (Dkt. 142 at 4; Dkt. 143 at 2-3.)  Pursuant to a stipulation of the parties, the last day for both fact and expert discovery was on March 28, 2025.  (Dkt. 427 at 2.)  The parties later agreed to permit certain limited depositions after the Discovery Cut-Off.  (Dkts. 668, 670, 724.)

Currently before the Court is a dispute related to Plaintiffs' deposition of a key defense expert, Dr. Wayne Marshall.  On March 28, 2025, the Court held an informal discovery conference to discuss this dispute and set a briefing scheduling.[2] (Dkt. 679.)  On April 11, 2025, Plaintiffs filed a Motion for Sanctions (the "Motion").  (Dkt. 688.)  On April 18, 2025, Defendants filed an Opposition to Plaintiffs' Motion (the "Opposition").[3]  (Dkt. 697.)  On April 22, 2025, Plaintiffs

---

[2] Plaintiffs timely raised this issue given that the deposition occurred on March 26, 2025.  (Dkt. 688-4 at 2.)

[3] Defendants' Opposition contains a 30-page declaration from Donald S. Zakarin and at 14-page declaration from Kenneth D. Freundlich.  (Dkt. 697-1 at 1-30; Dkt. 697-2 at 1-14.)  Both of these declarations are obviously just oversized briefs disguised as declarations in violation of the Court's 10-page limit on discovery motions absent leave of the Court obtained in advance.  If Defendants believed they needed more than 10 pages, they should have filed a request and explained why they (cont'd . . .)

filed a Reply in Support of the Motion (the "Reply") as well as a Notice of Manual Filing.  (Dkts. 699, 700.)  The Notice of Manual Filing notified the parties that Plaintiffs had lodged with the Court three video clips of the deposition of Dr. Marshall (Exhibits E, F, and G).  (Dkt. 700.)  On April 29, 2025, defense counsel Donald S. Zakarin filed a Declaration in Response to the Reply (the "Zakarin Decl.").  (Dkt. 702.)  Mr. Zakarin states that it was necessary to file the declaration to respond to an accusation of perjury, made by Plaintiffs in their Reply, which is based on the video clips submitted concurrently with the Reply.  (Id. at 2.)  Mr. Zakarin states that "rather than seeking to strike [the] withheld video[,] [he] simply want[s] the Court to understand that" Plaintiffs' accusations of perjury are false. (Id. at 2-3 n.1.)  On May 2, 2025, Plaintiffs filed a Response to the Zakarin Decl. (the "Response"), contending that the Zakarin Decl. constituted an improper sur-reply.  (Dkt. 703.)  For the reasons set forth below, the Court hereby GRANTS IN PART the Motion such that the Court will impose monetary sanctions to reimburse Plaintiffs for the additional expenses incurred as a result of defense counsel's conduct.  (Dkt. 688.)

## II.

## RELEVANT BACKGROUND

On March 26, 2025, Plaintiffs took the deposition of defense expert Dr. Wayne Marshall.  (Dkt. 688-4 at 1.)  The deposition occurred remotely by video using the Remote Legal Platform offered by the deposition officer, Remote Legal. (Id. at 2-7.)  Benjamin Tookey took the deposition on behalf of Plaintiffs.  (Id. at 7.) Kenneth Freundlich and Donald Zakarin defended the deposition on behalf of different groups of defendants.  (Id. at 7-8.)  Dr. Marshall participated in the

---

needed more pages.  To the extent the Court does not address these declarations below, that is because the Court considers them to be in violation of the Court's page limits.

deposition from the Boston Park Plaza Hotel with both Mr. Freundlich and Mr. Zakarin in the room.  (Id. at 11.)  Several other defense counsel observed all or portions of the deposition remotely.  (Dkt. 697-3 at 2; Dkt. 697-4 at 2.)

Plaintiffs contend that Mr. Freundlich and Mr. Zakarin "grossly and knowingly transgressed" numerous discovery rules during the course of the deposition, in an effort to obstruct Mr. Tookey's ability to depose Dr. Marshall. (Dkt. 688 at 3.)  Specifically, Plaintiffs contend that Mr. Freundlich and Mr. Zakarin "interrupted questions, insisted their own questions be answered before allowing the witness to answer, coached the witness with speaking objections (and speaking without even objecting), supplied testimony themselves and to the witness, and lobbed personal attacks at [Mr. Tookey], all in a calculated and callous attempt to disrupt" the deposition.  (Id.)  Plaintiffs contend that Mr. Tookey "repeatedly requested that defense counsel stop testifying and making speaking objections[,]" but that defense counsel "refused and even mocked" Mr. Tookey.  (Id.)  Plaintiffs further contend that this behavior did not stop until "mid-deposition," when Plaintiffs' counsel served notice of an informal discovery conference seeking intervention from the Court.  (Id.)

Defendants vigorously dispute Plaintiffs' characterization of the deposition and contend that neither Mr. Freundlich nor Mr. Zakarin impeded, delayed, or frustrated Dr. Marshall's deposition.  (Dkt. 697 at 3-4.)  Specifically, Defendants contend that Plaintiffs rely on "intentionally misleading excerpts of the transcript, which omit all of the questioning that caused the objections to be lodged."  (Id. at 3.) Defendants further contend that Mr. Freundlich and Mr. Zakarin were repeatedly "involuntarily disconnected from the Zoom" during the deposition.  (Id. at 5.) Defendants contend that nearly all of the other defense counsel who were logged into the deposition had problems with the Remote Legal Platform.  (Id.)  Finally, Defendants note that Dr. Marshall was deposed for 6.5 hours on the record and the deposition did not conclude until Mr. Tookey advised that he had no more questions

4

for the witness.  (<u>Id.</u> at 4.)

### III.

### LEGAL STANDARD

Plaintiffs seek sanctions against Mr. Freundlich and Mr. Zakarin under Federal Rule of Civil Procedure 30(d)(2) and the Court's inherent powers.  (Dkt. 688 at 4.)  Under Rule 30(d)(2), "[t]he court may impose an appropriate sanction— including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." "Rule 30(d)(2) sanctions do not require a finding of bad faith."  <u>Lee v. Pep Boys-Manny Moe & Jack of California</u>, 2015 WL 9268118, at *3 (N.D. Cal. Dec. 21, 2015).  The advisory committee notes to Rule 30(d)(2) state that the rule "explicitly authorizes the court to impose the cost resulting from obstructive tactics that unreasonably prolong a deposition on the person engaged in such obstruction."  The notes further state that the "sanction may be imposed on a non-party witness as well as a party or attorney, but is otherwise congruent with Rule 26(g)."  Rule 26(g) states that when conduct violates the rule, the court "must impose an appropriate sanction[,]" which "may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  Fed. R. Civ. P. 26(g)(3).  Sanctions under Rule 30(d)(2) "may include attorney's fees [] incurred as a result of the improper conduct and the necessity of filing a motion with the Court."  <u>BNSF Ry. Co. v. San Joaquin Valley R. Co.</u>, 2009 WL 3872043, at *3 (E.D. Cal. Nov. 17, 2009). "[S]anctions for deposition conduct are discretionary."  <u>Batts v. Cnty. of Santa Clara</u>, 2010 WL 545847, at *3 (N.D. Cal. Feb. 11, 2010).

Courts also have inherent power to impose sanctions where a party has willfully disobeyed a court order, or where the party "has acted in bad faith, vexatiously, or for oppressive reasons."  <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 572 U.S. 545, 557 (2014) (internal quotation marks omitted).

5

"Because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Id. at 44-45. The requirement to show bad faith "sets a high threshold." Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997). This threshold may be met by "a variety of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." Fink v. Gomez, 239 F.3d 989, 994 (9th Cir. 2001). "It is the moving party's burden to demonstrate that the party against whom it seeks sanctions acted with the requisite bad faith or improper purpose." Lofton v. Verizon Wireless (VAW) LLC, 308 F.R.D. 276, 285 (N.D. Cal. 2015).

## IV.

## DISCUSSION

As set forth above, Plaintiffs contend that Mr. Freundlich and Mr. Zakarin repeatedly violated Rule 30 during the course of Dr. Marshall's deposition. (Dkt. 688 at 4.) As a remedy, Plaintiffs seek evidentiary sanctions precluding Dr. Marshall from testifying to any tainted or interfered-with lines of questioning. (Id. at 10-11.) Plaintiffs also seek monetary sanctions to compensate Plaintiffs for the costs and fees incurred in connection with Dr. Marshall's deposition and this Motion. (Id. at 12.) Finally, Plaintiffs seek an admonishment for defense counsel on how to comport themselves at future depositions as this case moves forward. (Id.) The Court will address each of Plaintiffs' alleged violations of Rule 30 below and then discuss appropriate remedies.

**A.** **Defense Counsel Violated Rule 30 By Making Lengthy And Argumentative Speaking Objections.**

Rule 30(c)(2) states that "[a]n objection must be stated concisely in a

6

nonargumentative and nonsuggestive manner."  "There is no proper need for the witness's own lawyer to act as an intermediary, interpreting questions, deciding which questions the witness should answer, and helping the witness to formulate answers."  Hall v. Clifton Precision, a Div. of Litton Sys., Inc., 150 F.R.D. 525, 528 (E.D. Pa. 1993) (footnote omitted).  "Speaking objections and coaching objections are simply not permitted in depositions in federal cases."  McDonough v. Kiniston, 188 F.R.D. 22, 24 (D.N.H. 1998).  Indeed, "[i]t is inappropriate for counsel to engage in extensive and unnecessary colloq[u]y, assert groundless objections, improperly object, or utilize any opportunity to interrupt and argue with opposing counsel during a deposition."  Luangisa v. Interface Operations, 2011 WL 6029880, at *7 (D. Nev. Dec. 5, 2011).  In other words, Rule 30 prohibits defending attorneys from "[c]oaching the witness, interrupting, giving long speeches, arguing with the examining attorney, and other misconduct[] [that] prejudices the other side's ability to depose the witness."  Hardin v. Mendocino Coast Dist. Hosp., 2019 WL 1855989, at *7 (N.D. Cal. Apr. 25, 2019).

Plaintiffs identify three examples of allegedly inappropriately lengthy and argumentative objections.  (Dkt. 688-2 at 4-5.)  The first example was in response to Mr. Tookey asking Dr. Marshall if his opinion would change based on a certain hypothetical:

MR. FREUNDLICH: Can you rephrase that, please?  It's just got too many negatives. And upon negatives, it's very hard to understand what we're trying to get at.

BY MR. TOOKEY:

Q      Dr. Marshall, do you understand the question?

MR. ZAKARIN: I'm going offer an objection. I think it's an objectionable question because you're asking him if we had the law in Moscow over originality, would this be okay, would this be original. I mean, (indiscernible) ask the question that presumes the law is not what the law is.

Are you asking something different than that?

(Dkt. 688-4 at 129:19-130:6.)

The second example was in response to Mr. Tookey asking Dr. Marshall to clarify a certain portion of his opinion:

> Q        Let's start with the exact combination. Let's start there.
> Did you find that in -- did you look at whether that exact combination, if its combination is original, even if the elements individually are not?
>
> MR. ZAKARIN: I've completely lost track what you mean by that exact combination.
>
> MR. FREUNDLICH: The witness has posited that that you were asking him about the exact instruments, which is the recording. Is that what your question is?
>
> MR. TOOKEY: Let's start there.
>
> BY MR. TOOKEY:
>
> Q        Okay. So, let -- Dr. Marshall, let's start there. I'm really – I'm not trying to, like, be tricky here. So --
>
> MR. ZAKARIN: Ben, I think that you are trying to be tricky, but I think that you're confusing instruments and a recording with a composition. And I think you're doing it repeatedly, but --

(Id. at 142:15-143:8.)

The third example was after Dr. Marshall had already answered Mr. Tookey's question about whether his opinion would change based on a certain hypothetical:

> MR. ZAKARIN: Let me just object an awkward objection, because when you're dealing with originality on a recording versus a composition, there's a difference. And I don't want it to get muddled in your questioning, because unless a recording copied a prior recording, duplicated it, it's going to be original. Because it's a – it's a separate recording, and you were asking him about a recording.

8

1    MR. TOOKEY: Mr. Zakarin, this is a speaking objection. If you have

2    an objection, you can state it, but this is – you're just speaking without even

3    objecting.

4    MR. ZAKARIN: No, I'm telling you that your question is improper,

5    wholly, because you're talking about a recording and you're misrepresenting

6    what is originality in a recording versus a composition. If you're going to do

7    that, I'm not going to let the witness answer at all. So I'm giving you a chance

8    to actually reframe your question so that it's an appropriate question under

9    copyright law. Otherwise, you're misleading the witness, and I'm not going to

10   allow that to happen.

11   MR. TOOKEY: Okay. If you continue to do these speaking objections,

12   I will involve Magistrate Richland (phonetic). I don't want to do that. Please

13   stop.

14   MR. ZAKARIN: I'd be delighted for Magistrate Richland to hear you

15   misrepresent recording and its originality versus a composition. I'd be

16   delighted.

17   (Id. at 107:3-108:7.)

18   Next, Plaintiffs identify three examples of Mr. Freundlich and Mr. Zakarin

19   allegedly improperly reframing the question for Dr. Marshall through a speaking

20   objection.  (Dkt. 688-2 at 5-6.)  The first example was in response to Mr. Tookey

21   asking a question before Dr. Marshall had a chance to respond:

22   MR. ZAKARIN: I don't understand the question.

23   MR. FREUNDLICH: Yeah.

24   MR. ZAKARIN: I'm objecting to that. Don't know the two things

25   you're talking about.

26   MR. FREUNDLICH: Please restate the question then.

27   (Dkt. 688-4 at 80:3-80:9.)

28   The second example was also in response to Mr. Tookey asking a question

9

before Dr. Marshall had a chance to respond:

> MR. FREUNDLICH: Objection to form. You want to put that back up if we're referring to it? So we see what we're talking about, please.

> BY MR. TOOKEY:

> Q    It's just what we were talking -- kick, kick, snare. Right? Just hitting on strictly the accented beats of a 3 plus 3 plus 2. Right? That's what we talking about is the floor.

> MR. FREUNDLICH: Yeah, I object to the question. Could you ask it a different way, please? Because I'm getting lost and when you refer to something that's not on the screen, it's confusing.

(Id. at 54:12-23.)

The third example was after Dr. Marshall had already begun answering Mr. Tookey's question:

> MR. FREUNDLICH: Objection. Objection [a]s to form. It's vague and ambiguous. Are you talking about what's in the SCAC or something different?

> BY MR. TOOKEY:

> Q    Okay. Dr. Marshall, I think you answered the question, though, that we're now at a place where you no longer think at that level, there is originality?

> A    Well, are you -- I -- I agree with Mr. Freundlich's question, which is, are we down to the – what's specified as the two measure loop in the SCAC here? Are you still talking about the full duration of the song?

(Id. at 28:4-15.)

Finally, Plaintiffs identify two examples of Mr. Freundlich and Mr. Zakarin allegedly making speeches about their views of the law and arguing with Mr. Tookey while Mr. Tookey was trying to question Dr. Marshall.  (Dkt. 688-2 at 6.) The first example was in response to Mr. Tookey asking Dr. Marshall to assume a

different definition of what makes a musical creation "original":

        MR. ZAKARIN: Functionally, Ben, you're asking him if the world were different than it is and prior art doesn't matter at all, you know, then would your opinion be different. That's what you're asking him. But the law is not different. The law is the law.

        MR. FREUNDLICH: Why is -- why is his opinion different for that matter?

        THE WITNESS: My opinion is not a legal opinion. My opinion is based on musical history.

(Dkt. 688-4 at 125:11-19.)

    The second example was in response to Mr. Tookey asking Dr. Marshall what definition of the term "original" he used in his report:

        MR. ZAKARIN: Objection. I'm not persuaded that what you just said represents reality as to the use of first or primary or in terms of original. So I think it's an improper question to ask.

        BY MR. TOOKEY:

        Q     Dr. Marshall, do you understand the question I'm asking?

        MR. FREUNDLICH: It also calls for a legal conclusion.

        MR. ZAKARIN: Agreed.

(Id. at 120:7-16.)

    Defendants contend that these "objections were proper to ensure the record was clear and to prevent Mr. Tookey from using improper repetitive questioning to muddle the record." (Dkt. 697 at 8.) However, the Court has reviewed the transcript of the deposition, including the questioning that preceded the objections set forth above, and rejects Defendants' contention that their objections were justified. Regardless, even assuming that Mr. Tookey had asked too many repetitive questions, the proper response would have been a brief objection that the question had been "asked and answered," or an "objection as to form," not a lengthy and

argumentative speaking objection as occurred here.  See Fed. R. Civ. P. 30(c)(2).  Moreover, the fact that a question has been asked and answered, is vague and ambiguous, or even irrelevant, is not a valid basis to prevent a witness from answering.  See In re Toys R Us-Delaware, Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig., 2010 WL 4942645, at *9 n.12 (C.D. Cal. July 29, 2010) ("An attorney may not instruct a witness not to answer a question on the ground that it has been asked and answered, is vague and ambiguous or is irrelevant.").  Yet, that is exactly what Mr. Zakarin and Mr. Freundlich were trying to do.  (See Dkt. 688-4 at 107:19-20 ("I'm not going to let the witness answer at all."); id. at 54:20-21 ("Yeah, I object to the question. Could you ask it a different way, please?").)

With regard to Mr. Freundlich's and Mr. Zakarin's objections related to hypothetical questions posed by Mr. Tookey, it is well-established that experts may testify in response to hypothetical questions, even at trial.  See Fed. R. Evid. 703, Notes of Advisory Committee on 1972 Proposed Rules; see also Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) ("[T]he use of leading, hypothetical questions to elicit expert opinions is entirely appropriate.").  It is also entirely appropriate to question an expert about the assumptions they relied upon in forming their opinions.  See Fed. R. Civ. P. 26(b)(4)(C)(iii).  Thus, the Court easily concludes that Mr. Freundlich and Mr. Zakarin violated Rule 30 by making the speaking objections set forth above.  See Hardin, 2019 WL 1855989, at *7 ("[Defense counsel] are not allowed to make long, argumentative objections, or reframe the question for the witness, or make speeches about the irrelevance of the examining attorney's questions, or get into arguments with the other side.").

## B.    Defense Counsel Violated Rule 30 By Testifying For Dr. Marshall.

In addition to complaining about lengthy and argumentative speaking objections, Plaintiffs identify nine examples of Mr. Freundlich and Mr. Zakarin testifying for Dr. Marshall, as well as one example where either Mr. Freundlich or

12

Mr. Zakarin actually prompted Dr. Marshall with the answer.  (Dkt. 688-2 at 2-4.) The first example was in response to Mr. Tookey asking Dr. Marshall about the bass element throughout Fish Market:

> MR. FREUNDLICH: The bass tones themselves speak for themselves. I don't know what kind of harmonic shift you're indicating. You said there's a B-flat and an occasional foray onto E-flat.
>
> MR. TOOKEY: Okay. Ken, if you are --
>
> MR. FREUNDLICH: Or --
>
> MR. TOOKEY: -- not testifying, you can just say your objection.
>
> MR. FREUNDLICH: That's --
>
> MR. TOOKEY: I just clarified.
>
> MR. FREUNDLICH: Again --

(Dkt. 688-4 at 26:17-27:2.)

The second example was in response to Mr. Tookey asking Dr. Marshall about a figure contained in an article he authored:

> Q      Right. And these are the same lines that we just looked at in Figure 6 a moment ago. Right?
>
> MR. FREUNDLICH: Objection. They're not the same.
>
> THE WITNESS: Well, it doesn't include the bass, but the kick, snare, and timbale parts are identical to what we just looked at.

(Id. at 74:21-75:2.)

The third example was in response to Mr. Tookey asking Dr. Marshall about the basis for his opinion that a certain combination was not original:

> Q      Right. So what I'm asking is, is it your opinion that this is not original because each element is too simple and can be found in prior art?
>
> MR. FREUNDLICH: Objection as to form, misstates testimony.
>
> MR. ZAKARIN: Asked and answered it. And you're asking him now to recharacterize his answer. Why don't you just give your answer as to why

you think it's not whatever is original?

(Id. at 73:7-15.)

The fourth example was in response to Mr. Tookey asking Dr. Marshall if his opinion would change in response to a hypothetical:

> Q    Okay. And if the definition of original was different, that would not change your opinion?

> MR. ZAKARIN: I'm just going to object to that. It's just such an improper question. You're asking him if the law is not what the law is, would your opinion change. It's not even a hypothetical. It's an objectionable question.

> MR. FREUNDLICH: And he's testified the definition he used, it's in his report.

(Id. at 131:12-20.)

The fifth example was in response to Mr. Tookey asking Dr. Marshall about the assumptions underlying his opinion:

> Q    And so if -- so, actually, let me -- let me ask it this way. So the characterization of a base element as bass tones versus a base line changes your originality analysis. Am I understanding that correctly?

> MR. ZAKARIN: I don't understand the question.

> MR. FREUNDLICH: And he never said that.

> MR. ZAKARIN: I don't understand the question. And the baseline is not part of your claim to begin with, unless you're adding to your claim yet again.

> MR. TOOKEY: Don, I'm going to keep asking you to stop testifying and stop with the speaking objections.

> MR. ZAKARIN: And I'm going to ask you not to ask the witness questions about elements that are not in your claim.

(Id. at 193:19-194:11.)

14

The sixth example was also in response to Mr. Tookey asking Dr. Marshall about the assumptions underlying his opinion:

> MR. FREUNDLICH: Objection. You've got an answer to the question. Don't try and put words into this. It's been asked and it's been answered five different -- six different ways now.
>
> MR. ZAKARIN: You have no melodic claim in the complaint. You're now trying to, as you have repeatedly, morph that one note into a melodic claim. Is that -- is that the gambit as (indiscernible)?
>
> MR. TOOKEY: Don, you've got to stop testifying and you've got to stop with the speaking objections.
>
> MR. ZAKARIN: You've got to stop changing what's in your complaint because what's in your complaint doesn't work.

(Id. at 188:21-189:10.)

The seventh example was in response to Mr. Tookey asking Dr. Marshall if his opinion would change in response to a hypothetical:

> MR. ZAKARIN: Let me also object to the characterization of base pattern.
>
> THE WITNESS: Right.
>
> MR. ZAKARIN: As opposed to base tones.
>
> MR. TOOKEY: I --
>
> THE WITNESS: Yeah, it's hardly a pattern.
>
> MR. TOOKEY: So I don't -- Don, I'm having trouble hearing you, but it sounded like you just offered testimony again. Please stop doing that. You can state your objection succinctly.
>
> MR. ZAKARIN: Your – I'll try to say it louder. Your reference to patterns is self-serving. There was no testimony about patterns. He's testified about a bass tone. So the question mischaracterizes what he said to you at great length. I hope you heard that.

15

(<u>Id.</u> at 219:8-24.)

The eighth example was again in response to Mr. Tookey asking Dr. Marshall about the assumptions underlying his opinion:

> Q      I'm asking is that the basis on which you disregarded the base element as a melodic or a harmonic element?
>
> MR. ZAKARIN: Is what the basis?

(<u>Id.</u> at 184:11-14.)

The ninth example was again in response to Mr. Tookey asking Dr. Marshall if his opinion would change in response to a hypothetical:

> Q      So my question is, using that definition, would the opinion you reached be that, yes, there is originality here?
>
> MR. ZAKARIN: Already testified, Ben, that he wasn't in the studio when Fish Market was created. So he has no way of addressing one portion of your definition.
>
> THE WITNESS: That is true. I cannot speak to independent creation here.
>
> BY MR. TOOKEY:
>
> Q      Okay. So -- all right. You're adopting your counsel's testimony?
>
> A      No, that's by your definition.
>
> MR. ZAKARIN: This was his testimony early on in the deposition. I'm old, but my memory will go back three hours.

(<u>Id.</u> at 126:9-24.)

Finally, Plaintiffs identified an example where either Mr. Freundlich or Mr. Zakarin actually prompted Dr. Marshall with the answer:

> Q      So what I'm asking about is if you heard that particular combination in prior music. Not sub combinations, not elements individually, that particular combination.
>
> A      Okay. So bass and tom on 1 and 3. 4, 4 kick, 3 plus 3 plus 2

1   snares, clave resembling timbale line. And then what else do we have? The

2   hi-hat. The tom. I -- I think if you want to get down to matters of arrangement

3   in individual instruments, then it is a different question because I think a lot of

4   those same instrumental roles and a lot of those same even rhythms can be

5   found, for example, in a lot of Cuban music, but maybe not using a drum kit

6   or an emulation of a drum kit. Right?

7   (Dkt. 688-4 at 144:5-18.)  The transcript quoted above does not reflect the

8   prompting by defense counsel.  However, the video clip of this testimony clearly

9   demonstrates that when Dr. Marshall was answering the question, he began his

10   answer and then appeared to ask himself aloud, "And then what else do we have?"

11   and someone else in the room clearly says in response, "the hi-hat."  (Dkt. 699-1 at

12   2, Exh. E; Dkt. 700 at 1.)  Dr. Marshall then quickly resumes his testimony by

13   identifying "the hi-hat" as part of his remaining answer to the question.  (Id.)  The

14   video does not show who prompted Dr. Marshall by saying "the hi-hat" off camera,

15   except that it was not Dr. Marshall because the video shows him on camera hearing

16   the prompt.  (Id.)  However, it is undisputed that the only two individuals in the

17   hotel room with Dr. Marshall were Mr. Freundlich and Mr. Zakarin.  (Dkt. 697-1 at

18   6; Dkt. 697-2 at 5.)  Therefore, the Court concludes that either Mr. Freundlich or

19   Mr. Zakarin must have been the source of the statement off camera to Dr. Marshall

20   while he was answering Mr. Tookey's question.  This is obviously improper.  See

21   Luangisa, 2011 WL 6029880, at *7 ("Deposition testimony should be that of the

22   deponent, not a version edited or glossed by the deponent's lawyer through coaching

23   or speaking objections.").

24   In response to Plaintiffs' contention that the video clip clearly shows someone

25   providing Dr. Marshall with the answer, "the hi-hat," Mr. Zakarin filed a declaration

26   stating that he has "listened several times to the clip and [he] do[es] not hear that

27   clearly on the video and it does not exist in the transcript."  (Dkt. 702 at 3.)  Mr.

28   Zakarin further states that "even assuming that the words 'hi-hat' were uttered, it

17

was not an answer to any question asked by Mr. Tookey.  Instead, at most, it was reminding Dr. Marshall, in response to what is clearly his question to himself, of an element he had just identified on page 142 of the transcript."  (Id.)  Like Mr. Zakarin, the Court has also reviewed the video clip many times and concludes that someone off camera (either Mr. Freundlich or Mr. Zakarin) clearly prompts Dr. Marshall with the answer, "the hi-hat."  (Dkt. 699-1 at 2, Exh. E; Dkt. 700 at 1.) Therefore, whether the off-camera prompt was the answer to Mr. Tookey's question or simply a reminder to Dr. Marshall of something he previously testified, the statement was clearly improper and the Court rejects Defendants' attempts to excuse the conduct.

The Court similarly concludes that the prior nine examples of Mr. Freundlich and Mr. Zakarin testifying for Dr. Marshall establish a pattern of improper conduct at the deposition.  "In short, depositions are to be limited to what they were and are intended to be: question-and-answer sessions between a lawyer and a witness aimed at uncovering the facts in a lawsuit. When a deposition becomes something other than that because of the strategic interruptions, suggestions, statements, and arguments of counsel, it not only becomes unnecessarily long, but it ceases to serve the purpose of the Federal Rules of Civil Procedure: to find and fix the truth."  Hall v. Clifton Precision, a Div. of Litton Sys., Inc., 150 F.R.D. 525, 531 (E.D. Pa. 1993) (footnote omitted).  As set forth above, Mr. Freundlich and Mr. Zakarin violated Rule 30 by interposing their own answers to Mr. Tookey's questions framed as speaking objections.  This is clearly improper and the Court once again rejects Defendants' attempts to excuse the conduct.  See Luangisa, 2011 WL 6029880, at *7 ("The witness's own counsel should not interpret questions, decide what to answer, or help the witness answer questions.").

## C.    Mr. Zakarin's Comment Was Unprofessional And Immature.

In addition to complaining about the aforementioned violations of Rule 30, Plaintiffs contend that Mr. Zakarin violated the Central District's Civility and

18

Professionalism Guidelines.  (Dkt. 688 at 10.)  Specifically, Plaintiffs contend that
Mr. Zakarin "resorted to petty name-calling—he referenced a 'sleaze factor' after
[Mr.] Tookey impeached [Dr.] Marshall with [Dr.] Marshall's own prior
statement—as well as other unbecoming conduct, such as speaking over [Mr.]
Tookey during questioning and preventing [Mr.] Tookey from asking questions until
[Mr.] Tookey answered [Mr.] Zakarin's questions."  (Id. (citation omitted).)  The
transcript of the exchange in questions is set forth below:

> Q      Okay. So it's fair to say, then, that you think the claim that is
> being asserted is -- just does not have merit?
>
> A      Not when we're talking about 3,000 songs. That doesn't --
>
> Q      Okay.
>
> A      Even -- I mean, let's talk about the – the initial song that was
> named, Dame tu Cosita. To my ears, that only has the boom-ch-boom-chick
> and occasionally bass that hits on 1 and 3. Doesn't have a tom, it doesn't have
> a timbale, certainly doesn't have a tambourine. Or it has a tambourine, but it
> only plays on the backbeat, which, you know, you're going to have to take
> that up with lots of churches if you want to own that.
>
> MR. TOOKEY: All right. So I'm going to mark this next exhibit as
> Exhibit 78.
>
> (Exhibit 78 marked for identification.)
>
> BY MR. TOOKEY:
>
> Q      Dr. Marshall, do you know who Danny Booten is?
>
> A      I do.
>
> Q      Who is Danny Booten?
>
> A      My understanding is that Danny Booten has done some amount
> of artist management for Steely and Clevie over the years. I was first
> introduced to Danny Booten in 2020 when he asked me if I could help him
> locate my video montage that you played for me a little bit earlier of the

1    different Dem Bow versions.

2        Q    Understood. Do you recognize what's been marked as Exhibit 78

3    as an email exchange you had with Mr. Booten?

4        A    Yes, I do. Yes, I do. I recall this – this exchange from 2021.

5    MR. ZAKARIN: Did you produce this – this document to us?

6    THE WITNESS: No.

7    MR. ZAKARIN: No, I'm not talking about --

8    THE WITNESS: Oh, sorry.

9    MR. ZAKARIN: I'm talking to them.

10    THE WITNESS: I see.

11    MR. ZAKARIN: You produced this document to us, Ben?

12    BY MR. TOOKEY:

13        Q    Okay. So, Dr. Marshall, my --

14    MR. ZAKARIN: Ben, I --

15    MR. TOOKEY: -- my --

16    MR. ZAKARIN: I asked you a question. You're using a document and

17    I just asked you, have you produced it to us? Mr. Booten's deposition was

18    taken. Was this document produced?

19    MR. TOOKEY: Mr. Zakarin, if you have an objection, you can state it.

20    MR. FREUNDLICH: I'll put it another way. Why didn't you produce it

21    to us? Instead of doing this the way you're doing, which is wholly and

22    entirely improper in an expert deposition.

23    MR. ZAKARIN: Okay.

24    MR. TOOKEY: So Mr. Marshall –

25    MR. ZAKARIN: (Indiscernible) the sleaze factor that they're using

26    documents they haven't produced, but there's nothing new now. Go ahead,

27    Ben, ask your questions.

28    BY MR. TOOKEY:

20

Q       So, Dr. Marshall, so you say in this email exchange, Of course I could never take the other side against Clevie in this case. Do you see that?

A       That's right. I wrote that in -- in 2021, and that's how I felt about it because of my great admiration for Clevie.

Q       And you said a couple sentences later, I do think there's merit in his claim of ownership over what has come to be known as the dembow, not to mention various other derivative works based on Fish Market's various elements, though I also believe it will be a challenging argument to make. Do you see that?

A       Yes.

(Dkt. 688-4 at 159:17-162:18.)

Defendants contend that Mr. Zakarin's "sleaze factor" utterance was justified in response to Mr. Tookey questioning Dr. Marshall about two email communications that had not been previously produced.  (Dkt. 696 at 9.)  Thus, Defendants contend that Mr. Tookey's "conduct is accurately described by Mr. Zakarin's comment."  (Id. at 10.)  The Court once again rejects Defendants' attempt to excuse the conduct of defense counsel.  This comment by Mr. Zakarin is clearly unprofessional and immature.

The Central District of California has adopted a set of Civility and Professionalism Guidelines that are published on the Court's website.[4]  As noted in the Preamble, the purpose of the guidelines is "to encourage us, the members of the bench and bar, to act towards each other, our clients, and the public with the dignity and civility that our profession demands."  The Central District "expect[s] that judges and lawyers will voluntarily adhere to these standards as part of a mutual commitment to the elevation of the level of practice in our courts."  However, the

_____

[4] See https://www.cacd.uscourts.gov/attorneys/admissions/civility-and-professionalism-guidelines (last amended January 10, 2022).

21

Preamble also cautions that "[t]hese guidelines shall not be used as a basis for litigation or for sanctions or penalties." Therefore, the Court declines for now to apply the Civility and Professionalism Guidelines as an enforceable basis for sanctions, but will direct Mr. Zakarin to carefully read the guidelines and file a declaration notifying the Court of his compliance. Should further unprofessional and immature behavior occur in this case, the Court reserves the right to begin enforcing the Civility and Professionalism Guidelines as a basis for sanctions.

**D.    The Court Will Impose Monetary Sanctions, Not Evidentiary Sanctions.**

As set forth above, the Court "may impose an appropriate sanction— including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2). Courts employ a two-step process when determining an appropriate sanction under Rule 30: (1) "the court must determine whether a person's behavior has impeded, delayed, or frustrated the fair examination of the deponent"; and (2) "the court must impose an appropriate sanction." Dunn v. Wal-Mart Stores, Inc., 2013 WL 5940099, at *1 (D. Nev. 2013) (internal quotation marks omitted). Courts have wide discretion to determine an appropriate sanction. See, e.g., Yeti by Molly, Ltd. v. Deckers, 259 F.3d 1101, 1106 (9th Cir. 2001).

Based on the Court's thorough review of the deposition transcript as set forth above, the Court easily concludes that Mr. Freundlich's and Mr. Zakarin's conduct delayed and at least temporarily impeded the fair examination of Dr. Marshall. For example, it is obvious from the portions of the transcript set forth above that Mr. Freundlich's and Mr. Zakarin's conduct prevented Dr. Marshall from answering certain of Mr. Tookey's questions. However, it does not appear that this conduct actually prevented Mr. Tookey from completing the deposition and ultimately asking Dr. Marshall all the questions Mr. Tookey wanted to ask. As just one of many examples, Mr. Freundlich and Mr. Zakarin both posed inappropriate speaking objections to Mr. Tookey's question about whether Dr. Marshall's opinion would

22

change if novelty were not required for a musical work to qualify as original.  (Dkt. 688-4 at 129:19-130:6.)  As set forth above, the speaking objections at least temporarily prevented Dr. Marshall from answering Mr. Tookey's question, but Mr. Tookey was eventually able to continue the line of questioning and asked several similar questions that Dr. Marshall ultimately answered.  (Id. at 130:8-131:11.)  This pattern of delay and inappropriate objections continued throughout the deposition, as set forth above, but Mr. Tookey was ultimately able to pursue his various lines of questioning.  Indeed, Mr. Tookey advised that he had no more questions for Dr. Marshall after about 6.5 hours on the record.  (Id. at 276.)  There was time remaining for Mr. Tookey to continue questioning Dr. Marshall, but Mr. Tookey declined.  (Id. at 277.)

Plaintiffs contend that "[e]videntiary sanctions are necessary because lesser sanctions such as a second deposition without [Mr.] Freundlich or [Mr.] Zakarin present will not cure the issues."  (Dkt. 688 at 11.)  Plaintiffs explain that Dr. Marshall's "testimony was befouled not by instructions not to answer but by his counsel providing answers."  (Id.)  Thus, Plaintiffs seek an evidentiary sanction precluding Dr. Marshall from testifying to any tainted or interfered-with lines of questioning.  (Id. at 10.)

However, "[e]vidence preclusion is a 'harsh' sanction that requires a finding of willfulness, fault or bad faith and consideration of the availability of lesser sanctions."  City of Pomona v. Sociedad Quimica Y Minera De Chile SA, 2020 WL 13357216, at *3 (C.D. Cal. Nov. 10, 2020).  Based on the Court's thorough review of the deposition transcript as set forth above, the Court concludes that evidentiary sanctions are not sufficiently justified.  For example, the Court concluded above that either Mr. Freundlich or Mr. Zakarin actually prompted Dr. Marshall with the answer to a question by stating, "the hi-hat," off camera.  (Dkt. 699-1 at 2, Exh. E; Dkt. 700 at 1.)  However, Defendants correctly point out that Dr. Marshall had already testified that the hi-hat was an element of prior art he had heard.  (Dkt. 688-

23

4 at 143:12-24.)  Therefore, it does not appear that Mr. Freundlich or Mr. Zakarin actually caused Dr. Marshall to testify in a way that was inconsistent with the opinions he had already expressed during his deposition.

This is one of many examples, but the Court believes this example is illustrative of the broader transcript showing that defense counsel's inappropriate objections and commentary did not ultimately cause Dr. Marshall to change his testimony.  Thus, the Court concludes that evidentiary sanctions are not warranted.  See, e.g., L.A Terminals, Inc. v. City of Los Angeles, 2023 WL 2628242, at *9 (C.D. Cal. Feb. 15, 2023) ("While LAT's argument regarding the impropriety of passing a note to an expert witness during a deposition question is well taken, the Court determines that exclusion of Dr. Odencrantz's testimony on improper coaching grounds is unwarranted because it appears at least plausible that Dr. Odencrantz's opinions were his own and that his lapse at the deposition was due to the onset of Dr. Odencrantz's illness, his related fatigue, and the vast quantity of documents in this case.").

Instead, the Court will impose monetary sanctions to reimburse Plaintiffs for the additional expenses incurred as a result of Mr. Freundlich's and Mr. Zakarin's conduct.  See Lee, 2015 WL 9268118, at *6 ("[C]ourts have awarded attorney's fees for an impeded deposition where counsel engaged in repeated, unnecessary objections that slowed the progress of the examination, impeded the flow of information from the witness, and unnecessarily prolonged the proceedings." (internal quotation marks omitted)).  These additional expenses may include expenses related to Dr. Marshall's deposition, as well as the briefing on the instant Motion.

The Court does not currently have evidence of Plaintiffs' additional expenses as a result of Mr. Freundlich's and Mr. Zakarin's conduct.  Accordingly, the Court will permit Plaintiffs 14 days to submit a declaration with supporting documents establishing these additional expenses.  Defendants shall have 14 days to respond to

the declaration if Defendants contend that the Court should not award reasonable expenses, or the amount of expenses sought by Plaintiffs. Because Mr. Freundlich and Mr. Zakarin were representing only certain defendants in the action, the Court intends to impose the award of reasonable expenses jointly and severally on Mr. Freundlich, Mr. Zakarin, and their clients only. The Court also encourages the parties to attempt to resolve this issue amongst themselves through informal negotiation because the Court does intend to award reasonable expenses.

The Court notes that Plaintiffs do not seek a further deposition of Dr. Marshall, (Dkt. 688 at 10-11), and the Court does not believe that a further deposition would be helpful given the Court's conclusion that Mr. Tookey was ultimately able to pursue his various lines of questioning. The Court is also mindful of the deadlines in this case and the fact that summary judgments motions with regard to this phase have already been filed. (Dkt. 706.) However, the Court agrees with Plaintiffs that guidance for future depositions in future phases is warranted. (Dkt. 688 at 12.) As set forth above, the Court expects the parties to both comply with Rule 30 as well as to behave in a professional and courteous manner. If the parties need assistance enforcing these expectations, they are invited to reach out to chambers by email for an informal discovery conference on short notice. If the parties are unable to comply with these expectations at depositions, the Court will utilize a variety of corrective actions including, but not limited to: (1) requiring the parties to provide a Zoom link for remote deposition so the Court can observe and supervise; (2) requiring the parties to conduct in-person depositions in the courtroom; (3) requiring the parties to pay a special master to supervise depositions; (4) requiring the party at fault to pay the cost of the deposition, including attorneys' fees; (5) requiring the party at fault to pay the costs of additional depositions, including attorneys' fees; and (6) requiring the client and/or client representatives of the party at fault to appear at Court hearings to discuss the inappropriate behavior of counsel. The Court notes that it needs time to impose these remedies. Therefore,

1    the parties are reminded of the need to schedule depositions well in advance of the

2    Discovery Cut-Off so that there is time to seek relief from the Court.

3

4                                              **V.**

5                                       **CONCLUSION**

6            Consistent with the foregoing, Plaintiffs' Motion is GRANTED IN PART

7    such that the Court will impose monetary sanctions to reimburse Plaintiffs for the

8    <u>additional</u> expenses incurred as a result of Mr. Freundlich's and Mr. Zakarin's

9    conduct.  These <u>additional</u> expenses may include expenses related to Dr. Marshall's

10   deposition, as well as the briefing on the instant Motion.  Because Mr. Freundlich

11   and Mr. Zakarin were representing only certain defendants in the action, the Court

12   intends to impose the award of reasonable expenses jointly and severally on Mr.

13   Freundlich, Mr. Zakarin, and their clients only.

14           Plaintiffs shall have 14 days to submit a declaration with supporting

15   documents establishing these additional expenses.  Defendants shall have 14 days to

16   respond to the declaration if Defendants contend that the Court should not award

17   reasonable expenses, or the amount of expenses sought by Plaintiffs.  The Court also

18   encourages the parties to attempt to resolve this issue amongst themselves through

19   informal negotiation because the Court does intend to award reasonable expenses.

20           Finally, Mr. Zakarin is directed to carefully read the Central District's Civility

21   and Professionalism Guidelines and file a declaration notifying the Court of his

22   compliance within 14 days.

23           IT IS SO ORDERED.

24

25   DATED:  June 12, 2025          _____

26                                          HON. A. JOEL RICHLIN
                                        UNITED STATES MAGISTRATE JUDGE
27

28